TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

ERIKA NORMAN (CA State Bar No. 268425)
Trial Attorney
Natural Resources Section
MICHELLE SPATZ
Trial Attorney
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:  (202) 305-0475 (Norman)
        (202) 598-9741 (Spatz)
Fax:     (202) 305-0506
Erika.norman@usdoj.gov
Michelle.spatz@usdoj.gov

*Attorney for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| FRIENDS OF THE CLEARWATER | ) | Case No. 3:21-cv-189 |
| | ) | |
| Plaintiff, | ) | **FEDERAL DEFENDANTS'** |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| v. | ) | **COMBINED CROSS-MOTION FOR** |
| | ) | **SUMMARY JUDGMENT AND** |
| CHERYL F. PROBERT, in her official | ) | **OPPOSITION TO PLAINTIFF'S** |
| capacity as Forest Supervisor of the Nez | ) | **MOTION FOR SUMMARY** |
| Perce-Clearwater National Forests; and U.S. | ) | **JUDGMENT (ECF No. 27)** |
| FOREST SERVICE. | ) | |
| | ) | |
| Federal Defendants. | ) | |
| | ) | |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

LEGAL BACKGROUND ................................................................................................... 2

    A.    National Forest Management Act .......................................................................... 2

    B.    National Environmental Policy Act ...................................................................... 3

    C.    Endangered Species Act ........................................................................................ 4

    D.    Summary Judgment Standard of Review Under APA............................................ 5

FACTUAL BACKGROUND ............................................................................................. 6

    A.    End of the World Project ....................................................................................... 6

    B.    Hungry Ridge Restoration Project ........................................................................ 9

    C.    "No Effect" Determination for Grizzly Bears ..................................................... 11

ARGUMENT ................................................................................................................... 13

    A.    The Projects Comply with NFMA. ..................................................................... 13

        1.    The Projects are Consistent with Forest Plan Appendix N...................... 14

            a.    The Forest Service's Use of the Green NIOG Criteria is Consistent with the Forest Plan. ................................................. 18

            b.    The Forest Service's Inclusion of MA20 is Consistent with the Forest Plan............................................................................... 21

        2.    The Forest Service's "Upward Trend" Findings are Consistent with Appendix A and not Arbitrary and Capricious. ........................................ 23

    B.    The Projects Comply with NEPA. ...................................................................... 28

        1.    The Forest Service Took the Requisite "Hard Look" at Environmental Impacts. .......................................................................... 28

            a.    Forest Health and Wildfire Risk ................................................. 29

            b.    Fisher and Wildlife ..................................................................... 34

            c.    Snake River Steelhead ................................................................ 37

            d.    Mill Creek .................................................................................. 40

i

2.      There are no NEPA Violations Tiered to NFMA or ESA Violations....... 41

3.      The Forest Service Adequately Analyzed Cumulative Effects................ 42

C.     An EIS is Not Required for End of the World...................................................... 43

1.      The "Context" of End of the World Does Not Require an EIS. .............. 45

2.      Effects are not Highly Controversial and Highly Uncertain.................... 45

D.     The Forest Service More than Satisfied its ESA Obligations and the Record
Supports its "No Effect" Determination for Grizzly Bear. .................................. 46

1.      The Record Supports the Forest Service's "No Effect" Finding. ............ 47

2.      The Forest Service Met and Exceeded Its Consultation Obligations
Under Section 7 of the ESA..................................................................... 48

3.      The Forest Service Reasonably Considered "Occupancy" in its
Effects Determination. ............................................................................. 49

4.      The Forest Service Sufficiently Considered Bear Security and
Human-Grizzly Conflicts in Reaching its "No Effect"
Determination. ......................................................................................... 51

E.     Should the Court Grant Any Relief, Federal Defendants Request the
Opportunity for Further Briefing on Remedy. ...................................................... 54

CONCLUSION............................................................................................................................... 55

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Bradford*,
  856 F.3d 1238 (9th Cir. 2017) ............................................................................ 2

*All. for the Wild Rockies v. Bradford*,
  864 F. Supp. 2d 1011 (D. Mont. 2012) ......................................................... 53, 54

*All. for the Wild Rockies v. Kruger*,
  950 F. Supp. 2d 1172 (D. Mont. 2013) .............................................................. 51

*All. for the Wild Rockies v. Pena*,
  865 F.3d 1211 (9th Cir. 2017) .......................................................................... 34

*All. for the Wild Rockies v. Savage*,
  375 F. Supp. 3d 1152 (D. Mont. 2019) .............................................................. 55

*All. for the Wild Rockies v. U.S. Forest Serv.*,
  907 F.3d 1105 (9th Cir. 2018) ..................................................................... 20, 21

*Anderson v. Evans*,
  371 F.3d 475 (9th Cir. 2004) ........................................................................... 45

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*,
  126 F.3d 1158 (9th Cir. 1997) ............................................................................ 4

*Bark v. Northrop*,
  607 F. App'x 652 (9th Cir. 2015) ...................................................................... 44

*Bark v. U.S. Bureau of Land Mgmt.*,
  643 F. Supp. 2d 1214 (D. Or. 2009) .................................................................. 43

*Bark v. U.S. Forest Serv.*,
  393 F. Supp. 3d 1043 (D. Or. 2019) .............................................................. 33, 46

*Bark v. U.S. Forest Serv.*,
  958 F.3d 865 (9th Cir. 2020) ........................................................................... 33

*Bay Neighborhood Council, Inc. v. Karlen*,
  444 U.S. 223 (1980) ......................................................................................... 4

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
  524 F.3d 938 (9th Cir. 2008) ........................................................................... 29

*Blue Mountains Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) .......................................................................... 44

*Cal. Communities Against Toxics v. U.S. EPA*,
  688 F.3d 989 (9th Cir. 2012) ........................................................................... 54

*California v. Block*,
   690 F.2d 753 (9th Cir. 1982) ................................................................. 4

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) ........................................................................... 6

*City of Sausalito v. O'Neill*,
   386 F.3d 1186 (9th Cir. 2004) ............................................................... 29

*Conservation Cong. v. United States Forest Serv.*,
   235 F. Supp. 3d 1189 (E.D. Cal. 2017) ...................................................... 43

*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*,
   655 F.3d 1000 (9th Cir. 2011) ............................................................... 43

*Earth Island Inst. v. U.S. Forest Serv.*,
   697 F.3d 1010 (9th Cir. 2012) ............................................................... 19

*Ecology Ctr. v. Castaneda*,
   574 F.3d 652 (9th Cir. 2009) ............................................................. 2, 32

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*,
   451 F.3d 1005 (9th Cir. 2006) ............................................................... 34

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ........................................................................... 6

*Forest Guardians v. U.S. Forest Serv.*,
   329 F.3d 1089 (9th Cir. 2003) ................................................................ 2

*Friends of Santa Clara River v. U.S. Army Corps of Eng'r*,
   887 F.3d 906 (9th Cir. 2018) ................................................................ 51

*Friends of the Clearwater v. U.S. Forest Serv.*,
   No. 3:20-CV-00322-BLW, 2021 WL 3408595 (D. Idaho Aug. 4, 2021) ...................... 39

*Friends of the Rapid River v. Probert*,
   427 F. Supp. 3d 1239 (D. Idaho 2019) ...................................................... 20

*Friends of the Wild Swan v. Weber*,
   767 F.3d 936 (9th Cir. 2014) ............................................................... 34

*Great Old Broads for Wilderness v. Kimbell*,
   709 F.3d 836 (9th Cir. 2013) ............................................................... 20

*Greater Yellowstone Coal. v. Reese*,
   392 F. Supp. 2d 1234 (D. Idaho 2005) ...................................................... 44

*Hapner v. Tidwell*,
   621 F.3d 1239 (9th Cir. 2010) ............................................................... 34

*Helena Hunters & Anglers v. Tidwell*,
   841 F. Supp. 2d 1129 (D. Mont. 2009) ...................................................... 20

*Idaho Conservation League v. U.S. Forest Serv.*,
  No. 1:11-cv-341-EJL, 2012 WL 3758161 (D. Idaho Aug. 29, 2012) ..................................... 37

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
  305 F.3d 957 (9th Cir. 2002) ........................................................................................ 2, 21

*In Def. of Animals, Dreamcatcher Wildhorse & Burro Sanctuary v. U.S. Dep't of Interior*,
  751 F.3d 1054 (9th Cir. 2014) ...................................................................................... 44, 46

*In re Big Thorne*,
  857 F.3d 968 (9th Cir. 2017) .................................................................................................. 6

*Inland Empire Pub. Lands Council v. Schultz*,
  807 F. Supp. 649 (E.D. Wash. 1992) ...................................................................................... 4

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ................................................................................................................ 4

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ........................................................................... 3, 33, 38, 46

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
  549 F.3d 1211 (9th Cir. 2008) ................................................................................................ 6

*Montana Wilderness Ass'n v. Connell*,
  725 F.3d 988 (9th Cir. 2013) ............................................................................................... 43

*Nat. Res. Def. Council v. Kempthorne*,
  506 F. Supp. 2d 322 (E.D. Cal. 2007) ............................................................................ 54, 55

*Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*,
  966 F.3d 893 (9th Cir. 2020) ............................................................................................... 50

*Native Ecosystems Council v. Dombeck*,
  304 F.3d 886 (9th Cir. 2002) ............................................................................................... 45

*Native Ecosystems Council v. Krueger*,
  946 F. Supp. 2d 1060 (D. Mont. 2013) ................................................................................ 53

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) ............................................................................................. 34

*Native Ecosystems Council v. Weldon*,
  697 F.3d 1043 (9th Cir. 2012) ............................................................................................... 2

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ............................................................................................... 44

*Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*,
  265 F.3d 1028 (9th Cir. 2001) ............................................................................................. 53

*Pac. Rivers Council v. Thomas*,
  30 F.3d 1050 (9th Cir. 1994) ............................................................................................... 49

*Pollinator Stewardship Council v. U.S. EPA,*
   806 F.3d 520 (9th Cir. 2015) ........................................................................ 55

*Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.,*
   113 F.3d 1505 (9th Cir. 1997) ..................................................................... 32

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) ..................................................................................... 3

*S.W. Ctr. For Biol. Div. v.U.S. Forest Serv.,*
   100 F.3d 1443 (9th Cir. 1996) ................................................................. 5, 50

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
   747 F.3d 581 (9th Cir. 2014) ................................................................... 5, 6

*Selkirk Conservation All. v. Forsgren,*
   336 F.3d 944 (9th Cir. 2003) ..................................................................... 29

*Swanson v. U.S. Forest Serv.,*
   87 F.3d 339 (9th Cir. 1996) ......................................................................... 4

*Tri-Valley CAREs v. U.S. Dep't of Energy,*
   671 F.3d 1113 (9th Cir. 2012) ....................................................... 29, 47, 48

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
   435 U.S. 519 (1978) ..................................................................................... 3

*Westlands Water Dist. v. U.S. Dep't of the Interior,*
   376 F.3d 853 (9th Cir. 2004) ....................................................................... 3

*Wild Wilderness v. Allen,*
   871 F.3d 719 (9th Cir. 2017) ..................................................................... 44

*WildEarth Guardians v. Jeffries,*
   370 F. Supp. 3d 1208 (D. Or. 2019) ......................................................... 51

*WildEarth Guardians v. Zinke,*
   368 F. Supp. 3d 41 (D.D.C. 2019) ............................................................ 55

*Wildlands Def. v. Seesholtz,*
   No. 1:17-CV-408-BLW, 2017 WL 5473451 (D. Idaho Nov. 14, 2017) ................ 19

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................................ 5

16 U.S.C. § 1531(b) ......................................................................................... 4

16 U.S.C. § 1536(a)(2) ..................................................................................... 5

16 U.S.C. § 1536(c)(1) ............................................................................... 48, 49

42 U.S.C. § 4332(2)(C) ..................................................................................... 3

42 U.S.C. §§ 4321 ............................................................................................ 3

**Regulations**

40 C.F.R. § 1501.1 ......................................................................................................... 3

40 C.F.R. § 1501.3 ...................................................................................................... 3, 4

40 C.F.R. § 1508.27(b) ................................................................................................. 44

40 C.F.R. § 1508.27(b)(4) ............................................................................................ 44

40 C.F.R. § 1508.7 ......................................................................................................... 4

40 C.F.R. pt. 1502 .......................................................................................................... 3

40 Fed. Reg. 31734 (July 28, 1975) ............................................................................ 11

50 C.F.R. § 402.01(b) .................................................................................................... 5

50 C.F.R. § 402.12 ....................................................................................................... 13

50 C.F.R. § 402.12(c) ................................................................................................... 48

50 C.F.R. § 402.14(a) .................................................................................................... 5

50 C.F.R. §§ 402.12(f)-402.14(a) ................................................................................ 49

82 Fed. Reg. 508-09 (June 30, 2017) .......................................................................... 11

## INTRODUCTION

The United States Forest Service ("Forest Service") designed the End of the World and Hungry Ridge Projects (together, the "Projects") to respond to deteriorating forest health conditions across the landscape and the increasing risk of high-intensity wildfire.  A key purpose of the Projects is to modify fire behavior so that firefighters conducting suppression activities can work more effectively and safely in the area, thereby reducing the threat to life, structures, property, and natural resources.  The Projects would reduce fuel loadings and fire intensity by removing trees to lessen overcrowding and mitigate against insect and disease mortality, while in most cases leaving a fully stocked stand.  Both projects include timber harvesting, prescribed burning, road construction and reconstruction, and watershed improvement activities.  Based on hundreds of pages of analyses and dozens of specialist reports, the Forest Service determined the Projects would make the Forest more resilient to the increasing threats of insects, disease, and fire.  Plaintiff wholly mischaracterizes the Projects as "massive Forest Service logging projects" with limited benefits and causing substantial harm.  Pl.'s Opening Br. 1, 4, ECF No. 27.

