Bryan Hurlbutt (ISB # 8501)
Laurence ("Laird") J. Lucas (ISB # 4733)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
bhurlbutt@advocateswest.org
llucas@advocateswest.org

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| FRIENDS OF THE CLEARWATER | ) | No. 3:21-cv-189-CWD |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | **PLAINTIFF'S COMBINED** |
| | ) | **RESPONSE / REPLY BRIEF** |
| CHERYL F. PROBERT, in her official | ) | **ON CROSS MOTIONS FOR** |
| capacity as Forest Supervisor of the Nez | ) | **SUMMARY JUDGMENT** |
| Perce-Clearwater National Forests; and | ) | **(ECF Nos. 27, 29 & 30)\*** |
| U.S. FOREST SERVICE | ) | |
| | ) | |
| *Defendants*. | ) | |

\*   This Combined Response/Reply Brief complies with the 30-page limit set by the
Court's Scheduling Order, ECF No. 13.

## **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................3

   I.   NFMA VIOLATIONS FOR FAILURE TO COMPLY WITH FOREST PLAN ...3

      A.  Failure to Maintain Minimum 5% "Existing Old Growth" ........................3

           1.  Arbitrary & Capricious Decision to Count "NIOG" as Existing
               Old Growth ....................................................................................5

           2.  Failure to Separate Out "Existing" and "Replacement" Old
               Growth in MA20 ...........................................................................7

      B.  Arbitrary & Capricious "Upward Trend" Findings ....................................9

           1.  Ignoring Data Showing Downward Existing Trends ................10

           2.  Failing to Consider Stream Power and Flushing Rates
               Re Future Trends ........................................................................12

   II.   NEPA "HARD LOOK" VIOLATIONS .............................................................13

      A.  Failure to Take a Hard Look at Direct and Indirect Impacts....................13

           1.  Logging, Forest Health, and Wildlife Risk ...............................13

           2.  Fisher and Other Wildlife that Utilize Old Growth and
               Other Mature Forest ..................................................................19

           3.  Snake River Steelhead ...............................................................22

           4.  Ignoring Recent Severe Degradation in Mill Creek ..................23

           5.  Old Growth, Degraded Watersheds, and Grizzly Bear .............24

      B.  Cumulative Impacts .................................................................................25

  III.   NEPA VIOLATION FOR FAILURE TO PREPARE EIS: END
       OF THE WORLD....................................................................................26

  IV.   ESA VIOLATIONS FOR FAILURE TO CONSULT OVER
       GRIZZLY BEAR ...................................................................................28

V.      BOTH PROJECT APPROVALS MUST BE VACATED....................................29

CONCLUSION ............................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Bark v. U.S. Forest Service*,
    958 F.3d 865 (9th Cir. 2020) ........................................................................ 14,15

*Camp v. Pitts*,
    411 U.S. 138 (1973) ........................................................................................ 30

*Ctr. for Biological Diversity v. United States Forest Serv.*,
    349 F.3d 1157 (9th Cir. 2003) ........................................................................ 17

*Earth Island Inst. v. U.S. Forest Serv.*,
    442 F.3d 1147 (9th Cir. 2006) ........................................................................ 22

*Fund for Animals v. Hall*,
    448 F. Supp. 2d 127 (D.D.C. 2006) ............................................................... 22

*Greater Yellowstone Coal. v. Flowers*,
    359 F.3d 1257 (10th Cir. 2004) ...................................................................... 22

*Idaho Rivers United v. Probert*,
    No. 3:16-cv-00102-CWD, 2016 WL 2757690 (D. Idaho May 12, 2016) .............. 1

*Idaho Sporting Cong. v. Rittenhouse*,
    305 F.3d 957 9th Cir. 2002) ........................................................................... 26

*Kern v. BLM*,
    284 F.3d 1062 (9th Cir. 2002) ........................................................................ 22

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
    387 F.3d 989 (9th Cir. 2004) .......................................................................... 22

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) .......................................................................... 17

*Makua v. Rumsfeld*,
    163 F. Supp. 2d 1202 (D. Haw. 2001) ............................................................ 22

*Native Ecosystems Council v. Dombeck*,
    304 F.3d 886 (9th Cir. 2002) .......................................................................... 26

*Native Ecosystems Council v. United States Forest Serv.*,
    418 F.3d 953 (9th Cir. 2005) ....................................................................... 6,22

*Navajo Nation v. U.S. Forest Serv.*,
    479 F.3d 1024 (9th Cir. 2007) ............................................................ 19

*Or. Nat. Desert Ass'n v. Rose*,
    921 F.3d 1185 (9th Cir. 2019) ................................................... 17,20,22

*Pollinator Stewardship Council v. U.S. EPA*,
    806 F.3d 520 (9th Cir. 2015) ............................................................ 30

*Portland Audubon Soc'y v. Lujan*,
    795 F. Supp. 1489 (D. Or. 1992) ....................................................... 22

**Statutes**

5 U.S.C. § 706 ........................................................................................ 29

16 U.S.C. § 1604 ..................................................................................... 6

**Regulations**

36 C.F.R. § 219.7 .................................................................................... 6

36 C.F.R. §219.13 ................................................................................... 6

40 C.F.R. § 1508.27 .............................................................................. 27

50 C.F.R. § 402.14 ............................................................................... 28

**Other Authorities**

"Withdrawal of the Crystal Clear Restoration Decision Notice,"
    available at https://www.fs.usda.gov/nfs/11558/www/nepa/
    105482_FSPLT3_5503840.pdf (visited Dec 3, 2021) .................................................. 16

## INTRODUCTION

The End of the World and Hungry Ridge projects together authorize logging 26,000 acres of public lands over the next ten years to generate 317 million board feet of timber, or more than 30 million board feet of timber per year. The massive scale of these two projects is underscored by comparison to the Johnson Bar project recently before this Court, which approved logging 34 million board feet total over five years on 2,207 acres of the Nez Perce National Forest. *See Idaho Rivers United v. Probert*, No. 3:16-cv-00102-CWD, 2016 WL 2757690 (D. Idaho May 12, 2016). Yet the Forest Service persists in pretending that these projects are small-scale "forest health" projects which pose no long-term, adverse impacts. The Court should not be fooled.

Comparison with the Johnson Bar project—for which the Forest Service prepared an Environmental Impact Statement (EIS)—also underscores the agency's obvious violation of NEPA in refusing to prepare an EIS for End of the World, which alone approves logging on 19,000 acres (nearly 30 square miles) to log 144 million board feet. Nearly 1,600 acres would be "regeneration" logging, including twelve super-sized clearcuts. More than 10,000 acres would be logged by variable density thinning (VDT), a type of "intermediate" logging that allows clearcut gaps to cover 30% of the logging unit. Regeneration and VDT will riddle the area with clearcuts and similar scars, including in areas of mature forest habitat that will not recover for 100 years. The Forest Service's continued insistence that End of the World poses <u>no</u> significant impacts whatsoever is not credible in light of the massive scale of this project.

Just a mile away, Hungry Ridge will have equally large and lasting adverse impacts by logging 7,144 acres of forest (over 11 square miles) to harvest 173 million board feet of timber, with the vast majority—5,185 acres—as "regeneration" logging, mostly clearcuts. Twenty-nine super-sized clearcuts would be so large they would each exceed the standard 40-acre limit on the

size of forest openings, including one 405 acres in size. The fact that the Forest Service prepared an EIS for Hungry Ridge confirms it was arbitrary and capricious for the agency to rely on the EA and DN/FONSI to approve the nearby and similar End of the World project.

For both projects, the Forest Service cut corners and failed to comply with its legal duties, including to consider carefully the projects' cumulative impacts. The Forest Service falsely concluded that any adverse impacts to wildlife were only "potential," "short-term," and "minor," despite the fact that mature forest habitat utilized by fisher and other special-status wildlife will be logged and will not reestablish for 100 years or longer. It refused to acknowledge the recent and increasingly likely presence of grizzly bears in the area, and based on this, failed to engage in ESA consultation and failed to assess effects to grizzly in its NEPA documents.