The Projects comply with the National Forest Management Act ("NFMA"), the National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA").  The Projects are consistent with the Forest Plan for the Nez Perce National Forest (the "Forest"), specifically the old growth standards in Appendix N and the fishery objectives in Appendix A.  The Forest Service took the requisite "hard look" at the impacts of the Projects on fisher, aquatic resources, and grizzly bears.  The Forest Service's conclusions that the Projects would reduce the risk of severe wildfire and attendant danger to firefighters are not arbitrary and capricious.  The NEPA documents adequately address cumulative impacts of the Projects, which do not overlap spatially.  The Forest Service was not required to prepare an Environmental Impact Statement

("EIS") for the End of the World Project, because the project will not have significant impacts. Finally, the Forest Service not only satisfied, but exceeded, its consultation obligations under Section 7 of the Endangered Species Act ("ESA").

Defendants respectfully request that the Court deny Plaintiff's motion for summary judgment, and grant Defendants' cross-motion for summary judgment.

## LEGAL BACKGROUND

### A.    National Forest Management Act

"NFMA and its implementing regulations provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). The Forest Service first develops a forest plan containing "broad, long-term plans and objectives for the entire forest." *Id.* These plans "must provide for multiple uses" of forest resources. *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 961 (9th Cir. 2002) (citing 16 U.S.C. § 1604(e)(1)). The agency then implements the forest plan through site-specific projects. *Weldon*, 697 F.3d at 1056.

"While NFMA requires that the proposed site-specific actions be consistent with the governing Forest Plan, the Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Id.* (citing *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003)). "In the face of ambiguity, [courts] 'defer to the Forest Service's reasonable interpretation of the Forest Plan's requirements.'" *All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1242 (9th Cir. 2017) (quoting *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 661 (9th Cir. 2009)).

This degree of deference is consistent with the intent of NFMA to "provide effective guidance . . . but [to] allow enough flexibility so that the professional foresters can do the job, rather than lawyers and judges." Joint Hearings, 94th Cong., 2d Sess. 953-54 (Comm. Print

1976).  "Congress has consistently acknowledged that the Forest Service must balance competing demands in managing [NFS] lands [and], since Congress' early regulation of the national forests, it has never been the case that the national forests were . . . to be 'set aside for non-use.'"  *Lands Council v. McNair*, 537 F.3d 981, 990 (9th Cir. 2008) (third alteration in original) (internal quotation marks omitted).

### B.     National Environmental Policy Act

The purpose of NEPA is to ensure that federal agencies consider the environmental consequences of major federal actions significantly affecting the environment.  42 U.S.C. §§ 4321, 4331; 40 C.F.R. § 1501.1; *see also Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).  NEPA serves the twin aims of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that the public has access to relevant information.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA itself "does not mandate particular results, but simply prescribes the necessary process."  *Id.* at 350 (citations omitted).  A "court must avoid passing judgment on the substance of an agency's decision.  Its focus must be on ensuring that agencies took a 'hard look' at the environmental consequences of their decisions."  *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (citing *Robertson*, 490 U.S. at 350).

NEPA requires an agency prepare a comprehensive EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.  An EIS is a detailed statement subject to extensive regulations regarding format, content, and methodology.  *See* 40 C.F.R. pt. 1502.  An EIS "must consider and assess the environmental consequences of the proposed action and reasonable alternatives to the action."  *Westlands Water Dist.*, 376 F.3d at 865 (citing 40 C.F.R. § 1502.14).  In addition to direct effects, an EIS also looks at the potential cumulative effects of the proposed action and

3

reasonable alternatives.  *See* 40 C.F.R. § 1508.7.  Not every federal action or proposal, however, requires an EIS.  An agency may prepare an EA to determine whether the impacts of an action will be significant, and if not, the agency may prepare a FONSI and forego preparation of an EIS.  *See* 40 C.F.R. §§ 1501.3, 1501.4(c), (e), 1508.9, 1508.13.

In reviewing the sufficiency of an agency's NEPA analysis, a court should evaluate whether the agency has presented a "'reasonably thorough discussion of the significant aspects of the probable environmental consequences.'"  *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted).  "The reviewing court may not 'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies."  *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1183-84 (9th Cir. 1997) (citation omitted); *see also Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996).  Further, a court may not force an agency to elevate environmental concerns over other appropriate considerations, *see Stryker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227 (1980), or "substitute its judgment for that of the agency."  *Block*, 690 F.2d at 761.

In particular, "[f]orest management is fairly viewed as the sort of technical field where courts should defer to the findings of specialized administrative agencies."  *Inland Empire Pub. Lands Council v. Schultz*, 807 F. Supp. 649, 652 (E.D. Wash. 1992) (citation omitted).  "Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end."  *Block*, 690 F.2d at 761 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

### C.   Endangered Species Act

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).

ESA Section 7(a)(2) directs each agency to ensure, in consultation with the "consulting agency" (here, FWS[1]), that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat that has been designated for such species.  16 U.S.C. § 1536(a)(2).

"To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action . . . request of [FWS] whether any species which is listed or proposed to be listed may be present in the area of such proposed action."  *Id.* § 1536(c)(1).  If FWS advises that a listed species may be present, the agency "shall conduct a [BA] for the purpose of identifying any [ESA-listed] species which is likely to be affected by such action." *Id.*  No consultation with FWS is required unless the agency determines that the action "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a).  That is, if an action has "no effect" on listed species, then the consultation obligations are not triggered. *S.W. Ctr. For Biol. Div. v. U.S. Forest Serv.,* 100 F.3d 1443, 1447-48 (9th Cir. 1996).

### D.    Summary Judgment Standard of Review Under APA

NFMA, NEPA, and the ESA do not supply a separate standard of review, thus the Administrative Procedure Act ("APA") standard of review applies for claims under these Acts. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).  Under the APA, a court may set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  An agency action is arbitrary and capricious only where the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an

---

[1] The Secretary of the Interior is responsible for implementing the ESA with respect to listed terrestrial species and administers the ESA through FWS.  *Id.* § 1532(15); 50 C.F.R. § 402.01(b).

explanation that runs counter to the evidence before the agency or is so implausible that it could

not be ascribed to a difference in view or the product of agency expertise." *League of*

*Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1215

(9th Cir. 2008) (internal quotations and citation omitted).

This standard is "highly deferential" and requires a reviewing court to consider only

"whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment." *Jewell*, 747 F.3d at 601 (quoting *Citizens to Pres. Overton Park*

*v. Volpe*, 401 U.S. 402, 416 (1971)).  The Forest Service's judgments "often require trade-offs

among worthy objectives . . . Congress left such judgments to a politically responsive agency

with relevant expertise." *In re Big Thorne*, 857 F.3d 968, 976 (9th Cir. 2017).  Courts reviewing

agency decisions are limited to the administrative record.  *Fla. Power & Light Co. v. Lorion*, 470

U.S. 729, 743-44 (1985).

## FACTUAL BACKGROUND

The Forest Service manages the two-million-acre Nez Perce National Forest in Idaho

under a 1987 Forest Plan.  Both Projects lie within the Wildland Urban Interface ("WUI") for the

Grangeville, Idaho area.  The Mill Creek drainage separates the boundaries of the Projects,

which are approximately 0.5 to 1.5 miles apart.  B_000740.  Total commercial harvest from the

Projects is approximately 25,000 acres, of which about 6,750 acres is "Clearcut with Reserves."

### A.    End of the World Project

The End of the World Project area encompasses 49,565 acres located about six miles

south of Grangeville, Idaho.  A_000003.[2]  The project area receives heavy recreational public

---

[2] Citations to the administrative record for the Projects are to folders A, B, or C, followed by an
underscore and then the Bates number.

use. A_000016. The project area lies within the rural WUI where present forest health and fuel

hazard conditions put private lands and structures at increased wildfire risk. *Id*. In 2005, the

Blackerby fire threatened 80 homes within and adjacent to the End of the World project area. *Id.*

More recently, during the 2015 and 2018 fire seasons, many people were forced to evacuate their

homes. *Id.* The End of the World Project is designed to reduce wildfire risk to local

communities by reducing insect and disease infestation and restoring vegetation to a more

healthy and fire-resilient condition. A_000003-4. The proposed treatments would moderate fire

behavior, improving safety for firefighters, and allowing safer egress/ingress along critical travel

routes.[3] A_000016. Plaintiff mischaracterizes End of the World as simply a "logging" project.

The Forest Service begin developing the End of the World Project in 2017. *See*

A_001045. The Forest Service presented the proposal to the local government groups, including

the Idaho County Commission and the Grangeville City Council, held multiple public meetings,

and conducted a field trip to the project area. A_000017. The Forest Service also sent out more

than 300 "Opportunity to Comment" letters to the local community. A_000126. In addition, the

agency sought comment and held multiple meetings with the Nez Perce Tribe in 2017 and 2018.

*Id.* The Forest Service received forty comments in response to the letters. *Id.*

In October 2019, the Forest Service published the End of the World Project

Environmental Assessment ("EA"), which examined the environmental effects of the project on

a number of resources, including aquatic resources, fire and fuels, and wildlife. *See generally*

A_000118-181. The Forest Service prepared more than a dozen specialist reports, *see, e.g.*,

---

[3] Of course, the Forest Service will never be able to prevent all wildfires, a fact which Plaintiff
misuses to support their arguments. Pl.'s Opening Br. 24. The primary goal of the Projects is to
change fire behavior to make them less severe and more easily and safely controlled.

A_003230-3258 (Fire and Fuels); A_018694-18850 (Wildlife), a Biological Assessment ("BA")

for fisheries resources, A_000490-529, and an Aquatic Species/Habitat Report.  A_003282-3316.

In January 2021, the Forest Service published the Decision Notice and Finding of No

Significant Impact ("DN/FONSI") for End of the World.  Under the no-action alternative, the

Forest Service determined Forest Health in the project area would continue to decline and be

subject to increasing risk of wildfire.  A_000005.  The two action alternatives proposed varying

amounts of vegetation treatments, road and stream improvements, and other restoration activities

for invasive species, range improvement, and trail restoration and reconstruction.  A_000005-7.

The Forest Supervisor ultimately selected Alternative B.  A_000008.  The selected

alternative includes timber harvesting, prescribed burning, permanent and temporary road

construction, and watershed improvement activities.  A_000017.  The majority of the timber

harvest (approximately 16,300 acres or 91% of the proposed harvest) is intermediate in nature

and will leave fully stocked stands at the end of operations.  A_000004, 8.  In addition, the

decision authorizes various types of commercial thinning to reduce stand densities, remove dead,

diseased and deformed trees, and improve the growth and vigor of residual trees.  A_000004.  A

small portion of the project area (less than 1600 acres or 9% of the proposed harvest) entails

regeneration harvest that would still leave overstory reserve trees.  *Id.*; A_000005, 71.  Twelve

regeneration harvest units will have openings larger than 40 acres.  A_000005.  These larger

opening "create relatively large areas with fuels that are less prone to extreme fire behavior"

because they break up fuel continuity, an important driver of fire severity.  A_003215.  Both

types of harvest are designed to maximize the retention of old growth and large trees.

A_000004.  Activity fuels will be treated after harvest—an important distinction from the project

challenged in *Bark v. U.S. Forest Service*.  *Id.*  The project would also involve about 6,700 acres

of prescribed burning and the creation of a shaded fuel break along the Road 221 to reduce hazardous fuels and provide safer ingress and egress for the public and firefighters.  *Id.*

The End of the World Project also authorizes watershed improvement activities, including decommissioning twenty-eight miles of roads and installing 43 additional cross drain culverts.  A_000004, 8.  The Forest Service will use appropriate best management practices ("BMPs") and project-specific design criteria to minimize sediment input into streams from roadwork activities—a key driver of stream impacts.  A_000004.  The project also includes additional watershed improvement and restoration activities, including invasive plant treatments, riparian planting, strategic tree felling to deter cattle, and trail restoration activities.  A_000004, 8.  Finally, the project includes additional design features and mitigation measures from multiple sources to address or even eliminate the environmental impacts of the project.  A_000009-13.

The Forest Service did not prepare an EIS for End of the World, having determined based on the EA and project record that the selected alternative will not have significant effects on the quality of the human environment.  A_000018-23.

### B.     Hungry Ridge Restoration Project

The Hungry Ridge Restoration Project covers approximately 30,000 acres within rural WUI areas[4] in the Mill Creek and Johns Creek watershed approximately 17 miles southeast of Grangeville, Idaho.  B_000005-6.  Years of fire suppression in the project area has increased levels of insect and disease mortality and fuel loadings, making the area more prone to serious wildfire threatening vegetation, fisheries resources, watershed function, wildlife habitat, and private homes.  *Id.*  The purposes of the project are two-fold: to respond to deteriorating forest

---

[4] Approximately 80% of the project area lies within the WUI.  B_000007.

health conditions and the increasing risk of high-intensity wildfire and to improve the safety and efficacy of fire suppression activities.  B_000006.

The project includes a wide variety of actions designed to improve fish and wildlife habitat and reduce fire risk to private property.  The Hungry Ridge Project includes timber harvest and fuel treatments and associated road activities, restoration of soils and meadow areas, planting, and improvements to trail stream crossings.  B_000005.  The proposed timber harvest and fuels treatments would shift tree species composition away from shade-tolerant species toward more resilient species and reduce fuel loads near private property.  B_000008.  They would also improve habitat quality for certain wildlife species, including goshawk, flammulated owl, and elk.  B_000008.  Much of the associated roadwork is designed to improve watershed health by reducing road densities and addressing culverts that deliver sediment to streams. B_000009.  Hungry Ridge—like End of the World— is not a "logging project."