The Forest Service also violated NFMA when it authorized logging in sensitive, protected areas like old growth without demonstrating compliance with the Forest Plan. Instead of following the direction in the Forest Plan for how to separate out and calculate areas of "existing" and "replacement" old growth, the Forest Service just assumed that MA20 areas include sufficient existing old growth to meet the required 5% minimum without knowing how much existing old growth there actually is. It also authorized logging in degraded watersheds— two at End of the World and five at Hungry Ridge—by claiming there will be an "upward trend" in each watershed, while ignoring its own data showing the opposite.

Furthermore, substantial—and growing—science shows moisture and weather are the primary drivers of wildfire, undermining the Forest Service's simplistic assertions that large landscape-scale logging here will succeed in reducing "fuels" and preventing insect outbreaks to reduce fire risk. Yet the Forest Service continues to brush aside these substantial controversies, again requiring the End of the World and Hungry Ridge projects be held unlawful and reversed.

## ARGUMENT

## I.  NFMA VIOLATIONS FOR FAILURE TO COMPLY WITH FOREST PLAN.

### A.  Failure to Maintain Minimum 5% "Existing Old Growth".

The Forest Service failed to demonstrate it satisfied the Forest Plan's binding requirement to maintain at least 5% "existing" old growth, in addition to another 5% "replacement" old growth, in each Old Growth Analysis Area (OGAA) at End of the World and Hungry Ridge, requiring reversal of both project approvals. FOC Br. at 7–13.[1] The Forest Service's old growth analyses for both projects are flawed in two ways. First, instead of counting only forest stands that meet the Forest Plan definition of old growth ("Forest Plan Old Growth" or FPOG), it also counted stands that meet a different old growth definition ("North Idaho Old Growth" or NIOG) even when those stands did not meet the Forest Plan definition. Second, it also counted acres designated as Management Area 20 (MA20) without determining which stands in MA20 count as existing old growth versus replacement old growth.

As a preliminary matter, the Forest Service and AFRC try to downplay the amount and effect of logging in old growth wildlife habitat. Both projects, however, authorize extensive logging in old growth stands, most of which will preclude the area from qualifying as old growth after logging. In project documents, the Forest Service admitted that three of the types of logging it authorized will eliminate old growth: "Stands that are treated with [(1)] 'clear cut with reserves' and [(2)] 'seedtree' prescriptions and [(3)] areas within 'variable density thinning' [(VDT)] gaps would no longer meet NIOG and FPOG definitions." B_023980.

---

[1] Plaintiff Friends of the Clearwater's opening brief (ECF 27-2) is shortened to "FOC Br." and its Statement of Facts (ECF 27-1) is "FOC SOF." The Forest Service's opening/response brief (ECF 29-1) is referred to as "FS Br.," and Defendant-Intervenor American Forest Resources Council's opening/response brief (ECF 30-1) is referred to as "AFRC Br." All page citations to these briefs are to the internal page number of the brief, not the ECF page number.

Most of the logging the Forest Service authorized in old growth is by these three techniques. At Hungry Ridge, of the 530 acres of "regeneration" logging in old growth, 419 acres would be eliminated by "clear cut with reserves" (389 acres) and "seed tree" logging (30 acres). B_000651 at Table 3-51. Hungry Ridge also authorizes 139 acres of intermediate harvest in old growth (*id.*), some of which might be VDT (*see* B_000198), which would eliminate even more old growth. At End of the World, all 5 acres of regeneration logging in old growth would be eliminated by clear cut with reserves (4 acres) and seed tree (1 acre). A_019140 at Table 2. End of the World also authorizes 188 acres of VDT in old growth, which can be riddled with 5-acre gaps that eliminate old growth on up to 30% of the acreage, meaning roughly 56 more acres of old growth would be eliminated. *Id.* Thus, the projects authorize hundreds of acres of logging in old growth using techniques that the Forest Service admitted will eliminate old growth.

Other types of authorized logging eliminate old growth too, including regeneration by "shelterwood," as well as "intermediate" logging. For these, the Hungry Ridge wildlife report states: "After treatment, treated old growth areas would continue to meet NIOG and FPOG definitions in some of the 'shelterwood' units and all of the intermediate harvest units (except within 'variable density thinning' gaps) by retaining a minimum of 15 trees per acre in the largest tree size class or a minimum basal area of 40 square feet per acre." B_023980 (emphasis added). This is wrong. Even if a sufficient number of large trees are left, qualifying as old growth requires more. To qualify as FPOG depends on five additional criteria beyond just having 15 sufficiently large trees per acre, including having: two or more canopy layers; sufficient snags per acre; signs of rot and decadence; minimum canopy closure percentages (including total canopy cover of at least 70%); and "[l]ogs on the ground." C_027489. NIOG is also based on similar, additional criteria beyond just a minimum number of large trees. B_030172.

With respect to "shelterwood," despite the Forest Service's statement that "some" shelterwood might still qualify, the Forest Service counted areas authorized for shelterwood logging at Hungry Ridge as no longer qualifying as old growth after logging. B_000651 at Table 3-50. This was appropriate, because, among other reasons, the wildlife reports show that after shelterwood logging, only 30% or less canopy cover will remain, which is far less than the 70% required to count as FPOG. A_018790; B_023958. Thus, the 111 acres of shelterwood in old growth at Hungry Ridge (B_000651) will almost certainly be eliminated.[2]

The wildlife reports also admit "intermediate" logging reduces canopy to only 55-75%, and reduces down logs and snags. *See* B_023929, B_023944. Thus, even if some large trees remain, intermediate logging in old growth at End of the World (230 acres) and Hungry Ridge (139 acres) could cause these areas to no longer qualify as old growth. A_019140; B_000651.

1.    Arbitrary & Capricious Decision to Count "NIOG" as Existing Old Growth.

As FOC showed, when the Forest Service identified and counted acres of existing old growth, it included not just those acres that satisfy the Forest Plan's definition of old growth, or "FPOG," but it also included acres that satisfy a different definition of old growth, "NIOG." *See* FOC Br. at 9–10. FOC also showed that NIOG is based on different criteria, and some forest stands that qualify as NIOG do not qualify as FPOG. *Id.* In response, the Forest Service and AFRC point to the following statement in Forest Plan Appendix N: "These standards are based on the most current literature and may change as new information becomes available." C_027489. But the Forest Service cannot change a Forest Plan without formally amending it and without following the process required under NFMA. 16 U.S.C. § 1604(f)(4).

_____

[2] FOC submitted photos in its administrative objections showing the aftermath of recent shelterwood logging in the Nez Perce National Forest. B_030969–70.

The Forest Service's NFMA regulations state: "Except as provided by paragraph (c) of this section, a plan amendment is required to add, modify, or remove one or more plan components, or to change how or where one or more plan components apply to all or part of the plan area (including management areas or geographic areas)." 36 C.F.R. §219.13(a).[3] The Forest Service has wide latitude to amend a forest plan "in any manner whatsoever." 16 U.S.C. § 1604(f)(4). This includes making project specific amendments, such as the amendment it made for Hungry Ridge to allow some logging in MA20. *See* B_000078–79; B000757–62. But revising or amending a Forest Plan requires following the process set forth in NFMA and giving the public a full opportunity to review the plan's adequacy, through the preparation of an EIS, a 90-day public comment period, and other detailed procedures. *See* 16 U.S.C. § 1604(d)–(g).

Here, the Forest Plan has not been revised or amended to change the Appendix N old growth standards forest-wide or at either project area, so the Forest Service must follow the plan as written. In *Native Ecosystems Council*, the Ninth Circuit emphasized that a court reviewing a site-specific action looks at whether the Forest Service complied with the plan's requirements as written—not whether the Forest Service provided good reasons for deviating from the plan:

> Our scope of review does not include attempting to discern which, if any, of a validly-enacted Forest Plan's requirements the agency thinks are relevant or meaningful. If the Forest Service thinks any provision of the 1986 HNF Plan is no longer relevant, the agency should propose amendments to the HNF Plan altering its standards, in a process complying with NEPA and NFMA, rather than discount its importance in environmental compliance documents.