The publication of the Record of Decision for the Hungry Ridge Project is the culmination of a seven-years-long public process that began when the Forest Service published the Notice of Intent for the project in the Federal Register in February 2014.  B_003659-3661. The Forest Service mailed a scoping letter to over 300 potentially interested parties and received eleven comment letters on the proposed action.  B_000049.  The Forest Service released a draft EIS in March 2018 that assessed in detail the potential environmental effects of a no-action alternative and three action alternatives.  *Id.*  The agency again solicited public input on the project and received 24 comment letters on the draft EIS.  *Id.*  In November 2019, the Forest Service published the final EIS and draft record of decision.  B_001063-001736; B_000241-315. The Forest Service received four objections, B_000049, and subsequently republished the FEIS in September 2020.  B_000342-688 (FEIS Vol. 1); B_000689-1028 (FEIS Vol. 2).

In March 2021, the Forest Service issued a final Record of Decision implementing Alternative 2, as modified.  B_000010.  The selected alternative would entail one project-specific forest plan amendment to allow for mechanical treatment of 59 acres of old growth habitat in Management Area 20.  B_000010-11.  The decision authorizes timber harvest and fuel treatments, associated road activities, restoration of soils and meadow areas, and improvements to trail stream crossings.  Specifically, the project authorizes commercial timber harvest on approximately 7,144 acres, including intermediate harvest on 1,959 acres and regeneration harvest on 5,185 acres leaving large overstory reserve trees.  B_000011-12.  Project activities would produce twenty-eight openings exceeding 40 acres.  B_000041; B_000363; B_000717; B_007639.  To mitigate fire risk, natural and activity fuels would be burned on 9,495 and 2,877 acres, respectively.  B_000012-13.  Approximately 9 miles of new road and 23 miles of temporary roads would be constructed.  B_000014-15.  Other road-related actions authorized by the project include two miles of road reconstruction, 34 miles of road reconditioning, 30 miles of road maintenance, and approximately 27 miles of road decommissioning.  B_000015-16.  The project would replace 18 culverts and improve two trail-stream crossings.  B_000016-17.  Finally, the project would authorize riparian planting, soil restoration, and meadow restoration.  B_000017.  Implementation will take approximately ten years.  B_000019.

Finally, like End of the World, Hungry Ridge incorporates various design criteria and mitigation measures to avoid, minimize, or compensate for environmental impacts.  B_000020.  These include BMPs to maintain water quality standards.  *Id*.

### C.     "No Effect" Determination for Grizzly Bears

In 1975, the U.S. Fish and Wildlife Service ("FWS") listed grizzly bear in the lower 48 United States as a "threatened" species under the ESA. 40 Fed. Reg. 31734 (July 28, 1975). Since 1982, FWS has aimed to foster grizzly recovery in six ecosystems.  82 Fed. Reg. 30,508-

09 (June 30, 2017). None of the six recovery zones overlap with the project areas.  C_007916.

      The Bitterroot Ecosystem—the only recovery zone overlapping the Forest—is located approximately 15 to 30 miles east of the project areas.  C_007926; A_000064; B_000694.  The Bitterroot Ecosystem is considered "unoccupied" by any grizzly population, which means that it does not contain "two or more reproductive females or one female reproducing during two separate years."  C_007926.  From 1946 until 2007, there were no verifiable reports of grizzlies on the Forest.  A_000654; B_024031.  In 2007, a young male grizzly was reported in the Kelly Forks area, over 50 miles from the project areas, and was killed by a hunter. *Id.*

      After 2007, there were no confirmed reports of grizzlies on the Forest until 2019, and there have been no verified reports since.  *Id.*  In 2019, two young male bears temporarily dispersed from the Cabinet Mountains of northwest Montana/northern Idaho and were observed on the Forest.  *Id.* The first bear ("Bear 927") was not observed in or around the project areas – the closest this bear was observed to the project areas was over 70 miles away.  C_016372; A_000654; B_024031.  It has been confirmed that Bear 927 returned to northwest Montana based on collar tracking data.  A_000654; B_024031.  The second bear ("White Bird Bear") was spotted in the White Bird drainage area, just west of the End of the World project area.  *Id.*  A DNA sample collected within the End of the World project area confirmed that the White Bird Bear came from habitat in northern Idaho approximately 200 miles away.  *Id.*  There have been no further reports of grizzlies in or around the project areas, indicating that the White Bird Bear was also not a resident bear. *Id*.

      Acting under Section 7(c) of the ESA, in January 2021, FWS provided the Forest Service with an updated list of threatened and endangered species that may occur in the proposed location of the Projects.  A_ 000638-51.  The list identified grizzly bear as a species that "may be

present" in the project areas.  *Id.*  Accordingly, the Forest Service prepared a Biological

Assessment ("BA") for each Project "evaluat[ing] the potential effects of the action on [grizzly

bear] . . . [to] determine whether [grizzly bear] are likely to be adversely affected by the action."

50 C.F.R. § 402.12.  In its BAs, the Forest Service determined that the Projects will not have an

effect on grizzly bear based on considerations including: there is no evidence that the one grizzly

bear confirmed to have occurred within the project areas in the last 75 years is still within the

area or has established a home range there; even the nearby Bitterroot Ecosystem does not have a

resident population of grizzlies; there are no Bear Management Units designated for grizzly

recovery in the project areas or in the Bitterroot Ecosystem; the Nez Perce Forest Plan complies

with the Grizzly Bear Recovery Plan and provides for cooperation with future grizzly recovery

efforts; the Projects will not reduce secure grizzly habitat within the project area; nor will the

Projects reduce forage availability.  A_000656; B_024032-33.

 While the ESA does not require consultation when there is a "no effect" finding, the

Forest Service nevertheless requested a meeting with FWS and requested FWS to review its

finding in light of the 2019 grizzly reports and FWS's updated map of where grizzlies may be

present.  A_000655; B_024032.  On December 18, 2020, biologists from the Forest Service met

with FWS staff to discuss the Forest Service's effects analysis.  C_000711-13.  While FWS does

not provide Letters of Concurrence with "no effect" determinations, FWS acknowledged the

Forest Service's finding and did not disagree with the finding or analysis.  *Id.*

## ARGUMENT

### A. The Projects Comply with NFMA.

 Plaintiff argues that the Projects are inconsistent with the Forest Plan in two respects.

First, Plaintiff argues that the Projects violate Fish and Wildlife Standard No. 7, which requires

adherence to old growth standards set forth in Appendix N of the Forest Plan.  Pl.'s Opening Br.

7-13.  Plaintiff argues the Projects fall below the required 5% minimum old growth threshold

that applies to each prescription watershed if North Idaho Old Growth ("NIOG"), as defined by

Green, et al., "Old-Growth Forest Types of the Northern Region" (2011), and Management Area

20 ("MA20") are not included in the calculations.  Pl.'s Opening Br. 9-13.  Second, Plaintiff

argues the Projects violate the fish/water quality objectives in Appendix A, because the Forest

Service failed to perform an adequate upward trend analysis for streams that currently fall below

Forest Plan water quality and fish objectives.  *Id.* 13-20.  Both arguments lack merit.

### 1.     The Projects are Consistent with Forest Plan Appendix N.

Forest Plan Wildlife and Fish Standard No. 7 directs the Forest Service to "[p]rovide

management for minimum viable populations of old-growth and snag-dependent species[5] by

adhering to the standards stated in Appendix N."  C_027300.  Appendix N contains "Minimum

Requirements for Amount and Distribution of Old Growth" including the following:

> [I]n order to maintain a viable population of old-growth-dependent
> species, it is necessary to maintain 10 percent of the total forested
> acres as old growth with *no less than 5 percent of the forested
> acres maintained as old growth within each prescription
> watershed[6] or combination of watersheds totaling 5,000 to 10,000
> acres*.  If less than 5 percent old growth exists in a drainage, the
> additional required acres will be assigned to adjacent drainages
> where excess old growth is available.  An additional 5 percent of
> the forested acres within each prescription watershed shall be
> designated as replacement old growth.

C_027489-90 (emphasis added).  Appendix N provides direction on the "Identification and

Designation of Old-Growth Stands," including that "[o]ld-growth stands will be identified

through the use of stand exam information, aerial photos, and field reconnaissance."  C_027490.

---

[5] The Forest Plan defines "old-growth-dependent species" as follows:  "The group of wildlife
species that is associated with old-growth forest plant communities."  C_027439.

[6] The boundaries of the prescription watersheds coincide with the boundaries of the Old Growth
Analysis Areas ("OGAAs").  A_018712.

Stands will be prioritized for identification and designation as old-growth based on how many of the six old growth criteria are met,[7] as well as "size of stand, presence of roads, age class of surrounding timber (*e.g.* clear cut vs. mature) and known or suspected use by the old-growth indicator species." *Id.* Finally, "[t]hese standards are based on the most current literature and *may change* as new information becomes available." C_027489 (emphasis added).

The Forest is broken up into different "management areas," and the Forest Plan defines specific goals for each. MA20 is 64,659 acres[8] comprised of approximately equal parts overmature saw timber (150 years or older) and immature stands (40-80 years) that "*will* provide for replacement old-growth habitat." C_027364 (emphasis added). MA20 provides habitat for wildlife species dependent on old-growth forest conditions such as fisher. *Id.* The "management intent" for MA20 is to "[m]anage for old-growth habitat for dependent species." C_027312.

### *End of the World*

For End of the World, the Forest Service identified old growth stands through management area validation, stand exam data, recent imagery, and the Forest's activities database (FACTS). A_018749. For each stand reviewed, Forest Service wildlife biology and

---

[7] "Old-growth stand refers to a stand of timber that, *generally*, meets the following criteria:

1.  At least 15 trees per acre greater than or equal to 21 inches diameter at breast height (DBH). Providing trees of this size in the lodgepole pine and sub-alpine fir stands may not be possible.
2.  Two or more canopy layers.
3.  At least .5 snags per acre greater than or equal to 21 inches DBH and at least 40 feet tall.
4.  Signs of rot and decadence present.
5.  Overstory canopy closure of 10-40 percent; understory canopy closure of at least 40 percent; total canopy closure at least 70 percent.
6.  Logs on the ground."

C_027439-40; C_027489 (same) (emphasis added).

[8] In addition to the 64,659 acres there are an additional approximately 35,570 acres of inclusions from other management areas. C_027364.

silviculture experts determined "whether the stand reviewed met Forest Plan old growth ("FPOG"), North Idaho old growth ("NIOG"), both or neither." A_018750. The Forest Service confirmed the existence of 760 acres of existing old growth forest habitat within the relevant OGAAs. *Id.* Areas identified as old growth that overlap with MA20 were excluded to avoid double counting. *Id.* Existing old growth in the five OGAAs within the End of the World Project area is set forth in Table 43 of the wildlife specialist's report. A_018750-51. The total percentage of old growth within each OGAA is between 13.4% and 21.4%. A_018750-51.

To calculate the impacts to old growth habitat under each alternative, the Forest Service overlaid GIS layers of identified Forest Plan MA20 and other old growth and replacement old growth forest habitats with layers showing proposed vegetation treatments and temporary road construction. A_018713. The Forest Service determined that of the 375 acres of old growth habitat treated under the proposed alternative *only five* acres would cease meeting old growth criteria after treatment. A_018800. This is because old growth stands treated with intermediate prescriptions—the vast majority of the harvest—"would retain sufficient numbers of the largest, healthiest trees . . . that qualify them as old growth." A_018800-01.

The Forest Service thus concluded that the old growth standards in Appendix N would continue to be met or exceeded, because only five acres out of the entire Project area would no longer qualify as old growth after implementation. A_018848. In the event of no action, however, there is increased potential for old growth stands to be eliminated due to increased risk of insect and disease infestation and large stand-replacing fire. A_018766.

### *Hungry Ridge*

The Forest Service similarly assessed the quantity, quality, and distribution of MA20 and other old growth habitat in the Hungry Ridge Project area. B_000645-46. As with End of the

16

World, the Forest Service included lands meeting the NIOG definition "as [the] best available science" in addition to lands meeting the FPOG definition. *Id.* The Forest Service used a number of data streams to identify old growth habitats within the Project area, including vegetation databases, aerial photos, stand exam data, historical information on land use, and forester first-hand knowledge of stand conditions. B_000645-47. Based on a review of the data, the Forest Service determined that within the Project area "[a]pproximately 1,140 acres meet the FPOG definition, 981 acres meet the NIOG definitions, 765 meet both definitions, and 4,444 meet the definition of replacement old growth within the project area." B_000646. Table 3-50 of the FEIS sets forth the total existing old growth for the six OGAAs within the Hungry Ridge Project area. B_000648. Old growth per OGAA range between 19% and 25%. *Id.*

The Hungry Ridge Project authorizes harvest activities on 669 acres of old growth habitat. B_000651. Because harvest would focus on smaller trees and larger trees would be retained "to the maximum extent possible," existing old growth areas would continue to meet the NIOG and FPOG criteria in many of the treatment units, with the exception of gaps created by variable density thinning. B_000654. Table 3-52 sets forth old growth and MA20 acres *after* the proposed treatments. B_000657. Old growth percentages would decrease in five of the six OGAAs, but old growth minimum standards would continue to be met in each OGAA. *Id.* The total percentages of old growth per OGAA after treatment are projected to be 21%, 18%, 14%, 17%, 17%, and 17%, respectively.[9] *Id.* The Forest Service explained how this calculation was "conservative." *Id.* The Forest Service concluded that the Hungry Ridge Project meets the Forest Plan old growth standards for all associated OGAAs. B_000662; B_001050.

---

[9] For comparison, the numbers prior to treatment were 21%, 20%, 19%, 19%, 19%, and 25%, respectively. B_000648.

a.    The Forest Service's Use of the Green NIOG Criteria is
Consistent with the Forest Plan.