---

[3] Paragraph (c) provides an exception for "administrative changes," which "include corrections of clerical errors to any part of the plan, conformance of the plan to new statutory or regulatory requirements, or changes to other content in the plan (§ 219.7(f))." "Other content in the plan" is a term of art defined by § 219.7(f) to include "watershed(s) that are a priority for maintenance or restoration," "the plan area's distinctive roles and contributions within the broader landscape," "the monitoring program required by § 219.12," and "information reflecting proposed and possible actions that may occur on the plan area during the life of the plan." 36 C.F.R. § 219.7(f). Adopting a new definition of old growth is not an administrative change.

418 F.3d 953, 961 (9th Cir. 2005). Thus, the Forest Service cannot change the Forest Plan

without adhering to the NFMA and NEPA amendment processes. Counting NIOG as old growth,

as it has done here, fails to comply with the Forest Plan as written and requires reversal.

      2.      Failure to Separate Out "Existing" and "Replacement" Old Growth in MA20.

The Forest Service separately violated NFMA by adding in acres of MA20 to its "total

old growth" numbers in every Old Growth Analysis Area (OGAA), without separating the

MA20 acreage into "existing" and "replacement" old growth as required by the Forest Plan. FOC

Br. at 11–13. Contrary to the Forest Service's and AFRC's arguments, FOC does not contest the

Forest Service's findings as to which areas are MA20. Nor does FOC contest that those acres of

MA20 count for something. Rather, FOC contests the Forest Service's failure to determine what

is in those MA20 areas: existing or replacement old growth, and how much of each.

It is undisputed that forest stands within an area designated as MA20 can be either (or a

combination of) existing old growth or replacement old growth. *See* C_027364. Replacement old

growth is <u>not</u> old growth; it is younger, immature forest stands expected to become old growth

within the next 100 years. *Id.*; C_027489. As FOC explained, within most areas of MA20, the

Forest Service never determined which stands count as existing old growth (FPOG or NIOG) and

which stands count instead as replacement old growth. FOC Br. at 11–12; FOC SOF ¶¶ 15–16.

This was a fatal omission, because the Forest Plan old growth standards require at least

5% existing old growth <u>plus</u> at least another 5% replacement old growth in each OGAA:

> [I]n order to maintain a viable population of old-growth-dependent species, it is
> necessary to maintain 10 percent of the total forested acres as old growth <u>with no
> less than 5 percent of the forested acres maintained as old growth within each
> [OGAA]</u>. If less than 5 percent old growth exists in a drainage, the additional
> required acres will be assigned to adjacent drainages where excess old growth is
> available  . . . . <u>An additional 5 percent of the forested acres within each [OGAA]
> shall be designated as replacement old growth.</u>

C_027490 (emphasis added). Appendix N provides specific direction for how to calculate acres

of existing versus replacement old growth and directs the Forest Service to: "Verify the quality, amount, and distribution of existing and replacement old- growth habitat as part of project planning." C_027490 (emphasis added). The Forest Service failed to do that here.[4]

Using the acres the Forest Service verified to qualify as FPOG, the record reveals that prior to logging none of five OGAAs at End of the World and only two of six at Hungry Ridge meet the 5% existing old growth requirement. *See* A_018750–51; B_000648; Jageman Decl. (ECF 27-7) at Figs 2 & 3. After clearcutting and other regeneration logging, old growth percentages will drop even more, and only one OGAA at Hungry Ridge will meet the minimum. *Id.* Even if FPOG and NIOG are counted as existing old growth, the Forest Service still failed to demonstrate any of the five OGAAs at End of the World and two of six at Hungry Ridge meet the 5% existing old growth requirement before logging. *See* A_018750–51; B_000648. After logging, only three of six at Hungry Ridge still have 5% existing old growth. *See* B_00657.

To make up for these shortcomings, in addition to counting acres of FPOG and NIOG, the Forest Service counted all acres of MA20 as "total old growth"—without knowing whether those MA20 acres are made up of existing old growth or replacement old growth, or how much of each. While some of these acres of MA20 might qualify as existing old growth, others will not as they will be replacement old growth (not old growth for 100 years). But the Forest Service has no idea which or how many acres in MA20 qualify as existing old growth and, thus, failed to demonstrate compliance with the standard to maintain at least 5% existing old growth.

---

[4] Illustrating this, the Hungry Ridge EIS explains: "[S]ome stands labeled as MA20 are not labeled as FPOG or NIOG. Not all areas have stand exams . . . This fact does not indicate stands labeled as MA20 alone are not old growth. Those stands simply lack stand exam data and cannot appear in the query performed to locate NIOG and FPOG." B_000646–47. But while any of these unlabeled stands in MA20 might be existing old growth, they might instead be replacement old growth. The Forest Service never did the work to figure this out and simply does not know which unlabeled stands of MA20 are existing old growth versus replacement old growth.

The Forest Service's "total old growth" approach (where it adds anything having to do with old growth together) requires ignoring the Forest Plan's explicit requirements to maintain at least 5% existing old growth <u>and</u> at least an additional 5% replacement old growth. Not only does this conflict with the plain language of the Forest Plan, it would also lead to absurd results, such as allowing the Forest Service to clearcut all of the existing old growth in an OGAA so long as it can point to immature replacement old growth in 10% of the OGAA. Maintaining 10% immature replacement old growth—without protecting any existing old growth—is not what the Forest Plan requires and would be devastating for wildlife that rely on old growth habitat.[5]

In summary, by failing to determine which acres of MA20 count as "existing" versus "replacement" old growth in each OGAA, the Forest Service failed to show—and there is no way for the Court to know whether—it is meeting the binding Forest Plan standard to maintain at least 5% existing old growth in most of the OGAAs, requiring reversal of both projects.

### B. Arbitrary & Capricious "Upward Trend" Findings.

There is no dispute that the Forest Plan prohibits logging in degraded watersheds unless the Forest Service first establishes an upward trend, as set forth in Forest Plan Appendix A and the Appendix A Guide. Those requirements are violated here, as cobble embeddedness numbers are trending downward, which the Forest Service ignored; and it failed to consider stream flushing rates in making speculative predictions about future trends. *See* FOC Br. at 13–20.

---

[5] The Forest Service and AFRC rely on the Jahn whitepaper regarding Appendix N. However, Jahn confirms: the important distinction between existing and replacement old growth; that there are multiple old growth "minimums"; and that following Appendix N's steps matters. For example, Jahn concluded: "It was the intent of management that areas of old growth habitat <u>and</u> replacement old growth stands (mapped as [MA20]) would be validated, prioritized, and adjusted where necessary, <u>using the criteria in Appendix N</u> of the plan, to assure that <u>minimums</u> are met and protected and that the designated old growth habitat is comprised of the highest quality stands that are most favorably arranged on the landscape." C_029014 (emphases added).

In response, the Forest Service disputes that it "must demonstrate that cobble embeddedness will improve to find an upward trend," asserting "such a requirement is not found in the Forest Plan." FS Br. at 28. To the contrary, that is precisely what the Forest Plan requires. Fish and Wildlife Standard #19 requires: "Restore presently degraded fish habitat to meet the fish/water quality objectives established in this Forest Plan (see Appendix A of the Forest Plan)." C_027300. Fish and Wildlife Standard #21 requires: "Meet established fishery/water quality objectives for all prescription watersheds as shown in Appendix A." C_027301. To comply with these binding standards, logging is prohibited in any watershed that currently fails to meet its Fishery Objective or its Sediment Yield Guideline, unless the Forest Service demonstrates a "positive, upward trend," as explained in the Forest Service's Appendix A Guide (C_017811).

Here, each degraded watershed fails to meet its Appendix A fishery objective, which is based entirely on cobble embeddedness. *See* A_003287; B_015707. Thus, to allow logging in any of these watersheds, the Forest Service must show cobble embeddedness is improving and/or will improve in the future. It would be absurd, and would render the upward trend requirement meaningless, if the Forest Service could claim to find an upward trend completely untethered from the very problem that needs to be corrected, which here is excessive cobble embeddedness.