The Forest Service's decision to utilize the NIOG definition from the 2011 Green paper

(C_020442-506) is consistent with Appendix N.  First, Appendix N expressly contemplates the

use of updated science.  C_027489 ("These standards are based on the most current literature and

may change as new information becomes available.).  As explained in Philip Jahn, "Old Growth

Management Implications of the 1987 Nez Perce National Forest Plan and Supporting EIS

Documents" (2012), the Green paper is the best available science for identifying old growth

stands in Northern Idaho.  *See generally*, C_029012-029023.  The Jahn whitepaper explains:

> The (Green and others) document provides a much more
> comprehensive approach to evaluating old growth and defines old
> growth in relation to such factors as habitat type groups, site
> potential, and other capabilities of the land as found specifically in
> Northern Idaho.  Appendix N was developed primarily from
> studies that were done in the Blue Mountains of Eastern Oregon
> and Eastern Washington and presented in the 1979 publication,
> Wildlife Habitats in Managed Forest the Blue Mountains of
> Oregon and Washington, (Thomas and others).

C_029020.  Second, Appendix N does not require rigid adherence the six old growth criteria to

the exclusion of all other information, as evidenced by the inclusion of the term "generally" in

the description of the criteria itself (C_027489) and by the inclusion of other listed factors—*i.e.*,

"size of stand, presence of roads, age class of surrounding timber (e.g. clear cut vs. mature) and

known or suspected use by the old-growth indicator species"—in the section on "Identification

and Designation of Old-Growth Stands."  C_027490.

Plaintiff asserts the Forest Service is artificially inflating the old growth numbers by

including NIOG stands and cite ponderosa pine stands as an example of this, because fewer large

ponderosa pine trees are needed to meet NIOG criteria than FPOG criteria for a stand to qualify

as old growth.  Pl.'s Opening Br. 20.  The Forest Service's decision to use the Northern Idaho-

18

specific criteria developed by Green is grounded in science not deceit.  As the Green authors explain, "[b]ecause of differing capabilities of the land, adequate and defensible old growth definitions should be based on a site potential stratification, such as habitat type, series, or habitat type groups," however the 1987 Forest Plan "continued to follow the definitions being developed in Oregon and Washington or emphasized structural characteristics related to old growth-associated species."  *See* C_020444-46.  The Green old growth criteria derive from a comprehensive study of vegetation in Northern Idaho that was updated in 2011.[10]  C_020444-50. Plaintiff falsely suggests the Green criteria are intentionally over inclusive, Jageman Decl. ¶ 17,[11] but the authors explain "most stands that meet minimum criteria will be suitable old growth." C_020454.  Plaintiff's numbers actually understate the amount of existing old growth within the project areas.

The Forest Service's interpretation of the Forest Plan as allowing the use of updated science is reasonable and entitled to deference.  *See Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) ("[T]he Forest Service is entitled to deference to its interpretation of its own Forest Plan, unless the interpretation is plainly inconsistent with a Forest Plan.") (citation and internal quotation marks omitted); *Wildlands Def. v. Seesholtz*, No. 1:17-

---

[10] In 1989, the Chief of the Forest Service established a National Old Growth Task Force and an action plan to deal with management of old growth forests.  C_020444.  Committees of experts and members of the public worked together to develop Region 1 old growth types for Northern Idaho for "use[] in the implementation of Forest Plans."  *Id.*  Three committees reviewed the available data and developed detailed old growth minimum criteria and associated characteristics for nine old growth types in Northern Idaho.  C_020450-51; C_020456-65 (descriptions of characteristics for North Idaho Zones).

[11] Plaintiff's calculations are set forth in the Declaration of Harry Jageman, which Plaintiff appends to its summary judgment memorandum.  For the reasons set forth in Defendants' Motion to Strike, attached hereto, the Court should strike Mr. Jageman's declaration, along with Mr. William's declaration, which contain numerous factual inaccuracies, and limit its review of the merits of Plaintiff's claims to the administrative record lodged in this case.

CV-408-BLW, 2017 WL 5473451 at *3 (D. Idaho Nov. 14, 2017) ("[T]he agency's

'interpretation and implementation of its own forest plan is entitled to substantial deference.'"

(citing *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836 (9th Cir. 2013))); *Helena*

*Hunters & Anglers v. Tidwell*, 841 F. Supp. 2d 1129, 1141 (D. Mont. 2009) (upholding Forest

Service's decision to implement a project because the Forest Service "advanced a reasonable

interpretation" of the Forest Plan).

Plaintiff's previous challenge to the Forest Service's interpretation of Appendix N in the

*Windy-Shingle* case is instructive.  *Friends of the Rapid River v. Probert*, 427 F. Supp. 3d 1239

(D. Idaho 2019), *aff'd in relevant part* 816 Fed. App'x 59 (9th Cir. 2020) ("*Windy-Shingle*").  In

that case, plaintiffs alleged the Forest Service violated Appendix N by, among other things,

failing to priority rank old-growth stands.  *Id.* at 1255-56.  The district court rejected plaintiffs'

NFMA claim, because all the Forest Plan required was that stands "be inventoried and

prioritized" which the agency did, even if it did not do so in the manner advanced by plaintiffs

by creating a list individually ranking old-growth stands.  *See id.* at 1256 ("Each of the

requirements outlined in the Nez Perce Forest Plan are part of the methodology of determining

and preserving old-growth, but there is no mandate that they be carried out in a particular

fashion.").

Alliance for the Wild Rockies and Idaho Sporting Congress cited by Plaintiff (Pl.'s

Opening Br. 9) do not support a NFMA violation here.  In *Alliance for the Wild Rockies*, the

Ninth Circuit found that the Forest Service failed to discuss a standard from the Payette Forest

Plan requiring that the agency maintain at least 20% of the acres within each forested PVG in the

large tree size class.  *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1116-17 (9th

Cir. 2018).  Attendant to that failure was the Forest Service's decision to use a different

definition of "old forest habitat" than that which was spelled out in the Forest Plan, which in turn led the Forest Service to fail to analyze the percentage of large tree size class on each PVG in violation of the standard at issue. *Id.* That case is dissimilar in two respects. First, the Forest Service here addressed compliance with the applicable standards in the project records. Second, the Forest Service did not ignore the Forest Plan definition of "old growth habitat," but rather used updated scientific information to broaden its consideration of effects.

*Idaho Sporting Congress* is also dissimilar. There, the Forest Service completely substituted the "R4" definition of old growth for the Forest Plan definition and wielded the R4 definition as a "two-edged sword," on the one hand arguing that in a given area it cannot be depleting old growth habitat because no habitat meeting the Forest Plan's definition will be harvested, while at the same time saying enough R4 old growth will be left after harvest to meet the old growth dedication requirement for that area. *Idaho Sporting Congress*, 305 F.3d at 970-71. *Idaho Sporting* is not appropriate precedent, because the Forest Service is not supplanting the Forest Plan definition nor is it using inconsistent definitions when it is evaluating the effects of the Projects.

In sum, the Forest Service's use of the Green "NIOG" criteria does not violate NFMA.

> **b.    The Forest Service's Inclusion of MA20 is Consistent with the Forest Plan.**

Plaintiff also erroneously argues that the Forest Service violated NFMA by "arbitrarily and capriciously assuming all forest lands labeled MA20 qualify as 'existing old growth' for purposes of compliance with Appendix N. Pl.'s Opening Br. at 11. The Forest Plan itself explicitly states that MA20 is comprised of old growth and replacement old growth habitat. C_027364 ("Approximately half of the area has a timber condition class of overmature sawtimber (150 years or older). The remainder of the area is comprised of immature stands (40-

80 years) that will provide for replacement old-growth habitat."). And the drafters of the Forest

Plan intended MA20 to be included in the old growth minimums required by Appendix N. As

the Jahn whitepaper explains, "[i]t was the intent of management that areas of old growth habitat

and replacement old growth stands (mapped as Management Area 20) would be validated,

prioritized, and adjusted where necessary, using the criteria in Appendix N of the plan, to assure

that minimums are met and protected and that the designated old growth habitat is comprised of

the highest quality stands that are most favorably arranged on the landscape." C_029014.

Stands in MA20 were properly categorized as existing old growth. B_001366; A_018750-51.

Consistent with the language of the Forest Plan and the intent of its drafters, the agency

validated the quantity, quality, and distribution of MA20 habitat for the Projects using

information from other NEPA projects, fire history information, past harvest data, stand exam

information, VMap (satellite data), 2002 Large Tree data (includes stand exams and research

study plots), and aerial photography to identify older stands with large trees. *See* B_000398;

B_000645-50; B_023972; A_000091; A_001557; A_018750; C_034802-06. For End of the

World, the Forest Service identified approximately 7,435 acres of MA20 within OGAAs

associated with the Project area. A_000152; A_018717. For Hungry Ridge, the Forest Service

identified approximately 2,478 acres of MA20 associated with the Project. B_001363-64.

Plaintiff asserts the Forest Service's inclusion of MA20 runs contrary to the agency's

own interpretation of the Forest Plan. *See* Pl.'s Opening Br. 10 ("The Forest Service knows

FPOG is what matters for Forest Plan compliance."). Plaintiff's assertion is not supported by the

record, in which the agency explains that "[t]he areas identified as old growth may be contained

within MA20 or within other management areas." B_000646 (emphasis added).

In sum, the Projects meet the Forest Plan minimum old growth requirements, because

under both projects 5% old growth will be maintained in all OGAAs.  A_018750-51; B_001366.

### 2.    The Forest Service's "Upward Trend" Findings are Consistent with Appendix A and not Arbitrary and Capricious.

The Forest Plan requires the Forest to meet or work towards meeting certain fish and water quality objectives.  C_027300-01.  Appendix A identifies eighty-six prescription watersheds that fall below Forest Plan fishery/water quality objectives.  C_027453-59.  In sixty-seven of them, Appendix A expressly allows continued development activities, *e.g.*, timber harvest, if there is a "positive, upward trend" in habitat capacity.  *See* C_027459 (n. 1-3).  The Implementation Guide to Appendix A of the Nez Perce National Forest Plan (the "Guide") defined an upward trend as "an improving trend is either in place and will continue, or than an improving trend will be initiated as a result of past, present and future management activities."  C_017821, 017822-24.  The Guide instructs that a "[s]tream specific determination of existing condition and present or future improving trend should be done through a convergence of evidence using stream surveys, monitoring results, watershed condition inventories, literature reviews, predictive modeling, and professional judgment."  C_017821.  The Guide cautions that "FISHSED [modeling] should not, however, be used as a trend analysis tool, since trend analysis is beyond the capabilities of the FISHSED model," because the model cannot predict actual sediment changes in streams.  C_017817, 017823.  "Sediment model results will be used in conjunction with other factors and professional judgement to determine how fish/water quality objectives can be met.  *See* C_027459; C_029026-27.  Stream flushing and stream power are relevant considerations in this analysis.  *See id.*

The Guide further instructs that the Forest Service can assume an upward trend where there is either passive or active restoration:

> In previously degraded watersheds, especially those identified as
> below objective in 1987, if there have been no entries or natural

23

> disturbances over the past 10 to 20 years, it could be assumed that
> trend is either static or improving.  If any watershed restoration has
> been implemented, or if a change in management (e.g. grazing and
> roads management) has resulted in fewer potential adverse effects
> to streams, an upward trend could be assumed in these cases as
> well.

C_017823; *id.* ("It was assumed in the Forest Plan that implementation of instream restoration

and other watershed restoration activities would result in an upward trend in carrying capacity").

In compliance with the Forest Plan, the Forest Service completed upward trend analyses

for both Projects, including a separate thirty-page analysis for Hungry Ridge as part of the

Fisheries Biological Assessment.  A_003293-98; B_015646-47; B_015667-96.  Plaintiff argues

that the Forest Service's upward trend analyses were deficient in a number of respects, including

that the Forest Service allegedly (i) failed to determine existing trends in the Hungry Ridge

Project area; (ii) ignored historical data on cobble embeddedness[12] that showed declines in

fishery habitat; (iii) ignored modeling predicting future downward trends; and (iv) ignored the

effects of streampower and flushing rates on meeting the fishery/water quality objectives.  Pl.'s

Opening Br. 13-20.  As explained below, these alleged deficiencies either do not exist, or

Plaintiff seeks to impose additional requirements not found in the Forest Plan.

### *End of the World*

For End of the World, only Jungle Creek and Cold Springs Creek (2 of 9 watersheds) fail

to meet Forest Plan fish/water quality objectives.  A_003292.  As required by Appendix A, the

Forest performed an upward trend analysis for both Jungle Creek and Cold Springs, where

contrary to Plaintiff's assertion it considered projected changes in cobble embeddedness, as well

---

[12] Cobble embeddedness refers to the extent to which rocks are covered or surrounded by sediment on the stream bottom.  Cobble embeddedness is an important consideration for fish habitat potential, because high cobble embeddedness can smother salmonid eggs, reduce hiding spaces for juvenile fish, and reduce aquatic insect production.  A_003294.

as past and future management activities and planned mitigation measures.  A_003293-98, 003311.  The Forest Service can consider factors other than cobble embeddedness in its trend analysis, *see* C_017822-23, and it was reasonable for it to do so here.  Cobble embeddedness data have limitations, because stream conditions vary annually based on location and weather, where cobbles can becomes more exposed or buried in between measurements.  A_003294.  High cobble embeddedness can occur naturally where a stream has low gradients and flushing capabilities—and this is the case for both Jungle Creek and Cold Springs.  A_003295, 003297.

The Forest Service reasonably determined an upward trend was indicated for both streams based on a number of considerations, including: (i) no timber harvest has occurred near either stream in decades;[13] (ii) planned road decommissioning in both watersheds and culvert removal and replacement in Jungle Creek under the project; and (iii) the planned implementation of numerous design features and mitigations, e.g., buffer retention, road graveling, and dust abatement.  A_003294-95 (Jungle Creek); A_003296-97 (Cold Springs); A_003298-99 (Roads); A_003302-03 (Design Features and Mitigation Measures); A_003304 (stream crossings and road decommissioning); A_003307, Tbl. 5 (Comparison of Alternatives); A_003310, Tbl. 1 (Summary of Environmental Effects).  Consistent with Appendix A, the Forest Service did not use FISHSED modeling results in the trend analysis, but only to compare cobble embeddedness between alternatives.  Like in *Windy-Shingle* there is nothing the Forest Plan requires here that the Forest Service did not do.