1.   Ignoring Data Showing Downward Existing Trends.

The Forest Service's trend analyses arbitrarily and capriciously failed to consider its own data showing cobble embeddedness got worse in six of the seven watersheds at issue from 1987 to the present (the only exception is Cold Springs Creek at End of the World). FOC Br. at 15–17. The Hungry Ridge trend analysis is in Appendix E to the EIS at B_000763–90. The End of the World trend analyses is in a portion of the aquatics report at A_003294–98. Neither trend

analysis discloses or discusses these cobble embeddedness data showing downward existing trends, which is all found elsewhere in the project records.[6] This is arbitrary and capricious.

To excuse this failure, the Forest Service and AFRC point to the Appendix A Guide:

In previously degraded watersheds, especially those identified as below objective in 1987, if there have been no entries or natural disturbances over the past 10 to 20 years, it <u>could be assumed</u> that trend is either static or improving. If any watershed restoration has been implemented, or if a change in management (e.g. grazing and roads management) has resulted in fewer potential adverse effects to streams, an upward trend <u>could be assumed</u> in these cases as well.

C_017823 (emphases added). While perhaps it "could be assumed" in other cases that there is an existing upward trend, such an assumption cannot be made here where the actual data shows otherwise. *See* FOC Br. at 16. The Forest Service sought to cut corners by assuming an upward trend when its own data shows the opposite in six of the seven watersheds at issue.

The Forest Service also tries to downplay the significance of its errors by arguing that cobble embeddedness data it collected is not actually useful, since stream conditions vary annually. FS Br. at 25. But while stream conditions and cobble embeddedness can fluctuate year to year, the Forest Service's cobble embeddedness data account for this variability—they are <u>averaged</u> values based on multiple years of data involving multiple measurements each year. *See, e.g.* B_000447 at Table 3-4, n.3; B_018867. The declining trends FOC showed (and the Forest Service ignored) used these averaged values, which account for annual variation.

In short, the best and only data on existing trends show cobble embeddedness is trending downward, which was arbitrary and capricious for the Forest Service to ignore.

---

[6] AFRC admits that the cobble embeddedness data shows that the five watersheds at Hungry Ridge do not have existing upward trends. AFRC Br. at 14. But AFRC cites to the fisheries report where the data was presented (Table 8 at B_015724). AFRC fails to show this data was disclosed or considered in the Hungry Ridge trend analyses in the EIS, which it was not. *See* B_000763–90.

2.    <u>Failing to Consider Stream Power and Flushing Rates Re Future Trends.</u>

The Forest Service's trend analyses also failed to address what the Appendix A Guide describes as "key" factors to understanding future cobble embeddedness: stream power and flushing rates. FOC Br. at 17–20. The Forest Service argues it "considered" those but that it "emphasized sediment input in its analysis" instead. FS Br. at 28. It adds, "long-term reductions in sediment input (from restoration, for example) are expected to reduce cobble embeddedness regardless of stream power and/or flushing rate." *Id.* There are multiple flaws with this argument.

First, it is not true that long-term reductions in sediment input will necessarily reduce cobble embeddedness regardless of stream power and flushing rates. Sediment inputs—even if reduced—might still be too much sediment for a stream to handle, depending on its sediment flushing rates and power. The Appendix A Guide explains, "<u>the key is that new sediment inputs remain below the flushing rates</u> considering stream power and the fish/water quality objective of the stream." C_017821 (emphasis added). Notably, every stream at issue meets its Forest Plan sediment yield guideline. A_003294, A_003296; B_000614 at Table 3-40. Yet they all fail the cobble embeddedness-based fishery objective, and six out of seven have downward cobble embeddedness trends despite having suitable sediment levels. *See* FOC Br. at 16. The Forest Service cannot focus only on sediment, because knowing flushing rates is the key to knowing whether any sediment reductions will lead to reductions in cobble embeddedness too.

Second, the Forest Service did not consider flushing rates and stream power. In the trend analysis for Hungry Ridge, there is no mention anywhere of stream power or flushing rates, and no indication that these were considered for each stream. *See* B_000763–90 (EIS Appendix E).[7]

---

[7] AFRC misleadingly points to two statements about the larger Mill Creek and Johns Creek watersheds to suggest that the five degraded sub-watersheds at issue transport sediment efficiently. *See* AFRC Br. at 15–18. However, these statements come from elsewhere in the

At End of the World, the trend analyses for Jungle and Cold Springs Creeks blamed the <u>existing</u> high cobble embeddedness on the streams' low powers and flushing rates, but never considered what that means for <u>future</u> trends. FOC Br. at 18. The agency cannot blame current high levels of cobble embeddedness on low stream power and flushing rates and then totally ignore those same key factors when speculating cobble embeddedness will get better in the future. *See* A_003294–98. Low stream power and poor flushing indicate that even with the future sediment reductions the Forest Service predicts, cobble embeddedness might not improve.

If the Forest Service had its way, so long as it tacks on some restoration projects, it can authorize logging and road incursions in degraded watersheds by claiming there will be an upward trend—no matter how steeply downward a watershed is trending, and without even considering the "key" factor of flushing rates. The Forest Plan requires more than speculation, and the Court must thus reject the Forest Service's approvals based on these NFMA violations.

## II.    NEPA "HARD LOOK" VIOLATIONS.

### A.    Failure to Take a Hard Look at Direct and Indirect Impacts.

1.    <u>Logging, Forest Health, and Wildfire Risk.</u>

The Forest Service violated NEPA by ignoring public comments and scientific studies questioning many of the assumptions it made to justify the logging authorized for each project, including assumptions about logging and fire risk, forest health, insects, and disease, requiring

---

project record (not in the Hungry Ridge trend analyses), and they do not show that any of the sub-watersheds efficiently deliver sediment. For the Johns Creek watershed, AFRC cites an EIS statement that "[m]ainstem reaches transport sediment efficiently, as evidenced by a low cobble embeddedness and a dominant substrate of boulders and large rubble." B_000443. But the Trout, Merton, and American Creek sub-watersheds at issue are not "mainstem reaches" of Johns Creek, nor do they have "low cobble embeddedness"—they have high cobble embeddedness exceeding Forest Plan standards. The same is true of the statement AFRC cites for the Mill Creek watershed in the Biological Evaluation. *See* B_015713–14. Mill Creek has many sub-watersheds, including the Merton and Upper Mill, which have high cobble embeddedness.

reversal under *Bark v. U.S. Forest Service*, 958 F.3d 865 (9th Cir. 2020). *See* FOC Br. at 21–25. The Forest Service and AFRC argue *Bark* is dissimilar because the controversy over VDT and its effects on fire was directed at moist, old growth stands in the Cascades, as opposed to drier, previously logged "plantation" stands where thinning is supposedly not as controversial.

There are two flaws to their argument. First, much of the logging and forest type here is similar to that in *Bark*. Second, FOC and other commenters and objectors raised other highly controversial issues related to fire, insects, and disease, beyond the single controversy in *Bark* regarding thinning and fire in mature, moist forest.

On the first flaw, End of the World and Hungry Ridge, like *Bark*, involve extensive VDT, plus other types of thinning, including within mature, moist forest. End of the World includes 10,043 acres of VDT, plus 6,117 acres of "commercial thinning." A_000005. Hungry Ridge includes 247 acres of VDT and 1,414 acres of commercial thinning. B_000011. Much of the thinning would occur in old growth and other mature forest. *See* FOC SOF ¶¶ 18, 21, 22. And while portions consist of drier and previously logged stands, other portions of these massive project areas are composed of mesic (moist) forest types and "previously unmanaged" mature forest stands similar to those at issue in *Bark*. A_017042; B_006558.[8] Far from being different,

_____

[8] The Forest Service's silviculture reports for both projects state that the "forest vegetation of north-central Idaho displays strong diversity in both composition and structure" and are "some of the most varied forest communities found in the Inland Northwest." A_017042; B_006558. "Existing forest types occurring in the project area include cold subalpine fir, cool Engelmann spruce/grand fir, moderately-dry to moist mixed-conifer, and dry ponderosa pine/Douglas-fir." *Id. See also* A_017044, B_0066563 (showing "moist", "cool", and/or "wet" forest at both sites).