Plaintiff falsely claims that the Forest Service failed to account for logging and non-restoration roadwork.  Pl.'s Opening Br. 18.  Both were addressed into the analysis.  The Forest

---

[13] Contrary to Plaintiff's assertion (Pl.'s Opening Br. 16), the agency's assumption that a lack of recent logging and other disturbances contribute to an upward trend is consistent with the Forest Plan.  *See* C_017823 (a lack of recent disturbance supports an upward trend).

Service found logging is not expected to increase sediment, A_003303, and road improvement and road decommissioning activities are only expected to add sediment to streams in the short-term.  A_003304.  The implementation of BMPs will prevent or reduce sediment delivery to streams, mitigating even short-term impacts.  A_003302-03; *see* C_019305, 13 (Forest monitoring has shown that current best management practices are effective at addressing erosion and sedimentation issues).  Further, the proposed roadwork was designed to reduce long-term erosion and sediment delivery to streams.  A_000075; A_000082, 84; A_003285; A_003304; A_003310-11, Tbl. 1.  Finally, the aquatic specialist's analysis showed the proposed action would reduce sediment input compared to the no action Alternative.  A_003300, 003305-07.

In sum, the Forest Service's upward trend finding for Jungle Creek and Cold Springs in End of the World is well supported by the record and not arbitrary and capricious.

### *Hungry Ridge*

For Hungry Ridge, the Forest Service performed an upward trend analysis for the four prescription watersheds that do not meet the fishery water quality objective—Merton Creek, Trout Creek, American Creek, and Deer Creek.  B_001480-1510 (FEIS, App'x E).  The Forest Service used multiple data sources, including field notes,[14] a culvert inventory, and fisheries models.  *See* B_001481-82.  Like with End of the World, the Forest Service used the FISHSED model to *compare* cobble embeddedness under each alternative over the long-term (*i.e.*, twenty years), not to predict actual changes in sediment.  B_001482; B_020821; B_020595-600; *see also, e.g.*, B_001486 (comparing cobble embeddedness under each alternative for Merton Creek).  The FISHSED model[15] did not predict a measurable change is summer rearing or winter

---

[14] Stream survey field notes include cobble embeddedness data.  *See* B_000765.

[15] The FISHSED model is used to evaluate the attainment of fish habitat objectives.  C_027301.

carrying capacity in any of the affected watersheds.  B_000449-52.

The Forest Service considered multiple factors in its upward trend analysis, including: (i) whether the watershed has improved over time since the implementation of the Forest Plan; (ii) how past activities have reduced sediment delivery to streams, *e.g.,* through the use of vegetative buffers; (iii) the anticipated effects of watershed improvement projects in each watershed, such as road decommissioning, culvert replacements, and dust abatement; and (iv) how planned design and mitigation measures such as BMPs[16] would reduce or eliminate sediment delivery. *E.g.*, B_000764-65, 767-71 (Merton Creek); B_000771-75 (Trout Creek ); B_000779-84 (Deer Creek); *see also* B_000767 ("Tools for accomplishing an upward trend include limiting new disturbances, allowing natural recovery to occur, and/or implementing activities that would improve aquatic conditions.").  The Forest Service separately analyzed the impact of each specific treatment (*e.g.,* harvest, burning) in each watershed.  *E.g.*, B_000768, 772, 780.

Based on all of these considerations—past activities, existing conditions, projected impact of project activities including restoration, and planned mitigation measures—the Forest Service reasonably found an upward trend in each prescription watershed under all action alternatives, although some action alternatives were projected to have a greater positive impact.  B_000769-71 (Merton Creek); B_000773-75 (Trout Creek); B_000778-79 (American Creek); B_000782-83 (Deer Creek).  B_000764-69 (discussing past activities).

Plaintiff argues the Forest Service failed to determine the existing trend for any of the watersheds in the project area.  Pl.'s Opening Br. 25.  To the contrary, the trend analysis in Appendix E to the FEIS includes a discussion of how past activities have contributed to the

---

[16] The Forest Service determined BMPs would reduce sediment delivery to streams.  *See* B_020820-21.

existing upward trend.  *See* B_000764-69 (explaining the process used to develop a trend analysis).  The Forest Service's reliance on past restoration activities to support an existing upward trend is permitted under the Forest Plan.  *See* C_017823.

Plaintiff also argues the Forest Service must demonstrate that cobble embeddedness will improve to find an upward trend.  Pl.'s Opening Br. 19.  But such a requirement is not found in the Forest Plan.  Rather, the Guide supports finding an upward trend where restoration activities—such as the replacement of nine culverts in Hungry Ridge—will be implemented.  *See* C_017823.  Hungry Ridge includes multiple planned restoration actions that support the agency's upward trend finding.  *See* B_005308-11.

Finally, Plaintiff alleges the Forest Service failed to consider flushing rates and stream power.  Pl.'s Opening Br. 19.  The Forest Service considered flushing rates and stream power, but emphasized sediment input in its analysis.[17]  This is because the Forest Plan requires it (A_003285, 017816) long-term reductions in sediment input (from restoration, for example) are expected to reduce cobble embeddedness regardless of stream power and/or flushing rate. A_003004.  There is no Forest Plan requirement to quantify stream power and flushing, although those factors were considered.  *See* C_017821-23.

The Forest Service has fully complied with the Forest Plan requirements and NEPA.

**B.      The Projects Comply with NEPA.**

**1.      The Forest Service Took the Requisite "Hard Look" at Environmental Impacts.**

NEPA's hard-look requirement does not mandate a specific form or content of an EIS. Instead, a court's "review of an EIS is limited to a rule of reason that asks whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable

_____

[17] Plaintiff did not mention stream flow or flushing power during the NEPA process.

environmental consequences." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206-07 (9th Cir.

2004) (citation and internal quotation marks omitted).  In applying this rule of reason, a court

"must not substitute [its] judgment for that of the agency."  *Selkirk Conservation All. v.

Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003) (citation omitted).

When the agency has prepared an EA instead of an EIS, that document need only "briefly

provide sufficient evidence and analysis for determining whether to prepare an environmental

impact statement or a finding of no significant impact."  *Tri-Valley CAREs v. U.S. Dep't of

Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012) (quotations omitted).  "An EA 'must provide the

public with sufficient environmental information, considered in the totality of the circumstances,

to permit members of the public to weigh in with their views and thus inform the agency

decision-making process.'"  *Id.* (quoting  *Bering Strait Citizens for Responsible Res. Dev. v. U.S.

Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008)).

The End of the World EA and the Hungry Ridge EIS satisfy these requirements.

### a.    Forest Health and Wildfire Risk

The Forest Service determined that decades of fire suppression in the area has increased

the prevalence of more fire-intolerant vegetation, contributed to greater levels of insect and

disease mortality, and caused an increase in fuel loadings.  A_000003-4; B_000386-7.  The

changes—the Forest Service concluded—have increased the risk of large, stand replacing

wildfires that could adversely affect vegetation, fisheries resources, watershed function, and

wildlife habitats and pose safety risks to firefighters responding to wildfire.  *E.g.*, A_003211;

A_000139-40; B_000386.  Indeed, since 2000 there have been three fires that have burned

within the End of the World Project area.  A_003212.

The Forest Service's fire and fuels specialist, Barry Ruklic, who has over twenty years of

experience and spent weeks on the ground in the End of the World Project area, explained how

the authorized treatments would reduce wildfire risk and help prevent damage to property and

loss of human life:

> The mechanical treatments would reduce surface fuel loading
> levels, raise canopy base heights by reducing ladder fuels, and
> reduce stand density by removing many diseased trees in the over
> story, resulting in reduced fire behavior potential in the project
> area.  Prescribed burning would be utilized as a means to reduce
> mechanical fuels residue and excessive fuel accumulations. . . .
> Mechanical thinning and prescribed fire application throughout the
> project area should return fuel loadings to historical levels and
> thereby help to restore forest health, reduce stand replacement fire
> risk, improve firefighter and public safety, and reduce wildfire risk
> to local communities. . . . [T]he Proposed Action and Alternative B
> . . . will provide a greater margin of safety.  The no action
> alternative will not.

A_003252.  In other words, treating the vegetation in the project areas in the manner proposed

will improve forest health and prevent large-scale, catastrophic fire, thereby benefiting forest

resources, including fish and wildlife, and reducing the safety risk to firefighters.  *E.g.*,

B_000668-70 (detailing improvements to forest composition, special arrangement, and

structure); B_000805 ("The proposed treatments will provide greater strategic and tactical

suppression opportunities, and create a safer environment during suppression operations for out

[sic] firefighting resources."); B_000028-29 (similar); A_000016 (similar).  For each project, the

Forest Service analyzed and compared the impacts of leaving the project areas alone with the

action alternatives and reached the conclusion that the treatments would improve forest health,

reduce wildfire risk, and benefit natural resources.  *E.g.*, A_000057-117; B_000342-688.

Plaintiff argues the Forest Service failed to consider certain "studies" that allegedly

establish the controversial, uncertain, and/or negative effects of timber harvest on wildfire, forest

health, and climate change.  This is incorrect.  The Forest Service provided the opportunity for

public comment and the submission of relevant scientific information regarding proposed

activities.  *See* A_000016-26.  The Forest reviewed and considered the scientific literature

submitted by the public and by Plaintiff in particular.  A_012130-191; B_000803-1003.

The Forest Service's ultimate determination that the thinning authorized under the

Projects would *reduce* fire risk is not controversial, let alone arbitrary and capricious.  Current

Forest conditions unequivocally support the need for action:  For End of the World, "[t]wenty-

eight percent of the project area is within vegetative condition class 2 or 3 [which are moderate

to high departures from their natural range of variability]" and there is "[a] need within the

project area [ ] to reduce vegetative susceptibility to subsequent insect and disease activity,

which will minimize tree mortality that would contribute to surface fuel loadings."  A_003203.

For Hungry Ridge, "[a]s a result of fire exclusion resulting from effective suppression and past

management, there has been a vegetative shift to more fire intolerant species, an increase in fuel

loadings and a proportional increase in the risk of large, stand replacing wildfire" and the

"[c]omplexity of fighting wildfires in the project area has increase due to the change in

vegetation conditions."  B_000007.

Numerous studies considered by the Forest Service as part of the record have shown

that—contrary to Plaintiff's contentions—thinning reduces fire risk.  As explained in the

agency's response to Plaintiff's objections to End of the World, the fire and fuels specialist relied

on multiple peer-reviewed papers and the Wildland Fire Assessment Tool to analyze the

effectiveness of fuel treatments.  *See* A_000465 ("The impact of no treatment in the context of

fuels, was analyzed by the responsible official and documented both in the Fire and Fuels

Specialist Report (pp. 21-23 of 29) and the EA (pp. 16, 23-25) and found that as the landscape

would have increasing stand densities and potential to severe wildfire due to fuel loading (p.

16).").  Taking one example from Hungry Ridge, the Forest Service responded in depth to public

comments asking the Forest Service to consider a 1999 article by Dr. Cohen and limit treatment areas to those close to property and structures: "Cohen does suggest that fire spread rates are faster in thinned stands than un-thinned stands.  However, spread rates are isolated to the surface and are not crown fire driven spread rates which can be attacked by ground crews slowing fire spread."  B_000850.  The Forest Service concluded that treating only lands adjacent to private property would not reduce the risk of crown fire, which poses the greatest risk.  *Id.*

The body of literature supporting thinning as a tool to improve forest health and reduce wildfire risk—two purposes of the Projects—is overwhelming, and the Forest Service strongly disputes Plaintiff's characterization that this area of scientific research is "controversial."  Pl.'s Opening Br. 22.  Indeed, the agency noted that "[m]ore than half of the 76 opposing viewpoints" on the efficacy of thinning to reduce fire risk submitted to the agency were "opinion pieces found in news articles or advocacy journals," a few supported the project, and "[m]ost were generalized opinion pieces, having no connection to the proposed actions."  A_016336.

The Forest Service's determination that thinning would improve forest health and reduce fire risk in the Project areas was not arbitrary and capricious just because Plaintiff submitted what it believes to be contrary studies and expert opinion.  In APA cases, courts have "consistently rejected" attempts to "engage in a battle of the experts . . . offering their own studies to contradict those of the agencies."  *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1511 (9th Cir. 1997).  "[W]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  *Id.* (internal quotation omitted).  On scientific matters, a reviewing court affords substantial deference to the deciding agency.  *See Ecology Ctr.*, 574 F.3d at 658–59 ("We grant considerable discretion to

agencies on matters 'requir[ing] a high level of technical expertise.' (citation omitted)).  A plaintiff's citation of scientific studies that support a conclusion different from that reached by the agency is not persuasive.  *McNair*, 537 F.3d at 988 (the court does not "act as a panel of scientists that instructs the Forest Service how to validate its hypotheses regarding wildlife viability, chooses among scientific studies in determining whether the Forest Service has complied with the underlying Forest Plan, and orders the agency to explain every possible scientific uncertainty").

Plaintiff relies on *Bark v. U.S. Forest Service* for their argument that the Forest Service's analysis of the efficacy of thinning to reduce fire risk violates NEPA.  Pl.'s Opening Br. 22-23. *Bark* is a fact-bound decision and thinning projects to reduce fire risk are not inherently suspect after *Bark.  Bark v. U.S. Forest Serv.*, 958 F.3d 865, 870-71 (9th Cir. 2020) (holding the Forest Service's decision to proceed under an EA was arbitrary and capricious, because there was a "substantial dispute" about the effect of variable density thinning on fire suppression).  The *Bark* plaintiffs' allegations that thinning is controversial were directed at moist, old-growth stands in the Cascades dissimilar from the project areas.  *See Bark v. U.S. Forest Serv.*, 393 F. Supp. 3d 1043, 1052 (D. Or. 2019) ("the method that the USFS plans to use to perform thinning . . . has been used in dry plantation stands without the effects that Bark claims to cause controversy.").