Likewise, in its comments, the Nez Perce Tribe emphasized that the End of the World project area includes, in addition to some drier areas, "particularly mesic" forests which "are not typically maintained by low- or moderate-severity fire and are rarely dominated by ponderosa pine or other fire-resilient species." A_016531. The Tribe cautioned: "Efforts to actively manage stands in these areas for a more frequent, less severe fire regime, with low fuel loading and

this is like *Bark*, where the Ninth Circuit described that project area as "partly a moist 'transition' climate, and partly a dry 'eastside' climate." 958 F.3d at 868.

The similarities to *Bark* do not end there. The Forest Service and AFRC argue the Court must simply defer to the fuels specialist reports here. But as the Ninth Circuit explained in *Bark*: "Importantly, even the Fuels Specialist Report produced by the USFS itself noted that 'reducing canopy cover can also have the effect of increasing [a fire's rate of spread] by allowing solar radiation to dry surface fuels, allowing finer fuels to grown on . . . the forest floor, and reducing the impact of sheltering from wind the canopy provides." *Id.* at 871. The Forest Service made similar admissions in the End of the World fuel specialist report and the Hungry Ridge EIS, as FOC pointed out in its opening brief. FOC Br. at 24.[9] But the Forest Service and AFRC never addressed these admissions in their briefs. As in *Bark*, despite these admissions, the Forest Service simply stood by its controversial rationale that thinning will reduce fire severity.

Finally, the Forest Service also tries to distinguish *Bark* by arguing (without citing any support) that "*Bark* dealt with thinning without follow-on fuel treatment of activity fuels." FS Br. at 34. This is wrong. After the Ninth Circuit decision in *Bark*, the Forest Service's notice withdrawing the *Bark* project described the project as VDT "along with applying various fuels

---

wildfire risk, is inconsistent with their underlying ecology and threatens to erode habitat quality for a number of obligate wildlife species (including fisher)." *Id*.

[9] The End of the World fuels specialist report states: "These treatments would reduce the amount of shading on surface fuels, increase the wind speeds to the forest floor, reduce the relative humidity at the forest floor, increase the fuel temperature, and reduce fuel moisture. These factors may increase the probability of ignition over current conditions; depending on weather conditions. . . ." A_003249. The Hungry Ridge EIS states: "Under any alternative, wildfire ignition and occurrence is unavoidable. Research suggest that ignition is most common when fuel moisture contents is low. . . . Dry fuelbeds are needed to enable successful ignition and spread. . . . [I]t is expected that the project area will continue to experience the unavoidable event of wild fire and the adverse effects that are associated with this event." B_000670.

treatments once thinning activities were completed."[10] Thus, both *Bark* and the two projects here include follow-on treatments; and all include extensive logging by similar methods and in similar forest types as the Ninth Circuit found to be highly controversial in *Bark*.

Turning to the second flaw in the Forest Service's and AFRC's argument, FOC pointed to science raising substantial disputes about other issues beyond that in *Bark*, which also requires reversal. Unlike *Bark*, which involved only VDT, the projects here also involve extensive regeneration logging—including dozens of super-sized clearcuts, each 40 to over 400 acres in size. *See* FOC SOF ¶¶ 4, 9. Regeneration logging will create the very type of even-aged stands the Forest Service now points to as fire threats in need of thinning. *See* A_018713 ("regeneration . . . removes most of the original stand for the purpose of initiating a new crop"). FOC pointed to studies showing that homogenous stands resulting from regeneration lead to forest conditions with higher fire severity than unlogged forests. *See* C_006891 (Odion et al. 2004); C_005920 (Lesmeister et al. 2019); C_049858 (Zald and Dunn 2018). But Forest Service never considered how extensive regeneration logging in unlogged areas here will likely lead to homogeneous stands prone to more severe fire in the future, again requiring reversal.

Also, in its comments and objections, FOC pointed out that even in drier ponderosa pine forests of the northern Rockies (not just in more mesic forest types), studies dispute the Forest Service's underlying premises that higher fuel loadings cause high severity fire and that logging by any method (thinning and regeneration logging) will reduce fire severity in all forest types. FOC SOF ¶ 10. For example, a 2010 study of semi-arid ponderosa pine forests of the northern

---

[10] *See* "Withdrawal of the Crystal Clear Restoration Decision Notice," available at https://www.fs.usda.gov/nfs/11558/www/nepa/105482_FSPLT3_5503840.pdf (visited Dec 3, 2021) (also attached hereto as Addendum A).

Rockies found "logged sites are more prone to severe wildfires and insect outbreaks than unlogged, fire-excluded forests." C_041429 (Naficy et al. 2010). Similarly, a 2016 west-wide study found "forests with higher levels of protection [from logging] had lower [fire] severity values even though they are generally identified as having the highest levels of biomass and fuel loading." C_029273 (Bradley et al. 2016). The agency again failed to address this science.

Additionally, unlike in *Bark*, FOC submitted studies and raised numerous concerns about justifying logging to prevent or cure insect and disease outbreaks in order to further forest health and resilience and reduce fire severity. *See* SOF ¶ 11. Similarly, in its End of the World comments, the Nez Perce Tribe pointed out that insects and disease are natural to the project area, there is no evidence of current (or the risk of) disease outbreak in the area, and "there is now substantial field-based evidence showing that beetle outbreaks do not contribute to severe fires, nor do areas where outbreaks occur burn more severely." A_016530 (citing studies). These issues surrounding the justifications of logging to combat the potential risk of insects and disease and the resulting fire risk are also highly controversial, beyond the controversy at issue in *Bark*.

Yet the Forest Service never engaged in these issues by taking the "hard look" required under NEPA—and particularly not in its NEPA documents, which "is where the [agency's] defense of its position must be found." *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019) (quotation omitted). Under NEPA, an agency must "acknowledge and respond to comments by outside parties that raise significant scientific uncertainties and reasonably support that such uncertainties exist." *Lands Council v. McNair*, 537 F.3d 981, 1001 (9th Cir. 2008) (en banc). An "agency 'shall discuss . . . any responsible opposing view . . . and shall indicate the agency's response to the issues raised.'" *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003) (quoting 40 C.F.R. § 1502.9(b)). The "mere presence of [this]

information in the record alone does not cure" a failure to address this information in the

EIS/EA. *Id.* at 1169. "This disclosure requirement obligates the agency to make available to the

public high quality information, including accurate scientific analysis, expert agency comments

and public scrutiny, before decisions are made . . . ." *Id.* (citing 40 C.F.R. § 1500.1(b)).

For End of the World, all the Forest Service points to is an April 25, 2018 document in

the project record labeled "Consideration of Science and Literature Submitted by the Public"

(A_012130–191), which lists studies, indicates whether the Forest Service considered them, and

offers a short Forest Service response. Yet this document only addressed studies submitted

during earlier public comment and failed to address other studies like Bradly 2016, Naficy 2010,

Odion 2004, Lesmeister 2019, and Zald and Dunn 2018 cited above, and others FOC pointed to

in its objections, but which the Forest Service conclusorily dismissed elsewhere. *See* A_000465.

And even for the studies listed in the document, the Forest Service ignored many of them and got

others wrong. For one study (Black 2005) on the myths behind logging to battle insects and

disease, the Forest Service claims it followed the recommendation to maintain old growth forest

conditions because: "No old-growth will be harvested with the End of the World project."

A_012132–33. This false statement fails to acknowledge the many acres of logging authorized in

old growth, plus in other mature forest, at End of the World. FOC SOF ¶¶ 18, 21. For studies

submitted by the Nez Perce Tribe showing that beetle outbreaks do not contribute to severe fires,

the Forest Service only said they were considered, without any detail or explanation. *See*

A_012140; A_012147; A_012148–9; A_012172. Simply saying a study was "considered"

without discussing controversial issues it raises is again arbitrary and capricious.

Similarly, for Hungry Ridge, the Forest Service and AFRC point to the agency's response

to comments. There too, the Forest Service did not even address many studies at issue; and

where it did, it downplayed them without engaging in these highly controversial issues. The

Ninth Circuit has rejected the attempt to use these kinds of short, conclusory, and off-the-mark

statements in response to comments to cure the failure to take a hard look in the EIS itself.

*Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1051–53 (9th Cir. 2007).

    In sum, FOC and others raised multiple substantial disputes undermining the Forest

Service's justifications for logging, which were never given the serious consideration and public

airing that NEPA requires. And except for the limited and hidden concessions in the End of the

World fuels specialist report and Hungry Ridge EIS (*see supra* n.9), reading the project approval

and NEPA documents suggests to the public that all of the extensive logging authorized is

undoubtedly beneficial for reducing fire risk and otherwise creating healthy forests, when those

assertions are seriously questioned if not wholly undermined by other science.

        2.    Fisher and Other Wildlife that Utilize Old Growth and Other Mature Forest.

    The Forest Service arbitrarily and capriciously claimed each project would have only

negligible and short-term adverse effects to fisher, other "sensitive species," and "management

indicator species" of wildlife that depend on connected old growth and other mature forests with

few open areas. *See* FOC Br. at 25–28. *See also* Jageman Decl. (ECF 27-7) ¶¶ 29–45.

    First, as FOC showed, the Forest Service's NEPA and project approval documents ignore

the severe, long-term effects that its own wildlife reports show regeneration logging will have on

fisher. FOC Br. at 25–26. In response, the Forest Service tries to downplay the severity of the

effects disclosed in the wildlife reports, while AFRC argues that including this information in the

wildlife reports is adequate under NEPA. But neither disputes that the Forest Service's NEPA

documents falsely asserted that impacts to fisher and other sensitive wildlife are merely

"potential," "minor," and "short-term," when the wildlife specialist reports found the opposite.

*See id.* That the wildlife reports did acknowledge these adverse impacts does not save the Forest

Service's false statements in its NEPA documents, since again the agency's NEPA compliance must be found in the NEPA documents. *Rose,* 921 F.3d at 1191.[11] These unsupportable conclusions about fisher and other wildlife are arbitrary and capricious and violate NEPA.

Second, the Forest Service also violated NEPA because it failed to factor into its analyses the many acres of mature forest habitat that will be eliminated and converted to open areas by intermediate VDT logging. FOC Br. at 26–28. The Forest Service and AFRC admit that VDT logging allows for up to 30% of a logging unit to be riddled with clearcut gaps, with each gap up to 5 acres. A_000070–71. They do not dispute FOC's estimate that at End of the World, VDT logging could result in approximately 1,936 acres of these gaps in probable fisher habitat. FOC Br. at 27–28. The acreage of VDT at Hungry Ridge is less, but still meaningful. These numbers—the acres of VDT gaps—are simply not reflected in the tables and numbers on habitat loss and increases in open areas reported in either the wildlife reports or NEPA documents.[12]

The Forest Service argues the agency did not "ignore" the effects of VDT logging, citing to statements in the wildlife reports where VDT logging and its gaps are acknowledged. This argument again misses FOC's point: while the Forest Service acknowledged VDT gaps would

---

[11] Both the Forest Service and AFRC recite the wildlife reports' conclusions that each project will not threaten the viability of fisher across its entire range or cause the species to become threatened with extinction. That misses the point that the projects threaten significant, adverse site-specific impacts to fisher and its habitat in the Salmon-Clearwater Divide. *See* Jagemen Decl. ¶ 39 (effects disclosed in wildlife reports "may render each project area unsuitable for fisher for many decades").

[12] The Forest Service incorrectly states that "the biologist for Hungry Ridge treated VDT as a regeneration treatment", citing a table at B_023905. FS Br. at 36, n.18. That table listed harvest amounts without stating which types of harvest are deemed regeneration or intermediate. But the total acreage shown for shelterwood, seed tree, and clearcut with reserves equals the total regeneration harvest numbers, while the acreage of pre-commercial thinning, commercial thinning, and VDT equals the total reported intermediate harvest. *See* B_023905. VDT was, thus, counted as an intermediate harvest, not regeneration. Furthermore, throughout the rest of the wildlife report, VDT is consistently labeled an intermediate harvest. *See* B_023980, 023988.

occur and would eliminate habitat, its analysis of effects to fisher entirely failed to calculate or

consider how many acres of these gaps would occur. This failure resulted in a vast undercounting

of the acres of fisher habitat that would be eliminated and converted to open habitat. At End of

the World, by counting only regeneration, the wildlife report found 1,244 acres of fisher habitat

would be eliminated (A_018784); but based on FOC's estimate that another 1,936 acres will be

eliminated by VDT gaps, the Forest Service reached its conclusions by considering about <u>only</u>

<u>39%</u> of the true extent of fisher habitat that will be lost at End of the World.

AFRC argues the Forest Service does not have to follow a specific form for presenting

information and thus does not need to "tabulate" the acreage of VDT gaps. But in the wildlife

reports for both projects, the Forest Service chose to assess the affects to fisher by calculating the

acres of "probable" fisher habitat, acres of "mature forest" habitat, and acres of open areas (as

well as percentages of these) both before and after logging. *See* A_018783–84; B_023929–30.

There was good reason for doing so, as these are important indicators of the likelihood that fisher

can or will still use the areas after logging, as explained in the wildlife reports. *See* FOC SOF ¶

20. Having decided to use these acreages of probable, mature, and open habitat (and

corresponding percentages) before and after logging for its analysis, the Forest Service had no

reasonable basis for excluding VDT gaps from these numbers—especially where VDT gaps will

be the single biggest cause of eliminated and opened fisher habitat at End of the World.

Here, the Forest Service provides no explanation for failing to factor VDT into its

acreages. This is not accurate scientific analysis, as NEPA demands; and the failure to factor in

VDT gaps undermines the conclusions reached in the wildlife reports, the End of the World EA,

and the Hungry Ridge EIS. As the Ninth Circuit has explained:

> To take the required "hard look" at a proposed project's effects, an agency may
> not rely on incorrect assumptions or data in an EIS. 40 C.F.R. § 1500.1(b)

> ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.") . . . The agency is required to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." 40 C.F.R. § 1502.24.

*Native Ecosystems Council*, 418 F.3d at 964.

    3.    Snake River Steelhead

As FOC showed in its opening brief, the Forest Service failed to gather adequate baseline information on steelhead, failed to considered recent plummeting returns, and improperly dismissed all effects as "short-term." FOC Br. at 28–33. *See also* Williams Decl. (ECF 27-8).

In response, the Forest Service and AFRC rely heavily on ESA consultation documents produced by NOAA Fisheries. These are no substitute for the Forest Service disclosing and considering these factors in its public NEPA documents. Once again, the NEPA document itself "is where the agency's defense of its position must be found." *Rose*, 921 F.3d at 1191; *see also Kern v. BLM*, 284 F.3d 1062, 1073 (9th Cir. 2002) ("tiering to a document that has not itself been subject to NEPA is not permitted"); *Klamath-Siskiyou*, 387 F.3d at 998 (a non-NEPA document cannot satisfy an agency's NEPA obligations). Furthermore, ESA consultation is a different process, with different standards and no public involvement. As a result, courts have found that a biological opinion is not the "functional equivalent" of NEPA's environmental review process. *See Fund for Animals v. Hall*, 448 F. Supp. 2d 127, 134 (D.D.C. 2006).[13]

The Forest Service and AFRC also emphasize that the Forest Service found that, despite

---

[13] The "jeopardy" standard under the ESA is a much higher threshold than "major federal actions significantly affecting the quality of the human environment," the standard for preparing an EIS under NEPA. A "no jeopardy" ESA finding thus does not avoid the need for an EIS where a project may adversely affect a listed species. *See Greater Yellowstone Coal. v. Flowers,* 359 F.3d 1257, 1275–76 (10th Cir. 2004); *Makua v. Rumsfeld*, 163 F. Supp. 2d 1202, 1218 (D. Haw. 2001); *Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489, 1509 (D. Or. 1992). And NEPA's objective is for the Forest Service to "inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Earth Island Inst. v. U.S. Forest Serv*., 442 F.3d 1147, 1153–54 (9th Cir. 2006).

short-term adverse effects, each project is intended to improve steelhead habitat in the long term. This, however, is precisely FOC's point as to what the Forest Service got wrong in its NEPA analyses. Given steelhead's precarious situation, the already-degraded conditions in many project area streams, and that some adverse effects will occur and might not dissipate for about 18 years, these effects cannot simply be labeled "short-term" and brushed off as insignificant. Simply labeling 18 years of adverse impacts as short-term and negligible is arbitrary and capricious, and fails to take a hard look at the projects' direct and cumulative effects on this imperiled species.