Further, whereas in *Bark* the Court found that the Forest Service had failed to "engage" with the evidence, 958 F.3d at 871, the record here evidences the Forest Service's solicitation, review, and consideration of Plaintiff's literature.  A_000017, 000026; B_000049-50; A_012130-91; A_016333-495; B_000970-1003.  In *Bark*, the Court found that the Forest Service had only drawn "general conclusions" about the efficacy of thinning to reduce fire risk, 958 F.3d at 871, but here the Forest Service sufficiently supported the need to use thinning.  *See supra* p.

31.  Finally, *Bark* dealt with thinning without follow-on fuel treatment of activity fuels.  Here, the Projects authorize follow-on fuel treatments to reduce fire risk.  A_003219; B_000013.  *Bark* does not provide a basis for preventing these much-needed projects from moving forward.

Finally, belying Plaintiff's claim that thinning is sufficiently controversial to require a full EIS, the Ninth Circuit has repeatedly upheld Forest Service determinations, based on EAs, that thinning projects will have no significant environmental impacts.  *See, e.g.*, *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1235, 1239-1249 (9th Cir. 2005) (1,500-acre thinning project); *Friends of the Wild Swan v. Weber*, 767 F.3d 936 (9th Cir. 2014) (1,128 acres of timber harvest and 823 acres of thinning; 1,193 acres of timber harvest and 660 acres of thinning); *All. for the Wild Rockies v. Pena*, 865 F.3d 1211 (9th Cir. 2017) (12,802-acre timber harvest project that included thinning); *Hapner v. Tidwell*, 621 F.3d 1239, 1242 (9th Cir. 2010) (810-acre thinning project); *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005 (9th Cir. 2006) (578-acre thinning project).  End of the World is no different.

### b.     Fisher and Wildlife

Plaintiff's characterization of the effects of the Projects on wildlife resources as "severe" is lacks nuance.  There are many species with a variety of habitat needs within both project areas.  A_018694, 99, 018700; A_18850; B_023894-024004.  Some species require mature forest habitat, and will experience some habitat loss as a result of the proposed activities.  A_018837-46; B_023989-90.  Other species utilize early seral habitats created by harvest and burning for foraging, and would experience foraging habitat gains.  B_023949-51; A_018798-99.

The Forest Service analyzed effects for *all* species reasonably expected to be impacted by the projects.  B_023909-72; A_018752-18837.  For fisher, specialist reports for both projects contain a robust discussion of project impacts.  A_018703, 705, 709, 715, 730-32, 759, 782-85, 796, 814-15, 830-31, 842; B_023927-32.   This includes analyses of cumulative effects by sub-

watershed.  B_023931-32; A_018715.  Based on a number of considerations and findings, the agency determined that while some individuals or habitat may be affected by project activities (*e.g.*, B_023929, 023931; A_018715) neither project is likely to impact fisher viability on the population level or cause a trend to federal listing as threatened or endangered under the ESA. A_018842; B_023932.  First, the project will not result in the loss of high quality fisher habitat. *See* A_018782-85.  High quality fisher habitat is considered landscapes with less than or equal to 5% open habitat.  A_018730; C_023014.  The End of the World project area already has 12% open habitat, and fishers have still been documented within the project area.  A_018732.  The Hungry Ridge project would open areas from 5% to 26%, which may deter fisher from using some areas, but a large amount of mature forest (60%)—providing high quality habitat—would remain.  B_023930.  Plaintiff ignores this complexity and broadly implies 76% mature forest is a low number, Jageman Decl. ¶ 35, when in reality many species require a more diverse array of habitats.

Second, habitats treated with intermediate harvest would still provide fisher habitat. B_023929; A_018782-83.  This is because intermediate treatment is designed to leave a residual fully-stocked stand.  A_017112, 017121, 017123.  Third, under the no action alternative the condition of the forest would further deteriorate and the risk of catastrophic wildfire would increase.  A_018759; B_023929.  The authorized treatments would help prevent such an outcome and thereby benefit fish and wildlife resources, including fisher.  Finally, both projects include numerous mitigation measures to reduce wildlife impacts.  *See* A_018766-68; A_0000068-69; A_000009-13; B_023990-91; B_0000020-25; B_001135-39.

Nevertheless, Plaintiff erroneously argues the Forest Service failed to take a "hard look" at impacts to fisher.  Pl.'s Opening Br. 25-28.  Plaintiff first avers that the Forest Service ignored

severe, long-term effects of regeneration logging on fisher, which are "barely hanging on in the area." *Id.* at 25-26. The situation for fisher is not so bleak. The Forest Service estimates fisher distribution to be similar to historic levels for the Northern Rocky Mountains. B_023927; A_018732. The Forest Service has confirmed fisher are present in both project areas. A_018732; B_023927-28. The End of the World wildlife specialist's report thoroughly analyzes both short- and long-term effects on fisher. A_018714-15; A_018730-32; A_018782-85; A_018814-15; A_018842. The EA summarizes effects to fisher in Table 12 and directs the public to the wildlife report (A_000091). A_000094-97. The Hungry Ridge FEIS similarly directs readers to the specialist's report, project record, and Appendix E. B_000637; B_000643; B_000796. The Hungry Ridge wildlife specialist's report considered short-term and long-term effects to fisher. B_023927-32.

Plaintiff also argues that the Forest Service ignored effects on fisher from intermediate harvest by variable density thinning ("VDT"). Pl.'s Opening Br. at 26-27. Not true. Forest Service biologists specifically addressed the impacts of VDT on fisher and concluded that the Projects would not contribute to a loss of viability for the species.[18] A_018782-84; B_023905, 023929. One reason for this is that units treated with intermediate harvest will still provide a forest structure that fisher can use, because gaps created by VDT can be no larger than five acres and gaps cannot comprise more than 30% of the total unit area. A_017126. The Forest Service also considered that fisher evolved in an ecosystem where available habitat would have

---

[18] Although the Forest Service biologist for End of the World treated VDT as an intermediate treatment, A_018783-84, and the biologist for Hungry Ridge treated VDT as a regeneration treatment, B_023905, both arrived at the same conclusion that the Projects would not contribute to a loss of viability for the species.

fluctuated with the occurrence of stand-replacing fires that create a mosaic of openings across the landscape.  B_023929.

Thus, it is simply not the case the Forest Service "ignor[ed] VDT gaps."  Pl.'s Opening Br. 28.  It was clearly stated in the analysis that VDT could impact openings and habitat connectivity.  *See* A_018783- 84, 018842.  NEPA requires nothing more.  *See Idaho Conservation League v. U.S. Forest Serv.*, No. 1:11-cv-341-EJL, 2012 WL 3758161, at *8-12 (D. Idaho Aug. 29, 2012) (finding EA took a hard look at various sensitive wildlife species).

### c.  Snake River Steelhead

The Forest Service fully examined the potential effects of the Projects on fish and streams, including the Snake River Steelhead, in the specialist report and BA for End of the World and in the FEIS and BA for Hungry Ridge.  A_003290, 003291, 003300, 003311-12; A_000503, 000507-08, 000512, 000515, 000519-20; B_001077, 001161-73; B_000763-799; B_005318, 005331.  Proximity and mitigation are key factors in determining affects to fish and fish habitat.  Culvert removals and/or replacements, which adds some sediment to streams in the short-term but which would reduce future sediment delivery to streams in the long-run, are the only actions in the Hungry Ridge Project with the potential to directly affect steelhead[19] and are the primary driver of steelhead effects in End of the World. A_003312; B_015651-52.

For End of the World, logging and temporary road construction are not expected to increase sediment to streams.  A_003303.  Sediment from log haul on the roads may introduce additional effects, but they are expected to be minimal due to the implementation of BMPs.

_____

[19] Stream dewatering, fish salvage, and stream restoration could displace individual fish, however, any localized increases in in-stream sediment are expected to be short-lived and offset by long-term improvements associated with the improvement of stream crossings and the habitat enhancement from the stream restoration work.  B_015651-52.

A_003304.  In addition, the Projects include numerous mitigation measures designed to reduce impacts to aquatic and fish resources by greatly reducing sediment delivery to streams, which were analyzed and disclosed in the NEPA documents.

Plaintiff's arguments that the Forest Service's steelhead analyses are deficient lack merit. First, Plaintiff argues the Forest Service failed to use baseline population information in its analysis.  Pl.'s Opening Br. 29.  But knowing how many fish are in a stream has limited utility for predicting effects, because steelhead have a 2-5 year life cycle and population numbers can fluctuate dramatically from year to year.  A_000566, 568.  One year of data, for example, could not accurately predict project effects when work will be conducted over several years.  This is why the Forest Service focused its effects analysis on steelhead habitat and distribution (*i.e.*, whether steelhead are present verses how many), *see* B_005331- 32, and in particular, anticipated sediment delivery to fish habitat.  *See, e.g.*, A_000507-08.  The Forest Service's methodology was reasonable and that is all NEPA requires.  *See Lands Council v. McNair*, 537 F.3d 981, 1003 (9th Cir. 2008) ("Though the Forest Service must explain the methodology it used . . . NEPA does not require us to decide whether an [EIS] is based on the best scientific methodology available." (internal quotation marks omitted)).  For both End of the World and Hungry Ridge, the effects to steelhead come primarily from road improvement or decommissioning work although there are many mitigations in place to reduce impacts to fish and their habitat.

Next, Plaintiff argues the Forest Service failed to consider recent, "severe" steelhead declines[20] and points to the Lolo Insect and Disease Project that Plaintiff successfully challenged

---

[20] As explained previously, population data fluctuates—sometimes dramatically—from year to year, which is one reason why the Forest Service focusses on habitat in its effects analysis. Population numbers were as low in 1977 as they were in the mid-1990s.  Recently, there was a

in this district for failure to reinstate ESA consultation in light of 2019 steelhead returns.  Pl.'s Opening Br. at 30-31 (citing *Friends of the Clearwater v. U.S. Forest Serv.*, No. 3:20-CV-00322-BLW, 2021 WL 3408595 (D. Idaho Aug. 4, 2021) ("*Lolo*")).  The decision in *Lolo* does not translate to a NEPA violation here, because Plaintiff in that case did not challenge the steelhead effects analysis under NEPA.  As explained herein, the Forest Service's methodology for analyzing steelhead effects based on distribution and anticipated habitat impacts—and not population, which fluctuates from year to year—satisfies NEPA's "hard look" requirement.

Finally, Plaintiff argues that the Forest Service improperly characterized the Projects' effects on steelhead as "short-term."  Pl.'s Opening Br. 31-32.  Effects from road improvement or decommissioning would occur only once per stream crossing site and would not last more than two hours to two days per site.  *See* A_000512; A_000515.  While it is true that some Project activities would occur over a longer timeframe, the road work that could potentially affect steelhead (via sediment delivery to streams) would be isolated and of short duration.  A_003302; A_003304; A_000512; A_000515.  Plaintiff also ignores the fact that under the no action alternative sediment would continue to be delivered to streams from roads.  The proposed road improvement work would mean less sediment is delivered to streams from roads over time.

Plaintiff also misuses sediment and fish habitat modeling results (*i.e.*, FISHSED) to argue that that the Project will result in long-term impacts.  Pl.'s Opening Br. 31-32.  While it is true that the FISHSED modeling shows that cobble embeddedness will increase and habitat quality will decrease for the streams in the Project area, the Guide makes clear that "[t]he FISHSED model should be used to compare alternatives only."  C_017811.  In other words, the data

---

sizable increase in 2020 at Lower Granite Dam and a projected decrease in 2021.  *See* "Idaho Steelhead Update (9/1/21)," https://idfg.idaho.gov/blog/2021/08/idaho-steelhead-update-9121.

generated by FISHSED was not intended to be an accurate prediction of future in-stream conditions or long-term effects.  This was explained in the record.  A_003306-07.  Further, a 10-20% predicted change in embeddedness under the model is not considered "measurable" under the literature (Stowell et al. 1983), and predicted embeddedness for South Fork White Bird and Little White Bird remain below 20%.  *See* A_003306, 003311 ("FISHSED modeling indicates changes over 10% in cobble embeddedness and winter rearing in five prescription watersheds; however these watersheds remain within acceptable model ranges 10-20% (Stowell, 1983).").  The Forest Service's conclusion that the End of the World Project would have long-term benefits is thus well-supported.  *See* A_003302, 003304, 003312; A_000512; A_000515.

### d.    Mill Creek

Plaintiff also argues that the Forest Service ignored "severe degradation of stream conditions in Mill Creek."[21]  Pl.'s Opening Br. at 33.  Specifically, Plaintiff argues the Adams Camp and Doc Denny projects dramatically increased cobble embeddedness in Upper and Lower Mill Creek and that the FEIS failed to disclose and analyze that Hungry Ridge Project will cause conditions to deteriorate even more.  *Id.* 33.  Plaintiff's arguments, however, are grounded in erroneous cobble embeddedness numbers that were later corrected.  B_018939 (showing mean weighted cobble embeddedness for Mill Creek exceeding objective at 36%).  Further, the cobble embeddedness numbers for Lower Mill Creek are split below the slide and above the slide.  In 2018, above-the-slide cobble embeddedness was measured at 15% and below-the-slide cobble embeddedness was measured 25%.  B_018916.  Embeddedness values below the slide are higher due to sediment input from the slide and should not be used to predict project effects.  The 2011

---

[21] Plaintiff overstates historical logging in this area.  Since 1960, there has been harvest on approximately 29% of Mill Creek with the bulk of the harvest (4,457 out of 6,762 acres) occurring between 1970 and 1989.  B_000747.

numbers were taken above the slide only.  Plaintiffs also erroneously rely on FISHSED

modeling, which the Forest Plan advises should only be used to compare alternatives, *not* to

predict future in-stream conditions.  C_017811.  The Forest Service's analysis shows that the

adverse effects to water quality and fish in Mill Creek will be short-term and minimal and are

associated with the culvert replacement activities.  B_015620; B_015701.