      4.      <u>Ignoring Recent Severe Degradation in Mill Creek</u>

As shown in FOC's opening brief, cobble embeddedness in Upper Mill was measured in 2011 as 28%, and more recently was found to have increased to 53%. FOC Br. at 33–34. In Lower Mill Creek, cobble embeddedness was previously measured to be 12%, and later increased to 25%. *Id.* FOC also pointed out that other logging projects in the Mill Creek watershed (Adams Camp and Doc Denney) got underway after 2011. *Id.* The Forest Service asserts FOC's arguments "are grounded in erroneous cobble embeddedness numbers that were later corrected," citing to B_018939 to claim cobble embeddedness for Mill Creek is only 36%. FS Br. at 40. The Forest Service is wrong and fails to address FOC's argument.

First, the Forest Service points to the cobble embeddedness of 36% for the Mill Creek watershed as a whole; but the table at B_018939 also provides the cobble embeddedness of sub-watersheds within Mill Creek, including for Upper and Lower Mill creeks, and these are the very numbers FOC relied on: 53% cobble embeddedness in Upper Mill and 25% in Lower Mill. These high cobble embeddedness numbers are the same numbers reported in the Hungry Ridge EIS for Upper and Lower Mill creeks. B_000447. Second, the Forest Service fails to cite anything to support its assertion that these numbers were "corrected," as opposed to based on newer data. The 53% and 25% cobble embeddedness numbers are based on averages of multiple

years of samples, where each year included multiple samples. *See* B_000447 at Table 3-4, n.3; B_018867. But the Forest Service fails to indicate which of the many data were wrong and why.

In any event, the numbers—whether they reflect the most recent data or corrected data— show extremely high cobble embeddedness in Upper Mill Creek and increasing cobble embeddedness in Lower Mill Creek.[14] But upon obtaining these troubling numbers, the Forest Service simply plugged them into the Hungry Ridge EIS, without any explanation why cobble embeddedness is so high in Upper and Lower Mill. Neither did it reconsider its analyses in the EIS and the fisheries report which relied on the statement—now proven false—that "data suggest that no increases in deposited sediment in mainstem Mill Creek have occurred and conditions may have improved, particularly in Lower Mill." B_015726. Simply plugging in these new numbers is no "hard look" and undermines the Forest Service's assertions about the propriety and effects of the extensive logging and road work authorized by Hungry Ridge, especially in connection with the ongoing (or recently completed) Adams Camp and Doc Denny projects.

5.    Old Growth, Degraded Watersheds, and Grizzly Bear

While the Forest Service and AFRC argue there are no NFMA and ESA failures with respect to old growth, degraded watersheds, and grizzly bear, they do not dispute that failing to take a "hard look" at each of these issues would also violate NEPA, as FOC argued in its opening brief. FOC Br. at 34–35; FS Br. at 41–42; AFRC Br. at 41–42.

With respect to old growth, the Forest Service failed to do its homework to determine the composition of MA20 areas: whether they consist of existing versus replacement old growth, and how much of each. *See supra* I.A.3. With respect to degraded watersheds, the Forest Service

---

[14] The Forest Service attributes this increase in Lower Mill to a landslide. Whatever the cause, cobble embeddedness is now at 25% in Lower Mill Creek, which is a downward trend and is now approaching the 30% threshold that would exceed Forest Plan fishery standards.

failed to consider cobble embeddedness data and stream flushing rates—the "key" to understanding how sediment changes relate to changes in cobble embeddedness. *See supra* I.B. With respect to grizzly, based on its erroneous "no effect" finding, the Forest Service refused to even assess potential impacts to grizzly in either the End of the World EA or the Hungry Ridge EIS. *See* A_000110–11 (EA); B_000639 (EIS). The Forest Service's failure to candidly and accurately evaluate each of these issues violates NEPA.

### B.    Cumulative Impacts.

These Forest Service violations of NEPA's "hard look" requirement are magnified by its failure to address the cumulative impacts posed by End of the World and Hungry Ridge to these same values and resources. FOC Br. at 35–37. Again, the projects will log some 317 million board feet of timber on over 40 square miles of forest on sites adjacent to each other. But the End of the World DN/FONSI and EA fail to even mention Hungry Ridge. *See* A_000001; A_000057. The Hungry Ridge ROD also did not even mention End of the World; and while the Hungry Ridge EIS cumulative effects section acknowledged End of the World is a foreseeable, adjacent future action, it failed to provide any quantified or detailed information about the cumulative effects. *See* B_000001; B_000740; B_000744–47.

In response, the Forest Service and AFRC point to a few places in the Hungry Ridge EIS that mention End of the World as having potential cumulative effects, as well as to a handful of instances in the project records where the Forest Service acknowledged the other project. *See* FS Br. at 42–43; AFRC Br. at 40–41. But neither can point to any detailed and quantified consideration of the two projects together in their entirety, as NEPA demands.[15]

---

[15] *See* Jageman Decl. ¶¶ 41–42 (explaining for fisher that the Hungry Ridge wildlife report ignored End of the World, and that while End of the World wildlife report did consider Hungry Ridge, it narrowly limited that consideration to additive effects from a only a tiny fraction of the

"[A]n agency has the discretion to determine the physical scope used for measuring environmental impacts," but only so long as its choice represents a reasoned decision and is not arbitrary. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). The agency must "provide support for its choice of analysis area and must show that it considered the relevant factors." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002).

Here, the Forest Service failed to provide any justification for excluding all (or most all) of each project when it came to the cumulative effects they will have on old growth, fisher, forest health, and fire. These two massive, adjacent projects, each of which will occur simultaneously over the next thirteen or so years, will significantly transform not just each project area, but the entire Salmon-Clearwater Divide area for over a century. Putting on the blinders and looking at each project in isolation (with a couple very minor exceptions in the wildlife reports) is unreasonable and fails to take a hard look at the synergistic effects of the two projects.

## III.   NEPA VIOLATION FOR FAILURE TO PREPARE EIS: END OF THE WORLD.

The Forest Service's approval of End of the World based on the EA and DN/FONSI instead of preparing a full EIS is also arbitrary and capricious because this massive, long-term project obviously "may" have significant effects both in the short term and for the next 100 years. FOC Br. at 37–41. This is especially true considering its cumulative effects with the adjacent Hungry Ridge project—which is equally massive, will occur during the same time, and will similarly eliminate, degrade, and alter vast acres of old growth and other wildlife habitat for many decades to come, as discussed above.

Neither the Forest Service nor AFRC responds to FOC's showing that the DN/FONSI's assertion of "potential," "minor," and "short-term" adverse effects on fisher and other wildlife

---

Hungry Ridge project area, while ignoring most of the logging at Hungry Ridge, which "dilutes the likely extent of the adverse impacts to fisher").

that rely on mature forest are contradicted by the Forest Service's wildlife report. A_000019. Such false assertions are not a "convincing statement of reasons" as to why impacts <u>will</u> be insignificant, and alone requires reversal and ordering the Forest Service to prepare an EIS.

The record is clear that fisher are barely hanging on in the End of the World project area, but their habitat in the area is marginal, that habitat will suffer extensive and long-term losses due to logging, and neighboring areas where fisher might try to find refuge have other logging projects like Hungry Ridge, Doc Denney, and Adams Camp. For these reasons, effects to fisher far exceed the "may be significant" threshold, requiring an EIS. Furthermore, the uncertainty of the full extent of impacts due to VDT gaps, which FOC estimates as nearly 2,000 acres of fisher habitat likely to be eliminated that the Forest Service never considered, requires an EIS.