The Forest Service's decision *not* to use Mill Creek cobble embeddedness data in its End

of the World analysis was reasonable and complies with NEPA, since that Project does not occur

in the Mill Creek drainage.  The End of the World analysis thoroughly discusses impacts to

affected streams from road work and log hauling, and how those impacts are minimized through

the implementation of design features and BMPs.  *See* A_003302-05; A_000512; A_000515.

### 2. There are no NEPA Violations Tiered to NFMA or ESA Violations.

Plaintiff argues the Forest Service's alleged NFMA and ESA violations are also NEPA

violations.  Pl.'s Opening Br. 34-35.  First, the Forest Service did not fail to "verify locations and

amounts of existing old growth in the manner specified in the Forest Plan."  Pl.'s Opening Br.

35.  As explained above, *see supra* pp. 15-17, the Forest Service used several data sources to

identify old growth stands, including stand exams and other field data.  *See* B_006364-6457,

006458-6553 (Hungry Ridge Stand Exams); A_017164-17430 (End of the World Stand Exams);

B_026689-92, 026699, 026702-11, B_026726-30 (Hungry Ridge wildlife stand surveys and field

notes).  The Forest Service's old growth calculations comply with NEPA.

Plaintiff also argues that the Forest Service failed "to gather and utilize information on

flows and flushing capabilities."  Pl.'s Opening Br. 35.  This is untrue.  As explained above, *see*

*supra* p. 28, consistent with the Guide, the Forest Service considered stream power and flushing

rates in conjunction with its analysis of sediment input, which has a greater impact on cobble

embeddedness.  The Forest Service also analyzed the base geology for Jungle Creek and Cold

Springs, which shows the naturally low flushing power of those streams.  A_003295, 003297.

Finally, Plaintiff argues that the Forest Service "wrongly refused to consider effects to grizzly in the End of the World EA and Hungry Ridge EIS."  Pl.'s Opening Br. 35.  For the reasons explained in Section D, below, that is not the case.

### 3.      The Forest Service Adequately Analyzed Cumulative Effects.

Plaintiff next argues that the Forest Service failed to adequately address the cumulative effects of the Hungry Ridge and End of the World Projects in the NEPA documents.  To the contrary, the Hungry Ridge FEIS includes the—at that time, future—End of the World Project in its discussion of cumulative effects.  B_000600, 000625, 000628-29, 000660.  The Forest Service also addresses End of the World in Appendix C – Cumulative Effects to the Hungry Ridge FEIS.  *See, e.g.*, B_000744-47, Tbl. C-2; B_000755.  Finally, the wildlife specialist's report for Hungry Ridge defines the spatial and temporal context for the cumulative effects analysis for each species—*e.g.*, the Lynx Analysis Unit, Elk Analysis Area, project area, sub-watershed, and so on, depending on the particular species—and where End of the World falls outside of those boundaries it is not included in the cumulative effects analysis.  *See generally* B_023909-68; B_000947 (response to comment on cumulative effects analysis).  For fisher, the Forest Service biologist defined the cumulative effects analysis area as only including the Mill Creek and Johns Creek sub-watersheds (B_023931), which do not fall within the End of the World Project Area.

The End of the World wildlife specialist report considered Hungry Ridge in the context of affected resources and habitat where the spatial extent of the cumulative effects analysis areas

for the two projects overlap.[22]  *See* A_018803-27; A_018814-15 (discussing Hungry Ridge with

respect to fisher); A_018821 (discussing Hungry Ridge with respect to American Marten).

By considering cumulative effects by species and habitat in the wildlife analyses for both

projects, the Forest Service fully complied with NEPA.  *See Bark v. U.S. Bureau of Land Mgmt.*,

643 F. Supp. 2d 1214, 1223-24 (D. Or. 2009) (noting EA does not require "a cataloguing of all

past, present, and foreseeable projects by listing the time, type, place, scale, different plans and

methods, without regard to the usefulness of the data," and "when the analysis concludes that the

project will have virtually no effect on cumulative impacts, it is unnecessary for the agency to

detail other actions.").  Plaintiff rests their argument on the superficial absence of references to

the other project in certain NEPA documents.  *E.g.*, Pl.'s Opening Br. 36.  This elevates form

over substance.  *See Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000,

1009 (9th Cir. 2011) ("Although this evidence is not presented in the cumulative effects section

of the EA, it would impermissibly elevate form over substance to hold [the agency] must

replicate its entire analysis under the heading of cumulative effects."); *Conservation Cong. v.

United States Forest Serv.*, 235 F. Supp. 3d 1189, 1205 (E.D. Cal. 2017), *aff'd*, No. 17-16153,

2019 WL 2359434 (9th Cir. June 4, 2019) (citing *Mont. Wilderness Ass'n v. Connell*, 725 F.3d

988, 1002 (9th Cir. 2013)) ("NEPA does not mandate that the effects be presented in a particular

form; an agency has discretion in deciding how to organize and present information.")

In sum, the Forest Service adequately addressed the cumulative effects of the Projects.

---

[22] The Forest Service's aquatics analysis for End of the World did not address Hungry Ridge,
because the two projects do not overlap spatially.  *See* Forest Service Handbook, 1909.15-Nat'l
Environmental Policy Act Handbook, Ch. 10, 15.2 ("Spatial and temporal boundaries are the two
critical elements to consider when deciding which actions to include in a cumulative effects
analysis. . . . The effects of those actions must overlap in space and time for there to be potential
cumulative effects.").

C.      An EIS is Not Required for End of the World.

Under NEPA, "an agency may prepare an EA to decide whether the environmental

impact of a proposed action is significant enough to warrant preparation of an EIS." *Blue*

*Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).  Whether an

action "significantly" affects the environment depends on both "context" and "intensity." *Wild*

*Wilderness v. Allen*, 871 F.3d 719, 727 (9th Cir. 2017) (citing 40 C.F.R. § 1508.27).  "Context

refers to the setting in which the proposed action takes place," *Ocean Advocs. v. U.S. Army*

*Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) (citing 40 C.F.R. § 1508.27(a)).  "Intensity

means 'the severity of the impact.'" *Id.* (quoting 40 C.F.R. § 1508.27(b)).  "[T]he regulations

identify ten factors that agencies should consider in evaluating intensity," *In Def. of Animals,*

*Dreamcatcher Wildhorse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th

Cir. 2014) (citing 40 C.F.R. § 1508.27(b)(1)-(10)), including the degree to which possible effects

are "likely to be highly controversial" or are "highly uncertain or involve unique or unknown

risks." *See* 40 C.F.R. § 1508.27(b)(4), (5).  "One of these factors may demonstrate intensity

sufficiently on its own, although the presence of one factor does not necessarily do so." *Wild*

*Wilderness*, 871 F.3d at 727.

An agency can "reasonably rel[y] on its own expert reports and technical expertise in

concluding that the impact of the project would be insignificant." *Bark v. Northrop*, 607 F.

App'x 652, 655 (9th Cir. 2015).  An agency can consider mitigation measures in determining

whether a project's effects would be significant.  *Greater Yellowstone Coal. v. Reese*, 392 F.

Supp. 2d 1234, 1243 (D. Idaho 2005) ("An agency's decision to forego issuing an EIS may be

justified by the presence of mitigating measures."  (citation omitted)).  A FONSI "may be

overturned only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law.'"  *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004) (quoting *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002)).

The Forest Service looked at the context of the End of the World Project and then examined NEPA's intensity factors to make a finding of no significant impact.  A_000018-23. Plaintiff erroneously maintains that the size of the Project and NEPA's intensity factors required the Forest Service to prepare an EIS.  Pl.'s Opening Br. 38-41.  As explained below, these arguments lack merit.

### 1.    The "Context" of End of the World Does Not Require an EIS.

Plaintiff suggests that the size and timeframe associated with the project alone requires the preparation of an EIS.  Pl.'s Opening Br. 38.  A large project area does not necessarily equate to a significant effect.  Put into the context of the Nez Perce-Clearwater Forests as a whole, the proposed treatments are limited in size—covering 18,000 acres (or 1%) of the 1,708,628-acre Nez Perce-Clearwater Forests.  A_000005, 18.  Further, 91% of the treatments would leave fully stocked forest stands at completion of activities while only 9% of the treatments would be regenerative in nature.  A_000018.  Finally, design features and mitigation measures will "minimize adverse impacts to the extent that such impacts will be almost undetectable and immeasurable, even at the local level."  *Id*.  The Forest Service thus reasonably concluded the effects would be "local in nature and not likely to significantly affect regional or national resources."  *Id.* (analysis of "context").

### 2.    Effects are not Highly Controversial or Highly Uncertain.

Plaintiff first argues that an EIS was required due to the "highly controversial and highly uncertain" impacts of the project on wildfire risk and forest health.  Pl.'s Opening Br. 39. Plaintiff relies on *Bark*, where the Court struck down the Forest Service's decision to rely on an EA for a thinning project.  But as explained above, *see supra* p. 33, *Bark* is a fact-bound decision

that should not be applied to this case.  In particular, Plaintiff here attacks the Forest Service's decision to use thinning in a fire-prone area, whereas the *Bark* plaintiffs alleged thinning to prevent fires in moist, old-growth stands in the Cascades was controversial.  *See Bark*, 393 F. Supp. 3d at 1052; *supra* p. 33.  Accordingly, to the extent the *Bark* Court's holding relied on the "controversy" over thinning, it should not be extended beyond the specific facts of that case to a different forest ecosystem area.  Plaintiff faults the Forest Service for not discussing "current relevant science" on thinning and wildfire risk in the DN/FONSI or the EA, Pl.'s Opening Br. 39, but that information is in the record.  *See* A_012130-91 (describing literature considered).

Second, Plaintiff argues there remain "substantial questions" about the Projects' effects on old-growth-dependent species, such as fisher, and on ESA-listed species.  For the reasons in elsewhere in this brief, *see supra* pp. 34-37 (fisher); *infra* 46-54 (grizzly), Plaintiff has not established a substantial dispute as to the potential effect of End of the World on these resources. An EIS is not required "anytime there is some uncertainty, but only if the effects of the project are 'highly' uncertain."  *In Def. of Animals*, 751 F.3d at 1070 (quotation omitted).  Again, Plaintiff faults the Forest Service for not including a discussion of fisher in the DN/FONSI, but the EA clearly directs readers to the specialist reports where fisher is discussed in depth.

In sum, the Forest Service's finding that NEPA's intensity factors did not require preparation of an EIS was not arbitrary or capricious.

### D.    The Forest Service More than Satisfied its ESA Obligations and the Record Supports its "No Effect" Determination for Grizzly Bear.

Despite the record's clear support for the Forest Service's conclusion that no grizzly bears are present in the project areas and thus the Projects will have "no effect" on grizzlies, Plaintiff argues that this Court should nonetheless vacate the agency's determination and ignore the deference to which it is entitled.  *See Lands Council*, 537 F.3d at 987 ("Review under the

arbitrary and capricious standard 'is narrow, and [we do] not substitute [our] judgment for that of

the agency.'") (citation omitted).  The Court should reject Plaintiff's argument and uphold the

Forest Service's well-reasoned "no effect" determination, as both the record and the law

establish that there was no "clear error in judgment." *Tri-Valley CAREs*, 671 F.3d at 1124 ("An

agency will have acted arbitrarily and capriciously only when 'the record plainly demonstrates

that [the agency] made a clear error in judgment.'") (citation omitted).

### 1.      The Record Supports the Forest Service's "No Effect" Finding.

The crux of Plaintiff's argument is that the Court should vacate the agency's "no effect"

finding because there has been one confirmed report of a grizzly bear within one of the two

project areas over the course of the last 75 years.  Pl.'s Opening Br. 42.[23]  But the Forest Service

expressly considered evidence of this bear—as well as another bear (Bear 927) that was observed

over 70 miles away from the project areas in 2019—in its effects analysis set forth in the BAs for

each project. *See, e.g.,* A_000652-56 ("Both bears were males that dispersed from the Cabinet

Mountains of northwest Montana/northern Idaho. . . .").  Among other things, the Forest Service

considered that Bear 927 has been confirmed to have "return[ed] to northwest Montana to den,"

and that there have been no confirmed observations of grizzlies on the Forest since 2019. *Id.*  In

reaching its "no effect" determination, the Forest Service also considered factors including:

> [the] last known locations of verified bears; sex and age class of
> bears, which may inform potential home range size; whether the
> bear is transitory or localized to a specific area; the suitability of the
> habitat within the action area; and whether [sub-watersheds]
> adjacent to those within the action area should also be considered as
> areas where grizzly bears 'may be present'.

---

[23] Specifically, Plaintiff notes that the White Bird Bear was verified to have been in the End of the
World project area in 2019. *Id.*  Plaintiff also references the discovery of grizzly tracks outside of
the project area in April 2020, but neglects to mention that the Forest Service concluded that these
tracks were the same White Bird Bear's tracks "because of [their] proximity to that observation."
A_000654; B_024031.

A_000655; B_024032.  Based on these factors and its analysis of grizzly survey and observation data dating back to the 1940s, the Forest Service concluded that the Projects will not have an effect on grizzlies because there are no grizzlies in the project area to be affected.  A_000652-56; B_024029-33.  The Court should uphold the agency's reasoned conclusion, as it does not constitute a clear error in judgment. *Tri-Valley CAREs*, 671 F.3d at 1124.