An EIS is also required because the effects of logging on fire and forest health are highly controversial and uncertain—even more so than in *Bark,* as discussed above. Again, End of the World includes extensive thinning by VDT and other methods, including in moist areas and mature forest areas where the effects of logging on fire risk and safety are highly controversial, just like in *Bark*. And FOC and others raised additional highly controversial issues, including the questionable effectiveness of logging to combat insects and disease, and associated effects on forest health, resilience, and fire. These highly controversial issues are not addressed in the DN/FONSI or the EA, and they must be addressed in an EIS.

Furthermore, FOC has raised substantial questions about the project's effects to grizzly bear—which the Forest Service refused to even analyze at all—and to steelhead, with plummeting returns in recent years and degraded stream conditions at End of the World.

Finally, an EIS is required for potentially significant effects, even if on the whole the agency believes the project will be beneficial. 40 C.F.R. § 1508.27(b)(1). Thus, even if the Forest

Service and AFRC are correct about the long-term benefits they hope will occur, this is no excuse for failing to a prepare an EIS for the potentially significant effects the End of the World project may have. Any of the many NEPA significance factors that have been triggered here— including highly uncertain effects, highly controversial effects, cumulative effects, effects to ESA-listed species, and threatened legal violations (*see* FOC Br. at 38–41)—require an EIS.

## IV.  ESA VIOLATIONS FOR FAILURE TO CONSULT OVER GRIZZLY BEAR.

FOC's opening brief showed that the Forest Service wrongly failed to engage in ESA Section 7 consultation over the effects each project may have on grizzly bear. FOC Br. at 41–45. Paradoxically, the Forest Service says it agrees with USFWS's determination from late 2020 that grizzly "may be present" in both project areas and that this is why it prepared biological assessments for grizzly. FS Br. at 50. Yet, the Forest Service's only argument as to how it concluded each massive, long-lasting project will not have any possible effect on grizzly is because bears "are not present"—the opposite of USFWS's "may be present" conclusion.[16]

The Forest Service emphasizes that the area is not "occupied," that no grizzly had been documented in the area for many decades, and that the White Bird bear eventually left, to suggest that this was some errant bear which should not be expected to ever happen again. *Id.* To the contrary, USFWS determined grizzly bear may be present based on evidence of a verified grizzly bear (the White Bird bear) in the End of the World project area in 2019, and the confirmation in

---

[16] The Forest Service makes other irrelevant points, including that it met with USFWS about the "no effect" findings. This however is not ESA consultation; consultation concludes only upon USFWS issuing a biological opinion or a letter of concurrence, *see* 50 C.F.R. § 402.14(m), neither of which happened here. The Forest Service also points to USFWS's December 17, 2020 letter regarding the updated "may be present" grizzly map, which states this "does not . . . necessarily indicate a project is 'likely to affect' the species." C_000704. This is irrelevant, because the standard for triggering the duty to engage in ESA consultation is simply whether the project "may affect" a species, not whether it is "likely to affect" a species (the "likely to affect" issue distinguishes "formal" from "informal" consultation). *See* 50 C.F.R. § 402.14(a)–(b).

April 2020 of what might have been a second grizzly nearby. *See* SOF ¶ 25.

      USFWS's conclusion that grizzly may be present in each project area is well supported by additional information in the project records and the Mattson Declaration (ECF 27-6), including evidence of other grizzly bears verified in and around the Bitterroot Ecosystem in recent years. Both USFWS and Dr. Mattson agree that additional undetected grizzlies may already be there, grizzly dispersing from elsewhere are expected to move into this area more frequently, and the area is expected to be recolonized. Mattson Decl. ¶¶ 14–15, 22; C_007926 (USFWS 2019 annual grizzly report). There is no reasonable basis for the Forest Service to conclude there will not be any bears in or near either massive project area for the next thirteen or so years. The Court should defer to USFWS as the expert wildlife agency and reverse.

## V.    BOTH PROJECT APPROVALS MUST BE VACATED.

      For any of the violations identified, the Court must vacate the Forest Service's approval of the End of the World and/or Hungry Ridge projects, and there is no need for additional briefing on remedies, as the Forest Service suggests. The parties agreed in their joint litigation plan—which the Court approved—to brief this case upon cross-motions for summary judgment, with no provision for subsequent briefing on remedies. *See* ECF Nos. 10 & 13.  Particularly in light of the presiding Magistrate Judge's retirement in March 2022, it may prejudice Plaintiff if a remedies ruling were deferred for many more months after the Court rules on the merits.

      Moreover, vacatur of unlawful agency action is the presumptive disposition under the APA, which directs that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Supreme Court has explained that if an agency's decision "is not sustainable on the administrative record made, then the

[agency's] decision must be vacated and the matter remanded to [the agency] for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). The Ninth Circuit orders remand without vacatur "only in limited circumstances" and "only when equity demands" doing so. *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015).

There is no reason to depart from the default remedy here. If the project approvals are not vacated, road construction and logging may proceed, which will eliminate and degrade wildlife habitat and harm the environment; whereas the supposed benefits of each project are speculative, and might not occur until many years in the future. The Hungry Ridge EIS admitted, "wildfire ignition and occurrence are unavoidable" and "the project area will continue to experience the unavoidable event of wildfire" even if the project occurs. B_000670. Likewise, the End of the World fire report admitted the project "would reduce the amount of shading on surface fuels, increase the wind speeds on the forest floor, reduce the relative humidity at the forest floor, increase the fuel temperature, and reduce fuel moisture" which "may increase the probability of ignition over current conditions." A_003249. The Court should thus rule on remedies in resolving the cross-motions for summary judgment and should vacate both project approvals.

## **CONCLUSION**

For the foregoing reasons, Plaintiff FOC respectfully requests that the Court grant its Motion for Summary Judgment, and hold unlawful, vacate, and remand the End of the World EA and DN/FONSI and/or the Hungry Ridge EIS and ROD.

Dated this 3rd day of December, 2021.                    Respectfully submitted,

*/s/ Bryan Hurlbutt*
Bryan Hurlbutt (ISB # 8501)
Laurence ("Laird") J. Lucas (ISB # 4733)

*Attorneys for Plaintiff*

**ADDENDUM A**

**"Withdrawal of the Crystal Clear Restoration Decision Notice"**

| Forest Service | Mt. Hood National Forest | Barlow Ranger District |
|---|---|---|
| | | 780 NE Court Street |
| | | Dufur, OR 97021 |
| | | 541-467-2291 |
| | | Fax: 541-467-2271 |

**File Code:** 1950                                      **Date:** October 26, 2020
**Route To:**

**Subject:** Withdrawal of the Crystal Clear Restoration Decision Notice

**To:** Richard Periman, Forest Supervisor

As you know, on June 27, 2018, I signed the Decision Notice and Finding of No Significant Impact (DN/FONSI) approving the Crystal Clear Restoration (CCR) project. My decision was to apply variable density thinning on approximately 11,742 acres, along with applying various fuels treatments once thinning activities were completed. On September 19, 2018, a complaint was filed by Bark, Cascadia Wildlands, Oregon Wild, and Wild Earth Guardians in the United States District Court for the District of Oregon challenging the CCR project. On September 29, 2020, following an adverse decision on appeal, the district court remanded the CCR decision to the Forest Service "for further proceedings consistent with" the Ninth Circuit opinion.

On August 17, 2020, the White River Fire started immediately adjacent to the CCR project area, which eventually spread into the eastern portion of the project area within the Juniper Flats Wildland Urban Interface. Of the approximately 9,000 acres of NFS lands burned, approximately 1,400 acres included treatment units within the CCR project area. Two out of the three timber sales under contract have been affected by the fire: Ahoy and Bilge. Approximately 80% (670 acres out of 845 acres) of the Ahoy sale has been burned; and approximately 28% (250 acres out of 875 acres) of the Bilge sale has been burned. The Plank timber sale was unaffected by the fire.

In light of the court's ruling as well as the changed conditions from the White River Fire, it is prudent that I withdraw the CCR DN/FONSI. This memo serves as my official notification of that withdrawal. Having withdrawn the DN/FONSI, the Forest Service will not conduct activities on the basis of this decision. As new projects or activities are proposed in the project's area, the Forest Service will complete appropriate environmental analyses and issue new decisions.



KAMERON C. SAM
District Ranger