Instead of affording deference to the agency, Plaintiff suggests that the Court should vacate the agency's determination based on irrelevant hearsay statements in a purported expert declaration attached to its brief.  Pl.'s Opening Br. 33-34; Mattson Declaration.[24]  Relying only on Mr. Mattson's declaration as support, Plaintiff argues that "recent grizzly presence indicates other dispersing grizzly will attempt to occupy the project areas over the next decade."  *See* Pl.'s Opening Br. 43 (citing Mattson Decl. at ¶ 29 [sic]).  But this purely speculative statement, representing one man's forecast of the future, is hardly grounds to vacate the agency's effects determination.[25]

### 2. The Forest Service Met and Exceeded Its Consultation Obligations Under Section 7 of the ESA.

As Plaintiff acknowledges, the first step in complying with Section 7 of the ESA is for an agency to obtain "a list of any listed or proposed species . . . that may be present in the action area."  Pl.'s Opening Br. 42 (citing 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c)).  There is no dispute that the Forest Service did this.  Pl.'s Opening Br. 42.  In December 2020, FWS sent the

---

[24] For the reasons set forth in Federal Defendants' Motion to Strike filed contemporaneously herewith, the opinions in David Mattson's declaration—which were not before agency decision-makers in this case—cannot be used to evaluate the agency's effects determination.

[25] Even in Mr. Mattson's declaration itself, he offers no scientific basis for his prediction that it is "highly likely that grizzly bears will pass through or even attempt to take up residence in or near both project areas during the next 10 to 15 years."  Mattson Decl. at ¶ 14.

Forest Service an updated map showing that grizzly bear "may be present" in the project areas. C_000708-10.

Thereafter, the Forest Service prepared a BA for each Project analyzing whether it "may affect" grizzlies. A_000652-56; B_024029-33; 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.12(f), 402.14(a). Based on FWS's map, its analysis of the proposed project activities, and the other factors discussed *supra* pp. 47-48, the Forest Service determined that the Projects will not have an effect on grizzly bear. A_000652-56; B_024029-33. Upon arriving at that determination, the Forest Service's ESA-compliance obligations were concluded. *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994), *cert. denied*, 514 U.S. 1082 (1995) ("[I]f the agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered.").

Even though it was not required under the ESA, the Forest Service nevertheless requested a meeting with FWS for FWS to review its "no effect" finding in light of the reports of two grizzlies on the Forest in 2019 and FWS's updated map of where grizzly bears may be present. *Id.* In December 2020, Forest Service and FWS personnel met and discussed the Forest Service's effects analysis. C_000711-13. As a result of the meeting, FWS noted that, while FWS "does not provide Letters of Concurrence with 'No Effect' determinations" because it is not required to under the ESA, it "does acknowledge the Forest[ Service]'s determination of 'No Effect,'" and did not disagree with the finding. C_000712. This meeting exceeded the Forest Service's obligations under the ESA. Accordingly, summary judgment should be granted for Federal Defendants.

### 3. The Forest Service Reasonably Considered "Occupancy" in its Effects Determination.

Plaintiff further argues that the Forest Service's "no effect" finding is arbitrary and

capricious because its analysis focuses on whether grizzlies "occupy" the action area rather than whether they "may be present." Pl.'s Opening Br. 43. This argument conflates two distinct issues that were separately and appropriately addressed by FWS and the Forest Service. On the one hand, FWS prepared a map identifying areas in which grizzlies may be present, encompassing "both grizzly bear home ranges and the potential movement of transitory bears through [the] project area." C_000703. On the other hand, the Forest Service considered those areas identified by FWS and specifically analyzed whether grizzlies would be impacted by the Projects, including an analysis of whether those areas are "occupied" – meaning a grizzly has "established [a] home range[] and continuously reside[s]" there. A_000655; B_024032.

Plaintiff's notion that the Forest Service "disagreed" with FWS's map relies on the incorrect assumption that, just because grizzlies "may be present" in a project area, the project will necessarily impact them. Pl.'s Opening Br. 43. Indeed, in the letter accompanying its map, FWS noted that "although grizzly bear may show as 'may be present' through the mapping methodology, the Action Agenc[y] may find that the proposed action will have no effect to grizzly bears." C_000710. Further, the Ninth Circuit has upheld agencies' "no effect" determinations even where a listed species may be present in or around the action area. *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1446-49 (9th Cir. 1996) (upholding the agency's "no effect" determination despite it conflicting with a FWS-policy providing that "agency actions within one mile of a Mexican Spotted Owl Protected Activity Center ['PAC'] . . . may affect the [o]wl" because, even though the project was within one mile of a PAC, the agency's finding was not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise") (citation omitted); *Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 924 (9th Cir. 2020) (upholding the agency's "no

effect" determination for a pesticide registration despite its conclusion that protected species "would be exposed to potentially harmful chemicals," because a "recognition of exposure is not a recognition that [the project] 'may affect' protected species," rather, it is "a recognition that [the agency] did what the ESA requires it to do: assess risks to determine whether the exposure would have 'any possible effect'") (citation omitted); *Friends of Santa Clara River v. U.S. Army Corps of Eng'r*, 887 F.3d 906, 924 (9th Cir. 2018) (upholding the agency's "no effect" determination even though endangered steelhead trout populations would be exposed to discharged materials from the project, noting that the Court "may not substitute [its] scientific judgment for that of the agency") (citation omitted).[26]  Here, the Forest Service's "no effect" determination, based on an analysis of decades' worth of grizzly surveys and tracking information, is similarly entitled to deference.

> **4.      The Forest Service Sufficiently Considered Bear Security and Human-Grizzly Conflicts in Reaching its "No Effect" Determination.**

In its effects analysis, the Forest Service reasonably concluded that "bear security" in the project areas will be sufficiently maintained and that the Projects will not increase the potential

---

[26] Plaintiff's reliance on *All. for the Wild Rockies v. Kruger*, 950 F. Supp. 2d 1172 (D. Mont. 2013) and *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208 (D. Or. 2019) for the proposition that "using 'occupancy' rather than [the] 'may be present' standard to avoid Section 7 consultation violates the ESA" is unavailing.  Pl.'s Opening Br. 43.  Unlike the agency in *Kruger*, the Forest Service does not purport to make a "may be present" determination here.  Rather, it was FWS that determined where grizzlies "may be present," and the Forest Service conducted a separate "effects" analysis in which it appropriately considered "occupancy" as well as FWS's "may be present" findings. A_000638-42.  In *Jeffries*, instead of FWS identifying where ESA-listed species "may be present" like it did here, the action agency conducted that analysis and determined that, despite data from "radio collars show[ing] gray wolves traveling through the Project Area," the gray wolf was not a species that "may be present."  370 F. Supp. 3d at 1230-31.  The court remanded the agency's "may be present" finding, noting that that the appropriate "inquiry under the 'may be present' step of the Section 7 consultation analysis is not whether a given species may be present in great enough numbers to constitute a breeding pack . . . but whether the species 'may' be 'present.'" *Id.*  Here, FWS applied the appropriate standard and concluded that grizzly bear *is* a species that "may be present."

for human-grizzly conflicts.  A_000656; B_024033.  "Secure" grizzly bear habitat can generally

be defined as "any area >500-m from a road."  C_006416.  Contrary to Plaintiff's suggestion that

the agency failed to consider whether road density will increase in the short-term while each

project is underway, Pl.'s Opening Br. 44, the Forest Service did consider this issue.  With

respect to the End of the World project, the Forest Service found that the "project proposes 28

miles of road decommissioning, less than 1 mile of permanent road construction, and 15 miles of

temporary roads which will be obliterated/recontoured within 3 years of use."  A_000656.

Similarly, with respect to the Hungry Ridge project, the Forest Service found that the "project

proposes 25 miles of road decommissioning, placement of 4 miles of road in long term storage, 9

miles of permanent road construction, 2 miles of road reconstruction, and 23 miles of temporary

roads which will be decommissioned within three years of use."  B_024033.  Based on its

analysis, which considered the exact amount of roads that will be constructed and

decommissioned for each Project, the Forest Service determined that bear security will be

maintained, and possibly even increased, by the Projects. A_000006; A_000656; B_000010;

B_024033.

Plaintiff's argument that the Projects' "short-term" impacts to road density were not

properly considered—implying that the Forest Service should know exactly when each road will

be constructed and decommissioned over the lifespan of each Project—is both impractical and

unprecedented.  Unpredictable factors, like the weather, will often dictate when aspects of a

project are completed and when roads are needed and no longer needed.  Moreover, the Forest

Service's analysis of the Projects' impact on road density is especially reasonable based on its

finding that there are no resident grizzlies in the project areas.[27]  Indeed, in a district court case

---

[27] The cases relied on by Plaintiff do not support its contention that the Forest Service's analysis

cited by Plaintiff, the court noted that if the agency's "no effect" determination had relied on a finding that "the project at issue would not impact grizzly bears because there were none in the area"—just as the Forest Service did here—that would be a valid basis for its determination and there would be no need to consider factors like temporary road density. *Native Ecosystems*, 946 F. Supp. 2d at 1079-80.

The court in *Native Ecosystem* pointed to another case which is particularly instructive here. *See All. for the Wild Rockies v. Bradford*, 864 F. Supp. 2d 1011 (D. Mont. 2012), *amended in part*, No. CV 09-160-M-DWM, 2012 WL 12892360 (D. Mont. July 23, 2012). In *Bradford*, the court upheld the Forest Service's effects determination which concluded that "there are no grizzly bears in the Project Area" and thus "the Project will have 'no effect' on grizzly bears either through road construction or helicopter logging." 864 F. Supp. 2d at 1018. The court rejected the plaintiff's argument that the Forest Service's finding was arbitrary and capricious because, even though there was "some evidence contrary to [the agency's] conclusion" about the lack of grizzlies in the project area, there was "also evidence that supports the conclusion, and the Forest Service's interpretation of that evidence is not a clear error of judgment." *Id.* at 1019 ("While another reviewer could have come to a different conclusion in analyzing the available information, the Forest Service's conclusion is not a 'clear error of judgment.'").

Finally, Plaintiff argues that the Forest Service ignored "the risk of human/grizzly

---

is insufficient. *See* Pl.'s Opening Br. 44-45; *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1037 (9th Cir. 2001) (finding that a practice adopted by NMFS, under which "only [habitat] degradations that persist more than a decade . . . will be considered to degrade aquatic habitat," was insufficient because it effectively "ignore[d] the life cycle and migration cycle of anadromous fish" in the project area); *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1079-80 (D. Mont. 2013) (finding that the agency should have considered the project's "temporary increase in road density and [] temporary decrease in summer secure areas" because the main reason for its "no effect" determination was that the project's maintenance of "connectivity for transitory bears that might move through the project area").

conflicts based on the many workers that will be on the ground for the next 13 or so years in each project area, which creates a significant risk to grizzly." Pl.'s Opening Br. 44.[28] This argument fails for the same reasons as Plaintiff's road density argument. Plaintiff overlooks the Forest Service's conclusion in its effects analysis that the Projects will "not increase the potential for negative interactions with grizzly bears as a result of . . . human/grizzly conflicts," based on its finding that there *are no bears in the project areas* for humans to interact with. A_000656; B_024033. Thus, Plaintiff's contention that the Forest Service failed to consider potential human-grizzly conflicts is a red herring, as Plaintiff once again ignores the primary basis for the Forest Service's "no effect" determination.

## E.   Should the Court Grant Any Relief, Federal Defendants Request the Opportunity for Further Briefing on Remedy.

As discussed above, there has been no violation of law, but even were the Court to find a legal violation, every flawed agency decision "need not be vacated." *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Thus, should the Court find any violation of law, Federal Defendants request the opportunity to address whether vacatur is justified through separate remedy briefing. *See, e.g., Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 388 (E.D. Cal. 2007) (ordering supplemental briefing on the appropriate remedy and noting that "it is not prudent to impose a remedy without further input from the parties."). When "equity demands," courts may leave in place an agency action "while the agency follows the necessary procedures to correct" its error. *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (internal quotation marks omitted). Vacatur depends on "how serious the agency's errors are and the disruptive

---

[28] In support of this contention, Plaintiff quotes another conclusory prediction from Mr. Mattson's declaration, in which Mr. Mattson proclaims that he has "no doubt" that human-grizzly conflicts will increase while the Projects are underway but fails to provide any basis for his lack of doubt. *Id.* (citing Mattson Decl., ¶ 29 [sic]).

consequences of an interim change that may itself be changed." *Id.*

Both of these considerations are informed by the Court's decision on the merits.  In a case where the Forest Service can remedy the error through an amendment to the Forest Plan, for example, vacatur may not be appropriate.  *See Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (vacatur requires a "fundamental flaw" that would prevent the agency from adopting the same conclusion if the matter were remanded).  Courts have ordered remand without vacatur in cases of both NEPA and NFMA violations.  *See, e.g.*, *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156-57 (D. Mont. 2019) (ordering remand without vacatur where a large percentage of the project area geographically was unaffected by the Service's NFMA error and even within the affected area, the project authorized other work which could proceed);[29] *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 (D.D.C. 2019) (declining to order vacatur where "the probability that [BLM] will be able to justify retaining [its prior leasing decisions] is sufficiently high . . . ." (internal quotation marks omitted)).

In addition, in this case, the strong public interest in implementing the Projects is underscored by recent information produced by the Fireshed Registry, an interagency project, which identifies firesheds with the highest potential for forest fires to impact communities.  The Projects are located in one of the "top ten" highest risk firesheds in the region.  *See* Map, Ex. A.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion for Summary Judgment and grant Federal Defendants' Cross-Motion for Summary Judgment.  In the event the Court finds any violation of law, Federal Defendants request supplemental briefing on remedy.

---

[29] *Alliance for the Wild Rockies v. Savage* is particularly relevant here, where any NFMA violation may only apply to some of the watersheds, and to certain activities within those watersheds.

Respectfully submitted on this 9th day of November, 2021.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

/s/   Erika Norman
ERIKA NORMAN
Trial Attorney
Natural Resources Section
MICHELLE SPATZ
Trial Attorney
Wildlife & Marine Resources Section
4 Constitution Square
150 M Street, N.E., Suite 2.900
Washington, D.C.  20002
Phone:  (202) 305-0475 (Norman)
Phone:  (202) 598-9741 (Spatz)
Fax:  (202) 305-0506

*Attorneys for Defendants*