UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FRIENDS OF THE CLEARWATER,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>CHERYL F. PROBERT, in her official capacity as Forest Supervisor of the Nez Perce-Clearwater National Forests; and U.S. FOREST SERVICE,<br><br>　　　　　　　Defendants,<br><br>and<br><br>AMERICAN FOREST RESOURCE COUNCIL,<br><br>　　　　　　Defendant-Intervenor. | Case No. 3:21-cv-00189-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Before the Court are cross motions for summary judgment in this environmental case, and Defendants' related motion to strike. (Dkt. 27, 29, 30, 42.) The matters have been fully briefed and are ripe for the Court's consideration. The Court held a hearing by video on June 3, 2022, and took the motions under advisement. For the reasons more fully explained below, the Court will grant in part and deny in part the motions of the parties.

**MEMORANDUM DECISION AND ORDER - 1**

## FACTS

On April 28, 2021, Friends of the Clearwater ("FOC") filed the complaint in this matter challenging the United States Forest Service's actions and decisions made in relation to its approval of two forest health projects located within the Nez Perce - Clearwater National Forest. (Dkt. 1.) The complaint was later amended on July 23, 2021. (Dkt. 12.) American Forest Resource Council was permitted to intervene on behalf of the Forest Service. (Dkt. 24.)

FOC claims the Forest Service's decisions and actions violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.; National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq*.; National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*.; and Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et. seq*. The Forest Service counters that its decisions and proposed actions fully comply with the applicable standards and requirements of all of these environmental statutes.

The two projects involve extensive timber harvest and other activities in adjacent areas of the Nez Perce – Clearwater National Forest. The Forest Service lodged the extensive administrative records with the Court on August 17, 2021. (Dkt. 15, 33.)[1] FOC filed its motion for summary judgment on October 1, 2021, and the Forest Service and Intervenor filed their cross motions on November 9, 2021.

---

[1] The Forest Service later corrected the index to the administrative records. The project records were submitted to the Court on a thumb drive maintained in the Clerk's Office file room. There are three administrative records to consider. Citations to pages within the records follow the bates numbering provided by the Forest Service, and are as follows: A_000000 for End of the World; B_000000 for Hungry Ridge; and C_000000 for common files.

**MEMORANDUM DECISION AND ORDER - 2**

**End of the World**

The End of the World Project ("EOW") encompasses a project area of approximately 49,565 acres within the Salmon River Ranger District of the Nez Perce - Clearwater National Forest and lies entirely within the Wildland Urban Interface (WUI). . It is located approximately six miles south of Grangeville, Idaho. The Governor of Idaho selected EOW as a Priority Landscape Treatment Area under the Farm Bill (USDA-FS 2014/2016). A_000003.[2] Areas selected under the Farm Bill are considered to have "forest health and fuel hazard conditions outside of historic or desired conditions and are where private lands and structures are located," and the decision to create these areas was prompted in response to the "increasingly devastating fires around the country…." A_000003. The Forest Service issued a Decision Notice and Finding of No Significant Impact (DN/FONSI) for the EOW project in January of 2021, after completing an environmental assessment (EA) in October of 2019.

The Forest Service identified a need to: reduce the risk or extent of, or increase resilience to, insect or disease infestation; reduce wildfire risk to the local communities and surrounding federal lands; restore forest vegetation, dry meadows, and grasslands to a healthy condition; and improve water quality and aquatic habitats. A_000003. The EOW project therefore includes timber harvesting, prescribed burning, permanent and temporary road construction, system road reconstruction, and watershed improvement

---

[2] Although the project record does not identify the Governor of Idaho at the time the Farm Bill was enacted, Butch Otter was elected as Idaho's governor on November 7, 2006, and served until January 7, 2019. Idaho's current governor is Brad Little.

**MEMORANDUM DECISION AND ORDER - 3**

activities to meet the identified needs. A_000003-04. These project activities are, according to the Forest Service, required to maintain forest health and promote resilient ecosystems by managing towards more characteristic landscape level vegetation patterns, structure, patch size, fuel loading and species composition, and are designed to create conditions that will moderate fire behavior such that fire fighters will have more options. A_000003.

Specific project activities involve pre-commercial thinning of 1,098 acres; intermediate harvest of 17,099 acres; and regeneration harvest of 1,720 acres. A_000063. The Forest Service intends also to remove hazard trees in campgrounds and disbursed camping areas (51 acres); conduct dry meadow/range maintenance (82 acres); create a fuel break on FS Road 221; conduct prescribed landscape burning on 7,891 acres; treat invasive plant species; improve range conditions; conduct trail restoration or reconstruction; decommission roads; replace culverts; improve cross drains; and complete stream crossing hardening. A_000063. The proposed action includes 12 harvest units that create openings exceeding 40 acres in size. A_000065. The EA for EOW contains a more detailed description of proposed project activities. A_000070-75. In the discussion of the economic impact of the project, the Forest Service indicated that proposed commercial harvest activities are indirectly related, in that such activities would help meet the purpose and need of the project by generating funding to accomplish restorative projects. A_000078.

**Hungry Ridge**

The Hungry Ridge (HR) project is also located in the Nez Perce - Clearwater National Forest, within the Salmon River Ranger District. B_000003. The approximately 30,000-acre project area is in the Mill Creek and Johns Creek watersheds, tributaries to the South Fork of the Clearwater River, and located approximately 17 miles southeast of Grangeville, Idaho. B_000006. The Forest Service completed a Final Environmental Impact Statement (FEIS) in September of 2020. B_000342. The Forest Service indicated in the FEIS and the Final Record of Decision (ROD), dated March 24, 2021, that the overall purpose of the Hungry Ridge Restoration project is to manage forest vegetation to restore natural disturbance patterns; improve long-term resilience at the stand and landscape levels; reduce the potential risk to private property and structures; improve watershed conditions; and maintain/improve habitat structure, function, and diversity. Timber outputs from the proposed action would be used to offset treatment costs, support the economic structure of local communities, and provide for regional and national needs. B_000348, B_000005.

Specifically, the Forest Service intends to restore a more diverse and resilient forest structure; reduce the potential wildfire risk to private property and structures; improve wildlife habitat and watershed health; and sustain community stability by providing merchantable timber. B_000348-49.[3] The project activities include commercial timber harvest on approximately 7,144 acres using intermediate and regeneration harvest,

---

[3] Additional facts in the record pertaining to the projects are discussed as they become relevant in the analyses below.

as well as prescribed burning on approximately 12,372 acres to treat natural fuels and activity residual fuels from timber harvest operations.

FOC challenges the Forest Service's DN/FONSI and EA for EOW, and the ROD and FEIS for HR, requesting that the Court declare them arbitrary, capricious, and abuse of discretion, and otherwise not in accordance with the NFMA, NEPA, ESA, or the APA. FOC asks the Court to reverse, remand, vacate, and set aside both agency decisions, and to enjoin the projects until the Forest Service completes Section 7 consultation pursuant to the ESA for grizzly bear.

## LEGAL STANDARDS

### 1.    Summary Judgment

In the context of agency review, "[s]ummary judgment...serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the…standard of review*"* under the Administrative Procedure Act. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). Due to the Court's limited review under the Administrative Procedure Act, the summary judgment standard of Rule 56(a) does not apply when motions for summary judgment are determined in agency review cases. *See Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014). Therefore, the Court "is not required to resolve any facts in a review of an administrative proceeding." *Occidental Eng'g Co. v. I.N.S.,* 753 F.2d 766, 769 (9th Cir. 1985). Rather, the Court's purpose "is to determine whether or not as a

matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id*.[4]

### 2.    Administrative Procedure Act ("APA")

The Forest Service's DN/FONSI and EA for EOW, and ROD and EIS for HR, are final agency actions reviewable under the APA, 5 U.S.C. § 551 *et. seq*. Friends of the Clearwater challenges the two agency actions under the APA as violating the requirements of the NFMA, NEPA, and ESA.

Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985). An agency action must be upheld under the APA unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Friends of Earth v. Hintz*, 800 F.2d 822, 830–31 (9th Cir. 1986). Judicial review under this standard is to be "searching and careful," but remains "narrow," and the Court should not substitute its judgment for that of the agency. *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993).

---

[4] FOC submitted a statement of undisputed facts with its motion, to which Defendants responded, noting their disagreement with several statements. Because the Court is limited to the facts as set forth in the administrative record, the Court has considered these disputes in the context of the parties' arguments regarding the Forest Service's compliance, or lack thereof, with the analyses required by the NFMA, NEPA, and ESA.

**MEMORANDUM DECISION AND ORDER - 7**

The Court may reverse the agency's decision as arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1110 (9th Cir. 2015). Conversely, the agency's decision must be upheld if "there is a rational connection between the facts found and the conclusions made," and the determination was "not so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) *overruled in part on other grounds by Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7 (2008).

"[T]his standard is highly deferential, presuming the agency action to be valid." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011) (quoting *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007)); *see also River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010). The Court is to be "most deferential" when, as here, "the agency is making predictions, within its [area of] special expertise, at the frontiers of science." *Lands Council*, 537 F.3d at 993 (quotations and citation omitted); *accord Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt*., 387 F.3d 989, 993 (9th Cir. 2004). *See also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (When examining an agency's "scientific determinations...a reviewing court must generally be at its most deferential.") (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc*., 462 U.S. 87, 103 (1983));

**MEMORANDUM DECISION AND ORDER  - 8**

*Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1185 (9th Cir. 2011) (holding that

"Forest Service is entitled to rely on the reasoned opinions of its experts"). The Court

may set aside only those conclusions that do not have a basis in fact, not those with which

it disagrees. *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land

Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001).

Nevertheless, the "presumption of agency expertise may be rebutted if the

decisions, even though based on scientific expertise, are not reasoned." *Greenpeace v.

NMFS*, 80 F.Supp.2d 1137, 1147 (W.D. Wash. 2000). "Where an agency fails to

articulate a rational connection between the facts found and the choice made, the Court

may not supply a reasoned basis for the agency's action that the agency itself has not

given." *Defenders of Wildlife v. Babbitt*, 958 F.Supp. 670, 679 (D.D.C. 1997) (internal

quotation marks and citations omitted). The Court's review must be "sufficiently

probing" to ensure that the agency's decision is "founded on a reasoned evaluation of the

relevant factors." *San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971,

994, 995 (9th Cir. 2014).

The Court must uphold a reasonable agency action "even if the administrative

record contains evidence for and against its decision." *Modesto Irrigation Dist. v.

Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (quotation and citation omitted). "The

court's task is not to make its own judgment," because "Congress has delegated that

responsibility to the [agency]." *River Runners for Wilderness*, 593 F.3d at 1070. Instead,

"[t]he court's responsibility is narrower: to determine whether the [agency's action]

comports with the requirements of the APA...." *Id*. "The [agency's] action…need only be

**MEMORANDUM DECISION AND ORDER - 9**

a reasonable, not the best or most reasonable, decision," *id*., and the agency need only articulate a "rational connection between the facts found and choices made," *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

"The party challenging an agency's action as arbitrary and capricious bears the burden of proof." *W. Watersheds Project v. Ashe*, 948 F. Supp. 2d 1166, 1174 (D. Idaho 2013) (citing *WildEarth Guardians v. Salazar*, 741 F.Supp.2d 89, 97 (D.D.C. 2010)).

## ANALYSIS

### 1.    Admissibility of Extra Record Evidence

FOC seeks to introduce the declarations of David Mattson (Dkt. 27-6), Harry Jageman (Dkt. 27-2), Richard Williams (Dkt. 27-8), Gary Macfarlane (Dkt. 27-3), Jeff Juel (Dkt. 27-4), and Patrick Finnegan (Dkt. 27-5) in support of its motion for summary judgment. The Forest Service contends that the entirety of the Mattson, Jageman, and Williams declarations, as well as specific paragraphs of the Macfarlane, Juel and Finnegan declarations, should not be considered by the Court.[5]

FOC insists the extra record evidence is admissible, because it will show that the Forest Service did not consider all relevant factors when it decided to approve the projects. The Forest Service argues the declarations provide inadmissible expert opinion attacking the substance of the Forest Service's decisions challenged by FOC.

---

[5] The specific portions in the Macfarlane, Juel, and Finnegan declarations that the Forest Service seeks to exclude from the Court's consideration are:
Juel Declaration: ¶ 12, 15, 21 (sentences 4-7), 22-25, 27 (sentences 3-4, 28-29).
Macfarlane Declaration: ¶ 9-17, 23.
Finnegan Declaration: ¶ 12-19, 22-23 (sentence 3), 25-26.

**MEMORANDUM DECISION AND ORDER  - 10**

The APA is clear that the Court's review is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). However, the United States Court of Appeals for the Ninth Circuit allows a reviewing court to consider extra-record materials in an APA case, if a plaintiff demonstrates with particularity that the extra-record evidence proffered establishes the agency has not considered all relevant factors and did not adequately explain its decision. *Sw. Ctr. For Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)[6]; *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1438 (9th Cir. 1988), *opinion amended by* 867 F.2d 1244 (9th Cir. 1989).

Upon review of the extensive administrative records, the Court finds that FOC did not make the requisite showing under the "relevant factors" exception.[7] The administrative records are comprehensive and provide an ample background against which the Court can evaluate the integrity of the Forest Service's analyses. *Granat v. U.S. Dept. of Agriculture*, 2016 WL 1244516 (E.D. Cal. Mar. 2016) (denying admission of extra-record evidence when the evidence in the record was sufficient). Accordingly, the Court will grant the motion to strike with respect to the Jageman, Williams, Macfarlane,

---

[6] The Ninth Circuit recognizes four exceptions, and will allow extra-record materials in an APA case: (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, or (3) when supplementing the record is necessary to explain technical terms or complex subject matter; or (4) where plaintiffs make a showing of agency bad faith. *Sw. Ctr. For Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). The exceptions are "narrowly construed and applied." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).
[7] The Court's determination does not apply to the Declaration of Mattson, as a different legal standard applies to the admission of extra-record evidence under the ESA citizen suit provision. The Declaration of Mattson declaration will be discussed in the context of FOC's ESA claim.

MEMORANDUM DECISION AND ORDER - 11

Juel and Finnegan declarations. However, the Declaration of Mattson will be considered separately in the discussion regarding FOC's claim under the ESA.

**2.     The National Forest Management Act ("NFMA") – Third and Sixth Claims for Relief**

FOC contends the Forest Service violated the NFMA in two respects. First, FOC claims the Forest Service's decision to count North Idaho Old Growth ("NIOG") and stands within Management Area 20 ("MA20") as existing old growth was arbitrary and capricious. Second, FOC claims the Forest Service acted arbitrarily and capriciously when it failed to adhere to Forest Plan fisheries habitat standards. The Forest Service and Intervenor respond that the agency met its statutory obligations, reasonably interpreted the Forest Plan's old growth standards, and appropriately applied Forest Plan implementation guidelines for projects occurring in endangered fish habitat.

**A.     *Legal Framework***

The National Forest System:

> [C]onsists of units of federally owned forest, range, and related lands throughout the United States and its territories… [and] shall include all national forest lands reserved or withdrawn from the public domain of the United States, all national forest lands acquired through purchase, exchange, donation, or other means,…and other lands, waters, or interests therein which are administered by the Forest Service or are designated for administration through the Forest Service as a part of the system.

16 U.S.C.A. § 1609(a).

The National Forest Management Act creates a management framework for national forests. The framework is divided into a two-step process. First, the Forest

Service must develop a Land Resource Management Plan and an EIS for the entire forest. 36 C.F.R. § 219.10(a), (b); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). Second, once a forest plan is created, the Forest Service has an obligation "to ensure that '[s]ite-specific projects and activities…be consistent with an approved forest plan,' and to 'strictly comply with a forest plan's standards, which are considered binding limitations.'" *Oregon Nat. Desert Ass'n v. United States Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) (internal citations omitted).

"Procedurally, all management activities undertaken by the Forest Service must comply with the forest plan, which in turn must comply with the NFMA." *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 932 (9th Cir. 2010) (quotation omitted). Substantively, the NFMA also places a duty on the Forest Service to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area…." 16 U.S.C. § 1604(g)(3)(B). To ensure compliance with the forest plan and the NFMA, the Forest Service must conduct an analysis of each "site specific" action to ensure that the action is consistent with the forest plan. *Tidwell*, 599 F.3d at 932. "Every project and activity must be consistent with the applicable plan components. A project or activity approval document must describe how the project or activity is consistent with applicable plan components…." 36 C.F.R. § 219.15(d), *cited in WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1232 (D. Or. 2019).

However, the Court must "give the Forest Service ample latitude in ensuring the consistency of its actions with Forest Plans: 'We will conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest

**MEMORANDUM DECISION AND ORDER - 13**

Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan.'" *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1018 (9th Cir. 2012) (quoting *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008)). And, the Court must give the Forest Service's interpretation and implementation of its own Forest Plan substantial deference. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

Thus, in reviewing the approved actions' consistency with the Forest Plan, the Court must ask whether, based upon the record before it, the Forest Service's actions reflect a "clear error of judgment." *Weldon*, 697 F.3d at 1056. Moreover, "[e]ven when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'" *Alaska Dep't of Env't Conservation v. E.P.A.*, 540 U.S. 461, 497 (2004).

**B.    *Old Growth***

1.    *Applicable Old Growth Standards*

The Nez Perce Forest Plan, adopted in 1987,[8] specifies that the Forest Service must "[p]rovide management for minimum viable populations of old-growth and snag-dependent species by adhering to the standards stated in Appendix N." C_027300. The Plan indicates that the Appendix N standards "are based on the most current literature and may change as new information becomes available." C_027489.

---

[8] Although not mentioned in the briefing, the Court notes the Forest Plan was intended to guide management of the Forest for the next 10 to 15 years, and is valid until revised, "committing the Forest to a course of action no longer than 15 years." C_027662. The provisions related to old growth do not appear to have undergone any revision after the Forest Plan was adopted in 1987.

MEMORANDUM DECISION AND ORDER  - 14

Appendix N defines "old-growth habitat" as:

> [A] community of forest vegetation which has reached a late
> stage of plant succession characterized by a diverse stand
> structure and composition along with a significant showing of
> decadence. The stand structure will have multi-storied crown
> heights and variable crown densities. There is a variety of tree
> sizes and ages ranging from small groups of seedlings and
> saplings to trees of large diameters exhibiting a wide range of
> defect and breakage both live and dead, standing and down.

C_027489. It next defines the criteria used to determine the presence of an "old-growth"

stand, which is a stand of timber:

> [T]hat, generally, meets the following:
> 1. At least 15 trees per acre > 21 inches diameter at breast
> height (DBH). Providing trees of this size in the lodgepole
> pine and sub-alpine fir stands may not be possible.
> 2. Two or more canopy layers.
> 3. At least .5 snags per acre > 21 inches DBH and at least 40
> feet tall.
> 4. Signs of rot and decadence present.
> 5. Overstory canopy closure of 10-40 percent; understory
> canopy closure of at least 40
> percent; total canopy closure at least 70 percent.
> 6. Logs on the ground.

C_027489.

> [I]n order to maintain a viable population of old-growth-
> dependent species, it is necessary to maintain 10 percent of
> the total forested acres as old growth with no less than 5
> percent of the forested acres maintained as old growth within
> each prescription watershed or combination of watersheds
> totaling 5,000 to 10,000 acres. If less than 5 percent old
> growth exists in a drainage, the additional required acres will
> be assigned to adjacent drainages where excess old growth is
> available. An additional 5 percent of the forested acres within
> each prescription watershed shall be designated as
> replacement old growth.

**MEMORANDUM DECISION AND ORDER - 15**

C_027490. *See also* C_027659, C_027695, C_027695, C_027868. These acreages are

identified as "Old Growth Analysis Areas," or OGAAs.

Stands managed as MA20 consist of 64,659 acres and are described in the Forest

Plan as "equally distributed across the nonclassified portion of the forest….

Approximately half of the area has a timber condition class of overmature sawtimber

(150 years or older). The remainder of the area is comprised of immature stands (40-80

years) that will provide for replacement old-growth habitat." C_027364. The

management intent for MA20 is to "[m]anage for old-growth habitat for dependent

species." C_027312.

2.    *Analysis*

Both project records for EOW and HR indicate that old growth remaining after

treatment will meet the 5% OGAA minimum and 10% forest-wide minimum, because

there will be sufficient stands of Forest Plan Old Growth, or FPOG, and North Idaho Old

Growth, or NIOG, which when considered together will meet the Forest Plan minimums.

*See* A_018750–51 at Table 43; B_000648 at Table 3-50. FOC contends that, after

treatment, neither EOW nor HR will meet the minimum of 5% old growth within each

prescription watershed, because NIOG is not the same as FPOG as described in the

Forest Plan. To meet NIOG criteria, pine stands require only 8 or more sufficiently large

trees per acre, but the Forest Plan requires 15 or more large trees per acre to qualify as

FPOG. (*citing* C_020451 Table 1, and C_027489.) By considering NIOG and FPOG

together, FOC claims the Forest Service artificially inflated the percentage of old growth

in each OGAA, thereby improperly justifying its conclusion that more than 5% old growth would remain in each OGAA after treatment in both project areas.

In deference to the agency's expertise, the Court must review the Forest Service's interpretation of the Forest Plan solely to see whether the agency's interpretation is arbitrary and capricious. Thus, the Court will uphold the Forest Service's interpretation "unless it is plainly erroneous or inconsistent" with the Forest Plan. *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 760 (9th Cir. 1996).

The Forest Plan was developed over three decades ago to facilitate logging. C_027787 (discussing planned harvest levels over the next ten years). The Forest Plan's underlying EIS recognized the diversity of tree species present in the forest, including Douglas Fir, Grand Fir, Lodgepole Pine, Englemann Spruce, and other species. C_027793. In analyzing the preferred alternative, which culminated in the Forest Plan, the Forest Service recognized that Lodgepole Pine harvest would be limited to trees less than 21 inches in diameter. C_027793. Proposed utilization standards for harvest during decade one indicate the greatest volume of timber harvest would come from Grand and Douglas Fir, trees that reach up to thirty inches in diameter or more. C_027794. The only other tree reaching such a large diameter and proposed to be harvested was Englemann Spruce. C_027794. The EIS also identified four major forest types as having significant timber resources. C_027800. *See also* ROD, C_027605. Clearcutting was proposed as the optimal harvest system. C_027802, C_027803. For the alternative selected, the Forest Service projected that "35 percent of the forest is projected to be maintained in old-growth habitat by the end of the planning horizon." C_028050.

After adoption of the Forest Plan in 1987, the Chief of the Forest Service established in 1989 the National Old Growth Task Force and an action plan to deal with the management of old growth forests. C_020444. The Task Force developed regional definitions of old growth types. C_020444 - 45. The Task Force identified characteristics of old growth in Northern Idaho forest types, or NIOG, as follows: "8 trees per acre >21 inches DBH or more; large trees >150 years old; basal area of >40ft/acre." C_020456.

While the Forest Service may have developed regional definitions of old growth depending upon forest type, the Forest Plan cannot reasonably be read to include NIOG as meeting the criteria for an old growth stand. The purpose of the Forest Plan was to establish a floor of old growth forest wide, and in each OGAA. Logging predominantly favored large sized trees such as Douglas and Grand Fir. When these factors are considered together, the Court finds the Forest Service's interpretation that NIOG meets the criteria used to identify old growth in Appendix N is clearly erroneous.

The Forest Service's decision fails to consider the area's logging history and the potential for disappearance of Douglas Fir, Grand Fir, and Englemann Spruce if NIOG is considered to meet the Forest Plan criteria of an old growth stand. These three tree species (as well as some others prevalent in the forest) meet criterion number one of an old growth stand, because they reach a diameter of greater than 21 inches at breast height and exist in stands that have at least 15 trees per acre. B_030181. In contrast, trees meeting the NIOG criteria may not reach the same diameter, and a stand may not have as many trees per acre. B_030166, B_030179. It was expected that, over time, old growth habitat would be reduced by logging large trees. C_029015. Accordingly, the Forest Plan

MEMORANDUM DECISION AND ORDER - 18

required a minimum distribution forest-wide of stands meeting Appendix N's girth and number per acre. Thus, it is simply not reasonable to read the sentence following the specification that an old growth stand will generally have a diameter >21 inches and have 15 trees per acre as also including trees in lodgepole pine and sub-alpine fir stands as old growth, as the Forest Service insists. The Forest Service's interpretation in both the FEIS for HR and EA for EOW would, if taken to the extreme, eliminate large sized trees throughout the forest, where they were once prevalent.

Moreover, the Forest Service has not provided the Court with any references to other historical projects where it lumped FPOG and NIOG together to support its interpretation of the Forest Plan.[9] Thus, the inclusion of NIOG where FPOG stands may have once predominated may result in skewed numbers forest wide and within an OGAA. *See*, e.g., B_000647. (Figure 19, HR, OGAA map). The Court therefore finds the Forest Service's decision to count FPOG and NIOG together to satisfy the old growth minimum in the EOW and HR project areas is plainly erroneous and inconsistent with the Forest Plan.

FOC's second critique of the Forest Service's decisions concerns FOC's contention that the agency failed to verify whether forest lands labeled MA20 qualify as FPOG. A_00445; B_023792 (maps showing location of MA20 stands). FOC contends

---

[9] *See, e.g.*, C_026386, Doc Denney EA (noting that approximately 17% of the Nez Perce National Forest meets the Forest Plan Appendix N definition of old growth (15 trees per acre greater than 21 inches DBH). The Forest Service also excluded lodgepole pine dominated areas in its identification of old growth habitat in OGAA03050116. There is no inclusion of NIOG in the discussion of the Doc Denney project's effect on old growth.) *See, e.g.,* C_026515, Adams Camp EA (similarly excluding any consideration of NIOG in discussing the project's effects on old growth.)

MEMORANDUM DECISION AND ORDER - 19

the Forest Service never verified whether areas of MA20 contained FPOG, NIOG, or replacement old growth, because the Forest Service did not conduct stand exams, and did not follow the requirements of Appendix N.

Appendix N requires that "[o]ld-growth stands will be identified through the use of stand exam information, aerial photos, and field reconnaissance." C_027490. The Forest Service must also "[v]erify the quality, amount, and distribution of existing and replacement old-growth habitat as part of project planning." C_027490. To carry out the Forest Plan, "individual stand conditions are critical to the decision." C_027605. In 1973, the Forest Service conducted an inventory of the poletimber condition classes on the Forest, identifying 80-82 percent of forest land as commercial sawtimber. C_027689.

Here, while the Forest Service's NEPA documents indicate it used aerial photos, stand exam information, previous land uses, and personal knowledge to verify stand conditions in MA20, the Court cannot find any evidence in the record demonstrating that it did so other than its bare assurances. B_000646; B_000398; B_023972 – 76; A_018750-51; A_000091; A_001557; A_018750; A_000152; A_018717; C_034802-06. The Forest Service did not direct the Court to any documentation in the record of its activities verifying the makeup of MA20 stands.[10]

Further, Appendix N requires actual verification of individual stand conditions by specific methods – aerial photos and field reconnaissance. This was apparently done prior

---

[10] In contrast, the Forest Service identified the precise makeup of forest conditions according to tree type in the Adams Camp project area. C_026479 (breaking down the percentage of each tree type as compared to the total project area).

MEMORANDUM DECISION AND ORDER  - 20

to adoption of the Forest Plan to verify the amount of sawtimber throughout the forest. C_027689. Utilization of "previous land uses and personal knowledge" do not appear on the list of approved verification methods.

The Court therefore finds the Forest Service acted arbitrarily and capriciously when it took liberties outside of a reasonable interpretation of the Forest Plan to meet the minimum old growth requirements, and it failed to accurately identify the composition of areas of MA20. Accordingly, the Court finds the Forest Service has violated the NFMA because it did not establish that the projects would be consistent with the Forest Plan's criteria defining old growth stands.

## C.    *Water Quality and Fish Habitat*

FOC contends that the Forest Service's upward trend findings are arbitrary and capricious because the Forest Service (a) failed to evaluate existing trend and ignored existing trend data; and (b) ignored modeling predicting downward future trends and failed to factor in stream power and flushing rates. Here, the Forest Service's analyses of water quality and fish habitat differed depending upon the project. Accordingly, the Court will discuss FOC's arguments as they apply to each project.

### 1.    *Forest Plan Standards*

The Implementation Guide to Appendix A of the Forest Plan states that timber management activities can occur "concurrent with improvement efforts as long as a positive, upward trend in habitat carrying capacity is indicated." C-017820. "Upward trend means that stream conditions determined through analysis to be below the Forest Plan objective will move toward the objective over time. Stream specific determination

MEMORANDUM DECISION AND ORDER  - 21

of existing condition and present or future improving trend should be done through a convergence of evidence using stream surveys, monitoring results, watershed condition inventories, literature reviews, predictive modeling, and professional judgment." C_017821.

Once the analysis has been completed, it must be demonstrated that an "improving trend is either in place and will continue, or that an improving trend will be initiated as a result of past, present and future management activities." C_017821. The Forest Plan does not require that the improving trend be in place prior to the initiation of new activities. C_017821. "With all habitat components except sediment, the improving trend should be continuously upward, with no temporary downturns or reduction in the rate of improvement….With sediment, the key is that new sediment inputs remain below the general flushing rates considering stream power and the fish/water quality objective of the stream…." C_017821.

Assessing the current trend requires following nine typical steps, one of which is using "Forest Plan monitoring station cobble embeddedness data, where available." C_017822.

> It was assumed in the Forest Plan that implementation of instream restoration and other watershed restoration activities would result in an upward trend in carrying capacity. Where these activities have been implemented, it could be stated that an upward trend in the habitat conditions has been accomplished. In previously degraded watersheds, especially those identified as below objective in 1987, if there have been no entries or natural disturbances over the past 10 to 20 years, it could be assumed that trend is either static or improving.

C_017823.

**MEMORANDUM DECISION AND ORDER  - 22**

2.   *Hungry Ridge*

The FEIS for HR notes that five watersheds (Merton, Trout, American, Deer, and Upper Mill Creek) currently fail to meet Appendix A Fishery Objectives set forth in the Forest Plan due to excessive cobble embeddedness, thus requiring an upward trend analysis. B_015715-16. The FEIS refers to the upward trend analysis in Appendix E. B_000763 – 800. The Forest Service concluded that the proposed action would result in a positive upward trend for all five watersheds over the long-term. B_015725. For each of the five watersheds, the Forest Service analyzed the anticipated impact of planned restoration projects, vegetation management, and temporary road construction. The Forest Service predicted decreased cobble embeddedness and improvement in fish habitat due to culvert improvements, road decommissioning and improvements, and implementation of mitigation measures and best management practices. B_000769-70, B_000774-75, B_000778-79, B_000782-83, B_000787-88. The Forest Service therefore concluded that the project would improve watershed conditions and result in an upward trend.

The Forest Service also measured riparian management objectives, and utilized modeling to predict sediment yield percent over base by alternative for each watershed to predict cobble embeddedness increases due to project activities. Because none of the modeling predicted cobble embeddedness to increase more than 10% for any of the five watersheds, the Forest Service concluded the changes did not represent measurable change to instream conditions.

FOC first faults the Forest Service for failing to do any analysis regarding existing trend and ignoring existing trend data which, based upon cobble embeddedness data, indicated a decline in conditions. The Forest Service counters that its upward trend analysis for HR is consistent with Appendix A and that it evaluated stream conditions based on a number of factors in addition to cobble embeddedness.

The record demonstrates the Forest Service complied with the Forest Plan. First, the Forest Plan does not appear to require the Forest Service to conduct a separate, distinct "existing trend" analysis for each stream, as FOC appears to suggest. Rather, the Forest Plan speaks of "the analysis," which is a stream specific determination "of existing condition and present or future improving trend" to arrive at a trend analysis using a convergence of evidence. The analysis must show an "upward trend" over time.

The Court finds Appendix E to the FEIS analyzed future trend for all five watersheds, consistent with the Forest Plan. For each watershed, the Forest Service looked at past activities, the expected contribution of specific activities to aquatic condition, habitat improvement projects proposed to be implemented, mitigation measures, sediment yield values, and changes to cobble embeddedness as a result of project activities using FISHED modeling. B_000764-66.  The Forest Service disclosed existing condition fishery habitat potential, which was below Forest Plan conditions documented in 1987. B_015724.

Substantial deference is owed to the Forest Service's interpretation and implementation of its Forest Plan. *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d

836, 850 (9th Cir. 2013) (citations omitted). The Court finds no inconsistency with the Forest Service's analyses of upward trend in comparison with Forest Plan directives.

Second, FOC contends the Forest Service's upward trend analyses are arbitrary and capricious because the Forest Service ignored data showing cobble embeddedness will worsen in the short term, focused improperly on sediment yield instead of cobble embeddedness, and ignored stream power and flushing rates. In response, the Forest Service points to modeling results predicting change in cobble embeddedness for the five watersheds consistent with the Forest Plan.

A review of the record indicates the Forest Service evaluated cobble embeddedness data. Based upon existing data and modeling results, the Forest Service concluded the changes to cobble embeddedness from project activities would not be statistically significant. *See, e.g.,* B_ 000769 (disclosing predicted increase to cobble embeddedness in Merton Creek and finding projections "do not necessarily represent any measurable increase in actual instream cobble embeddedness."). The Forest Plan also exempts sediment from the requirement that the improving trend should be "continuously upward," suggesting that temporary downturns are permissible. C_017821.

Second, the Forest Service discussed the proposed habitat improvement projects, mitigation measures, and implementation of best practices during treatment. Although the Forest Plan indicates that, with sediment, the key is that new sediment inputs remain below the general flushing rates considering stream power, the Forest Plan allows the Forest Service to "assume…that implementation of in stream restoration and other watershed restoration activities would result in an upward trend in carrying capacity" of

**MEMORANDUM DECISION AND ORDER  - 25**

sediment. C_017823. In other words, the Forest Plan does not contain a requirement that the Forest Service specifically model stream power, flushing rates, or the like to determine precisely how sediment will be flushed from a stream.

"Courts may not impose 'procedural requirements not explicitly enumerated in the pertinent statutes.'" *Earth Island Institute v. Carlton*, 626 F.3d 462, 472 (9th Cir. 2010) (citing *The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008)). The Forest Service must support its conclusions that a project meets the requirements of the NFMA and the pertinent section of the Forest Plan with studies that the Forest Service has, in its expertise, deemed reliable; explain the conclusions it has drawn from its chosen methodology; and cite reasons it considers the underlying evidence to be reliable. *Id.* When the Forest Service does so, the Court may conclude that the Forest Service has acted arbitrarily and capriciously "only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirement of the NFMA and relevant Forest Plan." *Id. See also Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1072 (9th Cir. 2005) ("When the administrative agency has provided relevant data supporting its decision, we owe deference to the agency's line-drawing.").

Here, the Court finds FOC has not established that the Forest Service made a clear error in judgment. In turn, the Court finds the Forest Service's reliance on modeling predictions showing no statistically significant impact to sediment yield over base for each watershed examined was reasonable and consistent with the Forest Plan.

**MEMORANDUM DECISION AND ORDER  - 26**

3.      *End of the World*

Within the EOW project area, the Forest Service identified Jungle and Cold Creek as not meeting fish/water quality objectives set forth in Appendix A of the Forest Plan. A_003294-98. For Jungle Creek, the Forest Service noted that, "although conditions are below desired levels, they are considered to be mostly natural in origin." A_003295. The Forest Service specifically noted cobble embeddedness conditions were higher in Jungle Creek due to natural conditions, citing poor flushing rate and stream flow. The Forest Service concluded that, based on the lack of entries or natural disturbances over the past 34 years, the existing trend was improving and would continue to improve because of planned watershed improvement activities. A_003295-96.

Similarly, for Cold Springs Creek, the Forest Service noted that cobble embeddedness was high due to natural conditions. A_003297. A review of habitat survey data from 1985 and 2017 indicated poor spawning and rearing habitat suitability, again due to natural conditions, citing poor flushing rate and stream flow. A_003296-97. The Forest Service concluded that, based upon the lack of timber harvest for the past 25 years, as well as current conditions, an upward trend existed and conditions would continue to improve because of watershed improvement activities and road decommissioning. A_003297-98.

FOC acknowledges the Forest Service evaluated "existing trend", but claims the agency improperly utilized assumptions to determine an upward trend would result and ignored data on cobble embeddedness showing conditions worsened since 1987. The

**MEMORANDUM DECISION AND ORDER  - 27**

Forest Service contends its upward trend analyses were reasonable and consistent with the Forest Plan.

The Forest Plan expressly allows the Forest Service to assume upward trend in degraded watersheds if there have been no entries or natural disturbances over the past 10 to 20 years. Here, the Forest Service identified that no such disturbances had occurred in either the Jungle or Cold Creek watersheds, and therefore assumed an upward trend, as is permissible under the Forest Plan. *All. for the Wild Rockies v. Brazell*, No. 3:12-CV-00466-MHW, 2013 WL 6200199, at *28 (D. Idaho Nov. 27, 2013), *aff'd*, 595 F. App'x 700 (9th Cir. 2015).

Further, the Forest Plan does not require the Forest Service to prove the "existing trend" is upward. As discussed above, no separate analysis is required. Rather, the Forest Plan requires a determination of "existing condition." The Forest Service disclosed current cobble embeddedness data as compared to 1987 data. The Forest Plan allows for an assumption of improving trend if it "will be initiated as a result of…future management activities." C_017821. The Forest Plan permits the Forest Service to conclude that an upward trend in carrying capacity will result from implementation of restoration activities. this is precisely what the Forest Service did when it explained the anticipated results of restoration activities planned for Jungle and Cold Creek.

FOC argues also the Forest Service did not acknowledge its own modeling that demonstrated cobble embeddedness would worsen in the short term, and instead relied on assumptions that restoration activities would improve conditions, thereby ignoring the poor flushing rates and stream flows identified as existing in the two watersheds.

**MEMORANDUM DECISION AND ORDER - 28**

But the Forest Plan allows an exception concerning sediment, stating that for all habitat components *except sediment*, a continuously upward improving trend is not necessary. Rather, sediment inputs should remain below the general flushing rates considering stream power and fish/water quality objectives of the stream. The Forest Service discussed in the EA that the natural conditions present in Jungle and Cold Creeks exhibited poor flushing rates and stream power, but concluded that its restoration and mitigation activities would ultimately improve conditions. The Forest Plan expressly permits such an assumption. C_017821, C_017823. *Brazell*, 2013 WL 6200199, at *28.

The Court therefore finds the Forest Service complied with the NFMA in analyzing whether project activities at HR and EOW would result in a positive upward trend in habitat carrying capacity. Accordingly, FOC has not met its burden of establishing the Forest Service's analyses were arbitrary or capricious.

## 3.   National Environmental Policy Act (NEPA) – First, Second, and Fifth Claims for Relief

### A.   *Appliable Standard*

The National Environmental Policy Act ("NEPA") "requires that federal agencies perform environmental analysis before taking any 'major Federal actions significantly affecting the quality of the human environment.'" *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013) (quoting 42 U.S.C. § 4332(2)(C)). "When the Government conducts an activity, NEPA itself does not mandate particular results. Instead, NEPA imposes only procedural requirements to ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed

information concerning significant environmental impacts." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 23 (2008) (internal quotation marks and citations omitted).

An agency can comply with NEPA by preparing either an Environmental Impact Statement (EIS) or an Environmental Assessment (EA) An EIS is the most searching review. It is required for any action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EA is less searching. Its central function is to determine whether an EIS is required. 40 C.F.R. § 1508.9.[11]

A threshold question in a NEPA case is whether a proposed project will "significantly affect" the environment, thereby triggering the requirement for an EIS. 42 U.S.C. § 4332(2)(C). As a preliminary step, an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS. 40 C.F.R. § 1508.9. An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact," or FONSI. *Id*.

If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant. *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988). "The statement of reasons is crucial to determining whether the agency took a "hard look" at the potential environmental impact of a project." *Id*. Taking a "hard look" includes "considering all foreseeable direct and indirect impacts." *Center for Biological Diversity v. Salazar*, 695 F.3d 893, 916 – 17 (9th

---

[11] An agency may also invoke a Categorical Exclusion (CE). A CE allows an agency to proceed with a proposed action without preparing either an EA or and EIS, absent extraordinary circumstances.

Cir. 2012). The Court applies the "rule of reason" in evaluating whether an EA contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mt. v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998).

An EIS must be prepared if "substantial questions are raised as to whether a project…may cause significant degradation of some human environmental factor." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (quoting *Idaho Sporting Congress v. Thomas*, 137 F.3d 137 F.3d 1146, 1149 (9th Cir. 1998) (internal quotation omitted)).

NEPA requires also a cumulative impacts analysis. *Kern v. U.S. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998). A "cumulatively significant impact" is an impact on the environment that results from "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency…or person undertakes such other actions." *Id*. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. *Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846, 868 (9th Cir. 2005). In considering cumulative impacts, an agency must provide "some quantified or detailed information;…[g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id*. This cumulative analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Id*. If the

**MEMORANDUM DECISION AND ORDER - 31**

agency's determination of cumulative impact is "fully informed and well considered," the Court should defer to that finding. *Ocean Advocs.*, 402 F.3d at 868. On the other hand, the Court "need not forgive a clear error in judgment." *Kern*, 284 F.3d at 1075.

    **B.**    *Logging, Forest Health, and Wildfire*

FOC asserts that both the EA for EOW and the FEIS/ROD for HR fail to sufficiently discuss opposing scientific views on the efficacy of thinning on fire risk and insect outbreaks. FOC claims the Forest Service acknowledged contrary science, but made conclusory statements that did not address the contrary science in any meaningful way. The Forest Service counters that it relied on its own experts and the body of scientific literature which supports thinning as a tool to improve forest health and wildfire risk, and that contrary scientific literature was reviewed and considered.

NEPA documents must contain "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Ctr. for Biological Diversity*, 349 F.3d at 1166 (internal quotation marks omitted). A proper NEPA analysis "foster[s] both informed decision-making and informed public participation*." Churchill County*, 276 F.3d at 1071 (quoting *California v. Block*, 690 F.2d 753, 761(9th Cir. 1982)). The Forest Service is required to "acknowledge and respond to comments by outside parties that raise significant scientific uncertainties and reasonably support that such uncertainties exist." *Lands Council*, 537 F.3d at 1001 (emphasis added).

Once these uncertainties have been acknowledged, the analysis must "engage with the considerable contrary scientific and expert opinions" rather than merely draw general conclusions that "there are no negative effects to fuels from the Proposed Action

**MEMORANDUM DECISION AND ORDER - 32**

treatments." *Bark v. United States Forest Service*, 958 F.3d 865 (9th Cir. 2020). A failure

in an EA or EIS to "discuss and consider" evidence contrary to the Forest Service's

position suggests that the Forest Service "did not take the requisite 'hard look' at the

environmental consequences" of its proposed action. *Blue Mountains Biodiversity Project*

*v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir.1998).

In the project records for both HR and EOW, the Forest Service explains that,

among the requisites for the projects, is the need to "manage forest vegetation to restore

natural disturbance patterns" and reduce the "risk of high intensity and potentially

resource-damaging wildland fire," and the risk of "large, stand replacing wildfire…."

B_000007. *See also* A_000003. For HR, the Forest Service explains the goal is not to

eliminate fire or all risk, but to "restore a more diverse and resilient forest structure" so as

to "reduce the intensity and scale of wildfire and more closely emulate natural systems."

B_000008. The Forest Service states that its actions will reduce surface fuels and ladder

fuels within the HR project area to contribute to lessen fire intensities, reduce flame

lengths, reduce fuel loadings and thus reduce the effects of a large scale wildland fire,

lessen the potential for high intensity fire, and change fire behavior from crown fire

activity to surface fire activity. B_000029.

Similarly, for EOW, the Forest Service explains the project treatments are not

meant to prevent or eliminate wildfire, but to "create conditions that will moderate fire

behavior such that fire fighters will have more options." A_000003. Specifically, the

treatments are intended to "remove surface fuels and the majority of ladder fuels, thus

raising the height from the ground to the tree canopy, which would inhibit surface flames

from readily moving into the tree crowns." A_000073. In addition to timber harvest activities, the Forest Service intends to utilize prescribed surface fires to accomplish these objectives. A_000073. Currently, "50% of the project area is subject to passive or active crown fire with flame lengths greater than 4 feet." A_000085. The proposed action is expected to reduce the acreage that would burn via a passive/active crown fire, and increase the acreage that would be subject to surface fire, which will "allow for the use of safe efficient fire suppression management actions due to low flame lengths (less than 4 feet high), and surface fire type." A_000086.

The Forest Service's risk reduction calculations for HR and EOW are supported by scientific literature, fire studies conducted in the Hungry Ridge area, and by extensive modeling. A_003230-3258 (EOW Updated Fire and Fuels Specialist Report); B_026750-71 (HR Final EIS Specialist Report: Fire/Fuels Resource). The project record for EOW reveals the Forest Service evaluated contrary scientific opinions and addressed public comments. A_012130-191; A_016333-495. The same consideration was given to contrary scientific opinions and public comments for HR. B_000809 – 858; B_001019 – 20.

A review of the record indicates that FOC provided alternative scientific studies contradicting the Forest Service's conclusions about the appropriate methodology to

**MEMORANDUM DECISION AND ORDER  - 34**

impact fire behavior.[12] When faced, however, with a "battle of the experts," courts have "consistently rejected such attempts, noting that 'when specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'" *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1511 (9th Cir. 1997) (quoting *Marsh*, 490 U.S. at 378). A review of the record and the Forest Service's analyses related to management and control of fire behavior reveals the Forest Service's decisions were founded on a reasoned evaluation of the relevant impacts and was truly informed.

Here, the Court finds the methodology used and conclusions reached by the Forest Service were supported by adequate scientific data as set forth in the project records. Further, the Court is satisfied the Forest Service "engage[d] with the considerable contrary scientific and expert opinion," and drew conclusions supported by that evidence. *Bark*, 958 F.3d at 871. *See also Hapner v. Tidwell*, 621 F.3d 1239, 1245 (9th Cir. 2010) (finding Forest Service's fire risk reduction calculations well supported by scientific

---

[12] For instance, in FOC's response brief, FOC identified studies that the agency allegedly failed to address. Pl.'s Response Reply at 16 – 19. (Dkt. 35.) FOC also cited to language in the specialists' reports that FOC insists contradict the conclusions reached by the Forest Service. *Id.* n.9 at 15. However, the fire and fuels specialists were commenting upon the effect treatments would have on ignition and fire occurrence, not fire behavior, which is what the Forest Service's actions intend to address. The Forest Service never stated in its NEPA documents that its actions would reduce the occurrence of fire. Finally, FOC contends the Forest Service failed to include information about contrary science in the FEIS for HR. However, *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1057 (9th Cir. 2007), *on reh'g en banc*, 535 F.3d 1058 (9th Cir. 2008), requires only that the FEIS contain a separate "comments and responses" section, which the FEIS for HR contains. B_000801-1028. The FEIS presents the Forest Service's view regarding the scientific literature FOC submitted. The Court is not responsible for conducting its own scientific review of the literature FOC claims was not addressed and determining who is correct.

MEMORANDUM DECISION AND ORDER - 35

studies and extensive modeling). The Court therefore finds the Forest Service's actions were not arbitrary and capricious.

### C.   *Fisher and Other Wildlife*

FOC claims the Forest Service violated NEPA by failing to take a "hard look" at the direct and indirect impacts of regeneration logging and intermediate harvest by variable density thinning on fisher, who rely on old growth and mature forest habitat. First, FOC asserts that the Forest Service's conclusion in both the DN/FONSI for EOW and the ROD/FEIS for HR that regeneration logging will have only negligible, short term effects on fisher is contradicted by the wildlife reports for the two projects. Second, FOC contends the Forest Service did not address the impacts of variable density thinning ("VDT"), which will leave gaps of five acres throughout the project areas, thereby destroying fisher habitat connectivity.

In response, the Forest Service argues that it complied with NEPA, referencing the specialist reports upon which the two agency decisions are based. The Forest Service contends that the wildlife reports evidence the Forest Service's hard look and analyses for the fisher in and around the two project areas as required by NEPA.

FOC's first argument essentially faults the Forest Service's decision to contain only a brief or cursory mention of the effects each project may have on wildlife in the DN/FONSI for EOW and the ROD/FEIS for HR. However, the Court may look to the project record to evaluate whether there is adequate support for the Forest Service's decision in either an EA or an FEIS. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998). *See also Friends of Clearwater v. Petrick*, No. 2:20-

CV-00243-BLW, 2022 WL 622460, at *16 (D. Idaho Mar. 2, 2022) (explaining that an EA and an EIS may incorporate by reference supporting resource reports, references, and biological assessments, such that the Court can consider the materials in addressing the plaintiff's claims).

The DN/FONSI for EOW specifically refers to the EA and resource specialist reports for a discussion of the beneficial and adverse effects of the decision on wildlife. A_000019. In turn, the EA for EOW contains a summary discussing the effects of the project upon the fisher. A_000094 – 95. The EA discloses that fisher habitat is present in the project area, and summarizes the direct and indirect effects of the project on fisher, most specifically the impact to its habitat. A_000095. The EA also references the project record and the project website for a full analysis for wildlife. A_00091.

Similarly, the FEIS for HR incorporates by reference the project record, and provides a public website link to access the record. B_000400. The FEIS specifically indicates its reliance on the specialist reports. In the section discussing wildlife, the FEIS refers to the wildlife specialist report for a complete analysis. B_000637. Fisher are identified as a species for which the Forest Service completed an analysis. B_000640.

Upon review of the wildlife reports in the record for both projects, the Court does not find support for FOC's arguments. *See* A_018694-850 (Wildlife Specialist Report, EOW); B_023894-4004 (Terrestrial Wildlife Resources BABE Specialist Report, HR); B_023756 (HR Fisher Habitat Map); B_023766-67 (HR Fisher Boundary VMap); B_023826-28 (HR FEIS Fisher Habitat Cumulative effects); B_023829-831 (HR FEIS Fisher Boundary VMap alternatives). Instead, the Court finds the discussion and

**MEMORANDUM DECISION AND ORDER - 37**

consideration undertaken by the Forest Service for both projects was consistent with the "hard look" required by NEPA. *See Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (explaining NEPA is "primarily procedural").

Both project records contain wildlife reports evidencing that the Forest Service gave appropriate consideration to fisher and took the requisite "hard look" at the short and long term impacts the Projects may have on the species. A_018815;[13] B_023930. And, the wildlife reports discussed the impact that all harvest treatments, including VDT, would have upon fisher habitat and habitat connectivity. A_018783-85; B_023929-30. Finally, the reports contain a summary supporting the Forest Service's determination that, while project activities "may impact individuals or habitat," the action alternative "will not likely result in a trend toward federal listing or reduced viability for the populations or species." A_018842[14]; B_023932. Accordingly, the Court finds the Forest Service has satisfied its obligations under NEPA in this respect.

### D.    *Steelhead*

FOC challenges both project decisions on the grounds that the Forest Service failed to take a hard look at the effects upon Snake River Steelhead. FOC's challenge is two-fold. First, it challenges the methodology the Forest Service utilized to determine

---

[13] The DN/FONSI for EOW indicates that immediate effects due to project activities would be "minor in nature" and result in "short-term losses of habitat," but long term project effects would be beneficial for wildlife and their habitat. A_000019. This is consistent with the more detailed analysis in the EOW wildlife report.

[14] The stated conclusion in the EOW wildlife report is consistent with the conclusion set forth in the EA for EOW. A_000094 (The Forest Service concluded that the EOW project "may adversely impact individuals or habitat," but that it is "not likely to result in a loss of viability on the planning area, nor cause a trend to federal listing or a loss of species viability range wide.").

**MEMORANDUM DECISION AND ORDER  - 38**

effects. FOC contends the Forest Service's focus should have included an evaluation of baseline numbers of returning steelhead, and consideration of recent steelhead declines. The Forest Service counters that its methodology for assessing impacts on steelhead, which focused on the projects' effects on habitat by way of sediment delivery, was reasonable and complied with the Forest Plan. Second, FOC challenges the underpinnings of the Forest Service's conclusion that project effects upon steelhead will be "short term." The Forest Service asserts the record supports its conclusions regarding anticipated short and long-term effects based upon evaluation of project activities. Upon review of the record, the Court finds the Forest Service's analyses and conclusions satisfy NEPA's "hard look" requirement, as further explained below.

The Court does not find support for FOC's first challenge. The Forest Plan directs the Forest Service to manage fish habitat and improve existing habitat capacity by meeting drainage-specific fish/water quality objectives. C_027614; C_027300-01 ("Restore presently degraded fish habitat to meet the fish/water quality objectives established in this Forest Plan…."); C_027453-59. The Forest Plan indicates that the emphasis should be upon sediment limits set forth in the Forest Plan, and that emphasis needs to be placed on data gathering pertinent to the quality and quantity of habitat. C_027414.

A review of the record[15] indicates the Forest Service followed the Forest Plan's directive with regard to both projects. The Forest Service assessed potential impacts to water quality from sediment caused by project activities, as discussed above in the context of FOC's NFMA challenge. Turning to EOW, the record reflects that the Forest Service's BA contained information concerning recent steelhead data from 2017 and 2018, and data from the Idaho Department of Fish and Game showing daily steelhead counts in the Snake River Basin. A_000568 (discussing 2019 steelhead counts that are lower than counts in 2017 and 2018). The Forest Service's main focus, however, was an assessment of potential impacts to water quality from sediment caused by project activities at EOW, and a water trend analysis was conducted for those watersheds not meeting Forest Plan objectives. A_000505-06, A_000516-16. The Forest Service also compared water quality conditions from field observations in 2017 and 2018 to baseline conditions observed in 1985. A_000507-08.

Within the BA for HR, the Forest Service disclosed that it collected and compared data regarding deposited sediment at various reference sites throughout the HR project area in 2017 and 2018 and compared the more recent data to sediment data collected in the early 1990's during comprehensive basin wide surveys. B_005329. The FEIS for HR contains a discussion about the affected aquatic habitat and species because of sediment

---

[15] Contrary to FOC's assertion, the Court can look to the project record to determine if the Forest Service took the requisite "hard look" at project effects under NEPA. *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998).

delivery. B_001161-73. The Forest Service examined also data collected to evaluate existing habitat conditions by stream. B_001164-65.

The Court cannot "second-guess methodological choice made by an agency in its area of expertise." *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993). As discussed above in the context of FOC's NFMA challenge regarding water quality and fish habitat, the Forest Service complied with the directives in the Forest Plan and properly assessed the effects of sediment on fish habitat. The directive to examine project effects as a result of sediment delivery is established by the Forest Plan. It allows the Forest Service to compare project alternatives and choose the proposal that, in its opinion, would achieve project objectives without resulting in a measurably significant increase in long-term sediment yields. Further, the Forest Service is permitted to "use habitat as a proxy when the Forest Service concludes, in its expertise, that it is reasonable to assume that a project will maintain a species' viability if the project will maintain suitable habitat for the species." *The Lands Council v. McNair*, 537 F.3d 981, 1003 (9th Cir. 2008) *overruled in part on other grounds by Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7 (2008).[16] NEPA does not require the Court to "decide whether an [EIS] is based on the best scientific methodology available." *McNair*, 537 F.3d at 1003.

Further, *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005), does not compel a different result here. In *Powell*, the court held that the Forest Service's use of

---

[16] *Winter* foreclosed the use of an irreparable harm standard mandating less than a likelihood of irreparable injury, which standard was used in *Lands Council* to decide a motion for preliminary injunction.

**MEMORANDUM DECISION AND ORDER - 41**

stale fish count surveys, the most recent of which occurred six years prior to the completion of the NEPA documents, rendered their decision-making process inaccurate. *Id.* Here, in contrast, the record reflects the Forest Service collected current data regarding sediment yield over baseline and utilized that metric to guide its decision-making process.

Nor does the Court's recent holding in *Friends of the Clearwater v. United States Forest Serv.*, No. 3:20-CV-00322-BLW, 2021 WL 3408595, at *1 (D. Idaho Aug. 4, 2021), compel the Court to find error with the methodology employed by the Forest Service here. That case involved the impact of the Lolo Insect and Disease Project upon Snake River Basin steelhead. FOC challenged the Forest Service's actions under the ESA, which requires use of the "best scientific and commercial data available" to fulfill the ESA's consultation requirements. 2021 WL 3408595 at *8. In that context, the Court held the Forest Service erroneously disregarded recent data showing significant declines in returns, which undermined its conclusion that proposed actions would not harm individual fish. *Id.* The Court therefore found the agency's failure to reinitiate consultation under Section 7 of the ESA was in error. *Id.* In contrast, FOC challenges the Forest Service's decisions here under NEPA. Thus, the Court finds *Friends of the Clearwater*, No. 3:20-CV-00322-BLW, inapposite.

Turning to FOC's second challenge, the Court finds the Forest Service adequately supported its conclusions for both projects with regard to short and long term effects on steelhead. For EOW, the "project determination for steelhead and their critical habitat is…may affect, likely to adversely affect the fish and their critical habitat." A_000021-

22, A_000519. However, the Forest Service concluded that there would be "no significant effect" to steelhead and critical habitat because sediment effects would be "extremely short term (one day per site) and [project activities] would have long term benefits by providing access to historic habitats." A_000022, A_000512. Further, mitigation measures will include removing individual fish from work sites prior to culvert removal to minimize direct effects to fish. A_000022, A_000512.

Similarly, for HR, the FEIS sets forth the Forest Service's determination that project activities are "Not Likely to Adversely Affect" steelhead critical habitat, but are "Likely to Adversely Affect" steelhead. B_001077. In making its determination, the Forest Service expected effects to individual fish to be minimal, because construction activities in the form of road construction and decommissioning would be "short in duration," and increases from sediment will be "unmeasurable from baseline conditions after the first freshet." B_000794. NEZSED modeled increases in year 1 sediment did not exceed Forest Plan Appendix A guideline for any of the prescription watersheds. B_005330. And, the Forest Service expects increases in sediment yield will not occur all at one time, but will be distributed incrementally over the life of the project due to the nature of activities, which includes decommissioning of all 23 miles of temporary roads within three years of use; replacement of eighteen existing culverts to improve hydrologic function; and riparian planting. B_005309; B_005313; B_005330.

The Forest Service explained that it expects long term improvement because HR project activities include implementation of improved stream crossings and habitat enhancement. B_000794, B_005309, B_005331; B_000354, B_000416 (Apply

**MEMORANDUM DECISION AND ORDER  - 43**

PACFISH interim direction to project activities), B_000414 (replace 11 culverts for fish

passage). The HR project also includes short-term mitigation measures, such as

restrictions on instream activities in fish-bearing streams, which would restrict all

instream work between July 1 – August 15 to avoid sediment deposition and disturbance,

and suspension of instream activities if state turbidity standards are exceeded. B_000417-

18. *See also* B_000450 (requiring road related activities within RHCAs to be performed

during the dry season to minimize potential soil disturbance).

     The Court finds the Forest Service's conclusions are adequately supported by the

project records, and that *Pac. Coast Fed'n of Fishermen's Associations v. U.S. Bureau of

Reclamation*, 426 F.3d 1082, 1085 (9th Cir. 2005), does not compel a different result.

*Pac. Coast* involved an ESA challenge to the operation of a federal irrigation project that

the plaintiffs contended would jeopardize anadromous fish species. The project consisted

of a number of dams and reservoirs. The plaintiffs challenged the defendant's

determinations regarding the quantity of water that the BOR must release from behind

one of the dams on the Klamath River. There, the court found the BOR's discussion

lacked consideration of the fish population's short life cycle, because the decision

regarding flow rates would govern the BOR's actions for ten years. *Pac. Coast Fed'n of

Fishermen's Associations*, 426 F.3d at 1090. In other words, the fish lifecycle was a

relevant factor in the context of those project activities.

     Here, in contrast, the Court is reviewing the Forest Service's decision under

NEPA, not the ESA. Based upon a review of the project records, the Court finds the

Forest Service articulated a "rational connection between the facts found and the choices

**MEMORANDUM DECISION AND ORDER - 44**

made," and provided a reasoned explanation for its decision. *NRDC v. Dep't of Interior*, 113 F.3d 1121, 1126 (9th Cir. 1997). The Forest Service examined specific project activities and reviewed their duration in terms of impacts upon resident fish. And, the Forest Service described mitigation measures for each project designed to minimize sediment deposit and disturbance. The Forest Service's rationale for finding that project activities will cause short-term impacts upon fish is tied to the duration of relevant project activities expected to directly impact them.

The Forest Service explained also that its project activities will not impact all streams all at once for ten years, unlike the approved action in *Pac. Coast*, which would affect streamflow below the dam for ten years. There are also restoration projects involved, such as riparian planting and soil restoration activities, culvert improvements, and road decommissioning expected to improve habitat over the long term.

Accordingly, the Court finds the Forest Service's analyses of project activities and the discussion of short- and long-term impacts upon Snake River steelhead sufficient under NEPA.

### E.   *Mill Creek*

Mill Creek is located within the HR project boundaries. FOC claims that cobble embeddedness figures disclosed in the FEIS for HR demonstrate that recent conditions have declined since 2011 and the cause of the decline is due to activities from the Adams

Camp Project,[17] located nearby. FOC asserts that this data undermines the Forest

Service's predictions that watershed conditions in Mill Creek, and by implication in both

project areas, will improve. The Forest Service counters that FOC fails to: consider the

impact of a slide that occurred in 2008; present evidence that Adams Camp project

activities account for any increase in cobble embeddedness; or account for the guidance

in the Forest Plan.

    The record here supports the Forest Service's reasoning, and the Court does not

find FOC's criticisms persuasive. During the early 1990s, cobble embeddedness was

expressed as a range between 34 – 76% in Upper Mill Creek, and 24 – 25% in Lower

Mill Creek. B_018073. For the Adams Camp project, the Forest Service collected data

during 2011 at locations most likely to show increases in sediment, and which reflect

only two points in time. B_018073. At those locations and times, Upper Mill Creek %

mean cobble embeddedness was 28%, while Lower Mill Creek % mean cobble

embeddedness was 12%. B_018073. Later data collection done in 2013, 2017, and 2018,

and set forth in the project record for HR, measured % mean cobble embeddedness in

Upper and Lower Mill Creek for those specific years as follows: Upper Mill – 31%

(2013), 18% (2017), and 17% (2018); and in Lower Mill – 15% (2013), 10% (2017), and

25% (2018). B_018921. The Forest Plan recognizes fish habitat quality changes over

time, even under natural conditions. C_017815. For instance, the Forest Service

---

[17] The Adams Camp Project included regeneration harvest on 72 acres, improvement harvest on 841 acres, and other activities, and involved reconstructing 5.4 miles of road, road maintenance on 5.1 miles of roads, and construction of 5 miles of temporary roads to facilitate harvest. B_018064.

**MEMORANDUM DECISION AND ORDER  - 46**

considered the impact of a slide in Mill Creek, noting that, in 2018, cobble embeddedness in Mill Creek above the slide was under 15%, while below the slide it was measured at 25%. B_08916.

The FEIS for HR disclosed substrate data by prescription watershed collected from 2011 to 2018 and expressed it as a mean weighted percentage. B_000447. Yet, FOC simplistically compares a single data point in 2011 to a weighted mean that accounts for multiple years, and thus multiple data points. Further, data collected for 2013, 2017, and 2018 show fluctuations in the mean during those years that is not on a straight downward trajectory. Nor does FOC point to specific evidence in the record that project activities during the Adams Camp Project were what contributed to the increase in the mean weighted average. For instance, the Adams Camp Project commenced in or about 2013, and was to last for up to five years. B_018064. For FOC's argument to be supported, the Court would expect % mean cobble embeddedness in Upper and Lower Mill Creek for each year following 2013 to significantly worsen. Yet, that did not occur. B_018921.

Pursuant to the Forest Plan, the Forest Service relied upon other metrics, such as a trend analysis based on 2018 instream data and the combined results of NEZSED, ECA and FISHED analysis of alternatives. B_000437. The Forest Service expected all prescription watersheds to be at or below pre-project levels of percent sediment yield over base by year 7 after project implementation based upon NEZSED modeling. B_000437. And, in addition to cobble embeddedness, stream temperature and woody

debris, as well as other indicators of deposited sediment,[18] were considered. B_000439-440. The Forest Service explained in its decision that FISHSED modeling is not designed to predict actual cobble embeddedness levels from project activities, hence the reliance upon both NEZSED and FISHSED modeling. B_000441. These models predicted a percentage change in cobble embeddedness from project activities over existing condition one year after project implementation of 3% in Upper Mill Creek, and 6% in Lower Mill Creek, B_000448, and no detectible change in summer rearing capacity or winter carrying capacity, B_000449-50.[19]

The Court finds the Forest Service's analysis regarding watershed conditions in Mill Creek complies with NEPA's "hard look" requirement, and that the Forest Service's analysis adequately supports its conclusion.

F.      *Old Growth, Degraded Watersheds, and Grizzly Bear*

FOC contends that, for the same reasons the Forest Service failed to comply with the Forest Plan and the NFMA, and the ESA, it in turn violated NEPA. In other words, FOC tiers its NEPA violations to its claims that the Forest Service violated the NFMA amd the ESA. *See Lands Council v. Cottrell*, 731 F.Supp.2d 1074, 1090 (D. Idaho 2010) ("Where, as here, the alleged violation of the NFMA pertains to the procedural requirements that the Forest Service must comply with in order to ensure the viability of

---

[18] In addition to cobble embeddedness, these indicators include change in summer rearing habitat capacity; change in winter carrying capacity; Forest Plan fishery/water quality objectives and trend; and, a qualitative discussion of fish habitat. B_000440.

[19] In addition, the Forest Service intends to monitor sediment via cobble embeddedness measurements in Upper and Lower Mill Creek annually for five years following implementation of Project activities. B_000088. If cobble embeddedness increases more than 10% above existing conditions, the Forest Service will take action to address the source of any project-related sediment. *Id.*

MEMORANDUM DECISION AND ORDER  - 48

species, a NEPA violation can be found based on a violation of the NFMA."); *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1231 (D. Or. 2019) ("no effect" finding in violation of the ESA constituted also a failure to take a "hard look" under NEPA). The Forest Service denies that any NEPA violations are tiered to violations of the NFMA or ESA, for the same reasons it asserts in support of its arguments under the NFMA and ESA.

For the reasons explained above regarding FOC's NFMA claims, the Court's findings related to the NFMA serve to establish a violation of NEPA. However, as discussed below, the Court does not find violations of the ESA, and there is, in turn, no violation of NEPA grounded upon a violation of the ESA.

### G.    *Cumulative Impacts*

FOC contends the DN/FONSI and EA for EOW do not mention HR in the cumulative impact discussion, and that the ROD for HR does not mention EOW. A-_000001; A_000057; B_000001. Although FOC recognizes the FEIS for HR acknowledges EOW as a foreseeable future action adjacent to HR, FOC faults the document for failing to contain a detailed discussion about cumulative impacts to wildlife, forest health and old growth, fish, or streams. B_000744-47; B_000740. The Forest Service counters that FOC's argument elevates form over substance, pointing to numerous places in the record where cumulative impacts for each project are discussed, and that the Forest Service specialists analyzing each particular resource considered cumulative impacts in relation to spatial and temporal boundaries relevant to the resource.

**MEMORANDUM DECISION AND ORDER  - 49**

In response, FOC contends the Forest Service's references in its briefing to only a "few places" in the project record does not satisfy NEPA, and that the Forest Service did not provide sufficient justification for its choice of analysis area relative to each of the specific resources considered. The Forest Service contends FOC's argument is untenable and unreasonable because, in the absence of any identified error, FOC's argument would require the Forest Service to use the "Salmon-Clearwater Divide" as the cumulative impact analysis area for all resources.

FOC's argument is premised on a superficial inadequacy, insisting that specific documents lack a cumulative impact analysis. FOC simplistically asserts that neither project mentions the other, referencing only the DN/FONSI and EA for EOW, and the ROD for HR. Although the Forest Service did not present a robust discussion of cumulative impacts in the DN/FONSI and EA for EOW and the ROD for HR, "it would impermissibly elevate form over substance to hold that the Forest Service must replicate its entire cumulative effects analysis in a particular NEPA document." *Ctr. for Env't L. & Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1009 (9th Cir. 2011) (citing *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 667 (9th Cir. 2009) (holding that an EIS's discussion of cumulative effects was adequate because, even though "the cumulative effects section ... refer[red] generally to 'past and proposed activities,'…other parts of the EIS g[ave] extensive history about past actions in the area"); *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006) (approving a cumulative effects analysis based on a model that pervaded the EA)).

Turning to the records, there is ample evidence that the Forest Service considered the cumulative impacts of the two projects when the agency reviewed impacts to wildlife, fish, fisher, watersheds, and forest health in general, but not with respect to old growth. For instance, the FEIS for HR addresses EOW as a future foreseeable action. B_000600. The FEIS contains a discussion of cumulative effects in the analysis area of subwatersheds and prescription watersheds, and directs the reader to Table 3-48 and Appendix C, as well as to the project record. B_000625. The FEIS discusses the following in its cumulative effects analysis: road management; past and future timber harvests; the effect of prior wildfires and mining; livestock grazing, which is ongoing; the effect of the Mill Creek subwatershed 2008 flood event and later restoration projects; past and future watershed and fish habitat improvements, including those undertaken as part of the EOW project; recreational use of the area; the South Fork Clearwater River TMDL (total maximum daily loads) implementation plan; and climate change. B_000625-629. The FEIS next discusses the cumulative effects of the HR project together with other past and future projects upon specific subwatersheds, which include Mill Creek; Lower Johns Creek; and Grouse Creek-SF Clearwater River. This discussion analyzes the potential for increased sediment in these subwatersheds. B_000629.

The Terrestrial Wildlife Resources Biological Assessment and report for HR, dated May of 2019 and updated January of 2021, contains a cumulative effects discussion dependent upon the specific animal's analysis unit. For example, the cumulative effects for lynx are assessed "across the Lynx analysis Unit (LAU3050602), which totals 45,123 acres. B_023913. The same analytical process is repeated for each species found or

**MEMORANDUM DECISION AND ORDER - 51**

considered to be present, including the fisher, gray wolf, and others, as well as for old growth forest habitats. B_023916-996.

Similarly, the EA for EOW refers to the project record. The EOW Wildlife Resource Specialist Report, finalized on December 28, 2020, contains a discussion of cumulative effects. A_018803-27. Here, the Forest Service indicated it determined the amount and location of historic timber harvest, past wildfires, pre-commercial thinning, road construction, road decommissioning, and habitat improvements. A_018803. The Wildlife Resource Specialist Report then contains an analysis of cumulative effects in the analysis area applicable to specific species. For example, the report discusses the effect of the Doc Denney project, adjacent to EOW, on Lynx habitat located across the Lynx analysis Unit. A_018804-05. This same analytical approach is applied to other species, such as the Bald Eagle, fisher, and Gray Wolf, and old growth habitat. A_018804-50. HR is specifically mentioned in the analysis of cumulative effects pertaining to fisher. A_018814.

Next, the Forest Service justifies its decision to define the geographical boundaries of cumulative effects by habitat and watershed, because its decisions concerning analysis area involve a consideration of the appropriate scope. *See* Forest Service Handbook, 1909.15-Nat'l Env. Policy Act Handbook, Ch. 10, 15.2 ("Spatial and temporal boundaries are the two critical elements to consider when deciding which actions to include in a cumulative effects analysis. Spatial and temporal boundaries set the limits for selecting those actions that are most likely to contribute to a cumulative effect. The

effects of those actions must overlap in space and time for there to be potential cumulative effects.").

Referring to the EOW Aquatic Species/Habitat Report, finalized on October 24, 2018, the Forest Service defined the affected region for purposes of analyzing cumulative effects by the project area, because "[a]ny area larger than this would dilute the effects of project activities to the point where they would not be measurable." A_003289. Similarly, for HR, the FEIS Specialist Report analyzing fisheries resources examined portions of the Mill Creek and Johns Creek watersheds, as well as ten other prescription watersheds in the project area. B_015703. The cumulative effects were assessed at the Mill and Johns Creek watershed scale, and analyzed effects downstream, which included the South Fork Clearwater River. B_015725-30.

But the Court was unable to locate any discussion or analyses of the cumulative and synergistic impact of the two projects on old growth. This is problematic because the Forest Plan requires the Forest Service to maintain a minimum of 10% of the total forested acres as old growth. It is difficult to reconcile the Forest Service's justification that old growth need only be looked at in the context of each project's boundaries when the Forest Plan requires the Forest Service to view the forest as a whole. In this respect, the Court finds the Forest Service's analyses of cumulative effects to old growth failed to consider an important aspect of the problem, and is therefore arbitrary and capricious.

Generally, the Court defers to the agency's determination of the scope of its cumulative effects review. *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 413–414 (1976)). The

**MEMORANDUM DECISION AND ORDER - 53**

Court finds the Forest Service adequately justified its decision to limit the geographic

scope of the cumulative effects analyses by resource area relevant to the resources

involved for all resources *except* old growth. With that exception, a review of the project

records reveals ample evidence that the Forest Service considered relevant prior actions,

as well as current and reasonably foreseeable future projects, and took the requisite hard

look before approving the two projects. *See Ecology Ctr. v. Castaneda*, 574 F.3d 652,

667 (9th Cir. 2009). That is all NEPA demands.

### H.    *Failure to Prepare an EIS for EOW* (*First Claim for Relief*)

FOC argues an EIS, not just an EA, was required under NEPA for EOW, because

the project triggers several significance factors. Specifically, FOC contends that the

project will have significant cumulative effects when the HR, Doc Denny, and Adams

Camp projects are considered together; the project's effects on forest health and fire risk

are highly controversial and uncertain; there are substantial questions about the project's

effects upon species that depend on old growth and other mature forest habitat; there are

substantial questions about impacts to ESA listed species – steelhead and grizzly bear;

and there are substantial questions about whether the project threatens legal violations.

The Forest Service disputes FOC's claims, arguing that the context of the EOW

project, in conjunction with the Forest Service's evaluation of the intensity factors,

rationally supports its determination not to prepare an EIS. It disputes FOC's assertion

that the size and timeframe of the project alone require the preparation of an EIS. The

Forest Service contends its decision not to prepare an EIS for EOW was reasonable,

because the context does not warrant one, and the impacts on wildfire risk and forest

health are not highly controversial or highly uncertain.

        1.      *Standard for Preparation of an EIS*

      NEPA requires preparation of an Environmental Impact Statement ("EIS") for all

"major Federal actions significantly affecting the quality of the human environment." 42

U.S.C. 4332(2)(C); *see also Ocean Advocates v. United States Army Corps of Eng'r*, 402

F.3d 846, 864–65 (9th Cir.2005). In determining whether an EIS must issue, the Ninth

Circuit has stated:

> Whether an action may significantly affect the environment
> requires consideration of context and intensity. Context
> delimits the scope of the agency's action, including the
> interests affected. Intensity refers to the severity of impact,
> which includes both beneficial and adverse impacts, the
> degree to which the proposed action affects public health or
> safety, the degree to which the effects on the quality of the
> human environment are likely to be highly controversial, the
> degree to which the possible effects on the human
> environment are highly uncertain or involve unique or
> unknown risks, and whether the action is related to other
> actions with individually insignificant but cumulatively
> significant impacts.

*Center for Bio. Diversity v. National Hwy. Traffic Safety Admin*., 538 F.3d 1172, 1185–

86 (9th Cir.2008) (internal quotations and citations omitted). In reviewing an agency's

decision not to prepare an environmental impact statement, the question is "whether the

agency took a 'hard look' at the potential environmental impact of a project." *Blue Mts.*

*Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).

      The Court must rely on NEPA regulations, promulgated by the Council on

Environmental Quality ("CEQ"), to guide its review of an agency's determination of

"significance." *See* 40 C.F.R. § 1508.27; *see also Marsh*, 490 U.S. at 372, 109 S.Ct. 1851 (CEQ regulations entitled to substantial deference). To decide whether a proposed project will have "significant" impacts on the environment, an agency must evaluate "the degree to which the effects on the quality of the human environment are likely to be highly controversial," and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. §§ 1508.27(b)(4), (b)(5).

Courts apply the arbitrary and capricious standard when reviewing an agency's decision to not complete an EIS. *Id*. at 1211. Under that standard, the Court must determine whether the agency has taken the requisite "hard look" at the environmental consequences of the proposed actions, based its decision on a consideration of the relevant factors, and provided a convincing statement of reasons explaining why the project's impacts are insignificant. *See Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000); *Blue Mts*. *Biodiversity Project*, 161 F.3d at 1211. "A full [EIS] is not required if the agency concludes after a good hard look that the proposed action will not have a significant environmental impact." *Tillamook Cnty. v. United States Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002).

Where, as here, the agency concludes there is no significant effect associated with the proposed project, it may issue a FONSI in lieu of preparing an EIS. *Envtl. Prot. Info. Ctr. v. United States Forest Serv*., 451 F.3d 1005, 1009 (9th Cir. 2006); 40 C.F.R. § 1508.9(a)(1). However, an agency "cannot avoid preparing an EIS by making conclusory assertions that an activity will have only an insignificant impact on the

**MEMORANDUM DECISION AND ORDER - 56**

environment." *Ocean Advocates*, 402 F.3d at 864. The agency "must supply a convincing statement of reasons to explain why a project's impacts are insignificant." *Blue Mts*., 161 F.3d at 1212 (internal quotations omitted).

If the reasons for a finding of no significant impact are arbitrary and capricious and the complete administrative record demonstrates that the project may have significant impact on the environment, ordering the preparation of an EIS is appropriate. *Center for Bio. Diversity*, 538 F.3d at 1179. An agency may first prepare an Environmental Assessment ("EA") to decide whether the environmental impact is significant enough to warrant preparation of an EIS. An EA is arbitrary and capricious if it fails to consider an important aspect of the problem, or "offer[s] an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sierra Club v. United States Envtl. Prot. Agency*, 346 F.3d 955, 961 (9th Cir. 2003).

In sum, to prevail on their claim that the Forest Service violated its statutory duty to prepare an EIS, FOC "need not show that significant effects will in fact occur." *Blue Mountains Biodiversity Project,* 161 F.3d at 1212. It is enough for FOC to raise "substantial questions whether a project may have a significant effect" on the environment. *Id*.

        2.   *Analysis*

The Forest Service concluded that the EOW project was not a major federal action that posed a significant effect on the environment, and thus, no EIS was required. In the DN/FONSI, the Forest Service explained that the "context" of the project was limited in

**MEMORANDUM DECISION AND ORDER  - 57**

size "(approximately 18,000 acres out of 1,708,628 acres (1%) of the Nez Perce –

Clearwater Forests)", and that effects are local in nature and "not likely to significantly

affect regional or national resources." A_000018. The Forest Service considered the

project in the "context of the Forest as a whole." A_000019; A_000176.

Similarly, the Forest Service determined the "intensity" of effects of activities

such as intermediate harvest and prescribed fire, concluding they were insignificant.

A_000177; A_000019. The Forest Service decided "all effects would be minimal or

short-lived." A_000177; A_000019. Further, the Forest Service determined that, in

consideration of "past, present and reasonably foreseeable future actions on National

Forest Land" the effects were found to be insignificant, referring to the specialist reports.

A_000021. In turn, the Wildlife Specialist Report contains a discussion on existing

conditions and anticipated future conditions after project implementation with regard to

old growth. A_018750 – 51.

The Court finds the Forest Service's statement of reasons unconvincing. The

statement does not satisfy NEPA's requirement to take a "hard look" at the impact of the

project given the potential, cumulatively significant impact to old growth stands when

EOW and HR, side by side projects, are considered together. *The Ecology Ctr. v.

Kimbell*, No. CV04-557-C-EJL, 2005 WL 1027203, at \*3 (D. Idaho Apr. 28, 2005) (one

factor used to determine whether an EIS is necessary is whether it is reasonable to

anticipate a cumulatively significant impact on the environment.). Neither the DN/FONSI

nor the EA for EOW offers any discussion of the synergistic impact of HR and EOW on

old growth within the Nez Perce - Clearwater Forest. The adjacent projects  utilize the

**MEMORANDUM DECISION AND ORDER  - 58**

same flawed analysis of FPOG and NIOG to conclude that Forest Plan minimums will be met. However, the EOW project documents contain no discussion regarding the impact of thinning on FPOG or MA20 stands within the EOW project boundaries in relation to HR project activities, which propose to do the same.

Because old growth can take 100 years or more to regenerate, the effects can hardly be described as "short lived." The Forest Service could not have taken a "hard look" at this aspect of the problem when the Forest Plan requires a minimum of 10% FPOG forest wide. Thus, the Court cannot find that the Forest Service took the requisite "hard look" at the impact of the two projects on the forest as a whole in relation to old growth.

Accordingly, the Court finds the EA and the DN/FONSI for EOW did not adequately discuss or analyze the cumulative environmental impact of the two projects in relation to old growth and, therefore, the Forest Service's finding of no significant impact (and no need for an EIS) was in error.

**4.     Endangered Species Act – Fourth, Seventh, Eighth and Ninth Claims for Relief**

FOC challenges the Forest Service's determination that the EOW and HR projects will have "no effect" on the grizzly bear and asserts the Forest Service failed to engage in ESA Section 7 consultation with the United States Fish and Wildlife Service ("FWS"). The Forest Service contends it reasonably concluded the projects will have "no effect" on the viability of the grizzly bear as a species, and thus had no obligation to engage in ESA Section 7 consultation.

A.    *The Endangered Species Act*

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, evidences a congressional intent to afford endangered species the highest of priorities. *TVA v. Hill*, 437 U.S. 153, 194 (1978). Section 7 of the ESA affirmatively commands each federal agency to "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species…or result in the destruction or adverse modification of habitat of such species which is determined…to be critical." 16 U.S.C. § 1536(a)(2). The purpose of consultation is to obtain the expert opinion of wildlife agencies to determine whether the action is likely to jeopardize a listed species or adversely modify its critical habitat and, if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012). A federal action jeopardizes the continued existence of a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (1992).

Under Section 7, if any listed (or proposed listed) species may be present in the area of the proposed action, the federal agency (the "action agency") must prepare a biological assessment (BA) to determine the likely effect of its proposed action on the species. 16 U.S.C. § 1536(c)(1); *see also* 50 C.F.R. §§ 402.02, 402.12(c). A determination by the Forest Service in a BA that an action "may affect" a listed species or

critical habitat gives rise to a consultation requirement under section 7 of the ESA. *Karuk Tribe of Cal.*, 681 F.3d at 1027.

The threshold for a "may affect" determination is low and ensures "actions that have any chance of affecting listed species or critical habitat—even if it is later determined that the actions are not likely to do so—require at least some consultation under the ESA." *Karuk Tribe of Cal*., 681 F.3d at 1027. "[A]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character" triggers the consultation requirement. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). An agency may avoid the consultation requirement only if it determines that its action will have "no effect" on a listed species or critical habitat. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv*., 100 F.3d 1443, 1447–48 (9th Cir. 1996).

Because the ESA does not specify a standard of review, the Court looks to the APA, and must uphold agency action unless it is arbitrary, capricious, an abuse of discretion, or contrary to law. *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007); 5 U.S.C. § 706(2)(A). While the Court's review under the APA is generally limited to the administrative record, the ESA provides a citizen suit remedy. The Court may consider evidence outside the administrative record for the limited purposes of reviewing suits brought pursuant to the citizen suit provision. *Kraayenbrink*, 632 F.3d at

497. Thus, the Court may consider evidence outside the administrative record for the limited purpose of reviewing FOC's Eighth and Ninth Claims for relief.[20]

**B.      *The Forest Service's "No Effect" Finding***

The FWS's "may be present" determination was based upon the sighting of two bears, one in 2019 and a second in 2020. C_000711. Both were males that had disbursed from the Cabinet Mountains of northwest Montana and northern Idaho. As a result of these bear sightings, in late 2020, the FWS updated its maps of where grizzly bears "May Be Present" to include the EOW and HR project areas. C_000711. *See also* A_000654; B_024031. In compliance with Section 7(c) and 50 C.F.R. § 402.12(c)-(d), FWS provided the Forest Service with a list of threatened and endangered species that "may be present" in the project areas, which included the grizzly bear. A_000642; A_000654; B_024006.

The Forest Service completed biological assessments for both EOW and HR to determine if the proposed actions "may affect" or are "likely to adversely affect" the grizzly bear. A_000652-56. B_024029-33. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.12(f), 402.14(a), (b)(1). The Forest Service concluded that the projects would have "No Effect" on the grizzly bear. A_000656; B_024032-33. This conclusion was based primarily upon the fact that the 2019 White Bird bear "was a male dispersing from habitat approximately 200 miles from the project areas, and no further reports of grizzly

---

[20] FOC submitted the Declaration of David Mattson, a grizzly bear expert, in support of its Eighth and Ninth Claims for relief. (Dkt. 27-6.) The Forest Service moved to strike the declaration, arguing that the statements contained therein are not supported by any scientific authority, are speculative, and were not before the agency. The Court has considered the Mattson declaration pursuant to *Kraayenbrink*, 632 F.3d at 497, and the motion to strike the same is therefore denied.

**MEMORANDUM DECISION AND ORDER  - 62**

bears in either project area had been reported, indicating the bear was a transient bear." It was also believed that the 2020 grizzly bear sighting, confirmed by the presence of grizzly bear tracks at the Fish Creek Meadows winter recreation area, was the same bear as the 2019 White Bird bear because of its proximity to the 2019 sighting. C_000711; A_000654; B_024031. The Forest Service relied also upon the lack of documented populations or female bears in the Bitterroot Ecosystem, which is currently designated as "unoccupied per the definition of a population of grizzly bears" in the Bitterroot Environmental Impact Statement. C_000712. *See also* A_000655 – 56. (BA, EOW); B_024029 – 33 (BA, HR).

The Forest Service submitted the biological assessments to FWS and informally met with the FWS on December 18, 2020, at a Level 1 Team Meeting to discuss the "No Effect" finding. C_000711-12. *See* 50 C.F.R. § 402.12(j).[21] While the FWS does not provide Letters of Concurrence with "No Effect" determinations, the FWS acknowledged the Forest Service's determination of "No Effect" based upon the Forest Service's identified factors. C_000712; A_000656; B_024033.

C.    *Analysis*

FOC asserts two primary reasons for challenging the Forest Service's "No Effect" finding. First, FOC claims that the Forest Service's determination that the Bitterroot Ecosystem is "unoccupied" by grizzly bears is inconsistent with FWS's "May Be

---

[21] The regulation provides that: "[t]he Federal agency shall submit the completed biological assessment to the Director for review. The Director will respond in writing within 30 days as to whether or not he concurs with the findings of the biological assessment. At the option of the Federal agency, formal consultation may be initiated under § 402.14(c) concurrently with the submission of the assessment."

Present" determination, citing *Alliance for the Wild Rockies v. Kruger*, 950 F.Supp.2d 1172, 1181 (D. Mont. 2013). Second, FOC challenges the Forest Service's assumption that the 2019 White Bird bear was a transient bear based upon the Mattson declaraion. Mattson expressed the opinion that it is "highly likely that grizzly bears will pass through or even attempt to take up residence in or near both project areas during the next 10 to 15 years." Mattson Decl. ¶ 14. (Dkt. 27-6.) Thus, Mattson disagrees with each of the Forest Service's conclusions upon which it based its "No Effects" determination. Mattson Decl. ¶¶ 14 – 22.

FOC's first argument conflates the standard applicable to a determination that an animal "may be present" with the standard for determining "no effect." It is true that a finding of "may be present" does not require occupancy. *Friends of Clearwater v. Petrick*, No. 2:20-CV-00243-BLW, 2022 WL 622460, at *7 (D. Idaho Mar. 2, 2022) (citing *Native Ecosystems Council v. Kruger*, 946 F.Supp.2d 1060, 1074 (D. Mont. 2013)). In *Kruger*, the court explained that, even if territory is "unoccupied," grizzly bears "may be present" if transient bears may move through the area, thus requiring an agency to prepare a BA. 946 F.Supp.2d at 1076. Here, the Forest Service prepared a BA for both projects based upon the FWS's "may be present" determination.

Next, the Ninth Circuit expressly recognizes that a "no effect" determination may result even if the FWS previously determined a species "may be present." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 596 (9th Cir. 2014) (citing 50 C.F.R. § 402.14) (explaining that if the BA concludes "no effect is found, consultation is not required."); *see also Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1027

**MEMORANDUM DECISION AND ORDER  - 64**

(9th Cir. 2012) ("An agency may avoid the consultation requirement only if it determines that its action will have "no effect" on a listed species or critical habitat") (citing *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447–48 (9th Cir. 1996)).

The Court finds the Forest Service's "no effect" finding based upon its conclusion that bears do not "occupy" the project areas is not arbitrary and capricious. The Forest Service relied on its own evidence and reports to conclude that, currently, there are no grizzly bears occupying either project area, and that both bear sightings were of transient bears. While there may be a difference of opinion, and FOC offers the Mattson Declaration as evidence that bears may pass through or someday take up residence in the project areas,[22] an agency has "discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Lands Council v. McNair*, 537 F.3d 981, 1000 (9th Cir.2008) (en banc). That appears to be the case here.

FOC simply disagrees with the Forest Service, contending that evidence of transient bears outside the project areas compels a conclusion that bears may already be moving through the project areas. *See* note 22. But the same evidence supports the Forest Service's conclusion as well. The Forest Service also relied on the absence of female bears in the Bitterroot Ecosystem, and its judgment that the 2020 bear tracks were from the White Bird bear. The Court finds the Forest Service's interpretation of the evidence is

---

[22] Mattson opined grizzly bears are "highly likely" to "pass through or even attempt to take up residence in or near both project areas during the next 10 to 15 years." Decl. of Mattson ¶ 14. (Dkt. 27-6.) However, the Forest Service also knew grizzly bears were present in the greater Nez Perce National Forest. C_027407; C_027725; C_027764.

**MEMORANDUM DECISION AND ORDER - 65**

not a clear error of judgment. *All. for the Wild Rockies v. Bradford*, 864 F. Supp. 2d 1011, 1019 (D. Mont. 2012), *amended in part*, No. CV 09-160-M-DWM, 2012 WL 12892360 (D. Mont. July 23, 2012).[23] The Court's role is simply to ensure that the Forest Service made "no clear error of judgment that would render its action arbitrary and capricious." *Marsh*, 490 U.S. at 378. The Court finds that the Forest Service offered a reasoned choice backed by the record.

FOC's additional challenges[24] are premised upon an assumption that transient bears are present in the project area. Because the Court finds the Forest Service's "no effect" determination was not arbitrary and capricious, it does not reach FOC's additional challenges.

## 5.    Remedies

FOC insists that, for any violation identified, the Court must vacate the Forest Service's approval of the EOW and HR projects. The Forest Service argues, however, that it should be entitled to additional briefing on remedies, suggesting that the Court is not obligated to vacate agency decisions they find invalid, but must instead consider how

---

[23] The court in *Bradford* upheld the Forest Service's "no effect" finding for grizzly bears based upon the Forest Service's reasoned conclusion that grizzly bears did not "occupy" the project area. *Bradford*, 864 F. Supp. 2d at 1021. *Krueger* does not compel a different result here, because in *Krueger*, the Forest Service's "no effect" finding conflicted with its reasoning that "transient bears might move through the project area." *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1079 (D. Mont. 2013). The court distinguished *Bradford*, because there, the Forest Service "clearly articulated the Forest Service's argument that the project at issue would not impact grizzly bears because there were none in the area." *Id.*

[24] FOC contends the Forest Service: 1) did not consider the increase in road density and other short term impacts to grizzly bears; 2) ignored the risk of human/grizzly conflicts based upon the number of workers required to complete the projects over the course of thirteen years; and, (3) did not address the disturbance impacts to grizzly bears from light, noise, and vehicles. These challenges may be relevant had the Forest Service assumed grizzlies would pass through the project areas. *See Krueger*, 946 F.Supp.2d at 1079-80. But the Forest Service made no such assumption, nor was it required to do so. *See Bradford*, 864 F.Supp.2d at 1021.

**MEMORANDUM DECISION AND ORDER  - 66**

serious the agency's errors are in relation to the disruptive consequences of vacatur on the projects. The Forest Service contends it spent years developing the projects and that FOC's alleged errors do not implicate all project operations.

The Administrative Procedure Act directs that a court "shall…set aside" any agency action found to be "arbitrary, capricious,…or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Supreme Court has held that vacatur is the presumptive remedy for this type of violation. *See Fed. Election Comm'n v. Akins,* 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case."). Having found violations of the NFMA and NEPA related to the Forest Service's analyses of old growth in the two project areas, the Court concludes that remand is the appropriate remedy in this case. *See Am. Bird Conservancy, Inc. v. FCC,* 516 F.3d 1027, 1034–35 (D.C. Cir. 2008). Further, given the above disposition, the projects will be enjoined until the agency satisfies its obligations under the NFMA and NEPA. *See Lands Council v. Powell,* 395 F.3d 1019, 1037 (9th Cir. 2005).[25]

---

[25] The Court reviewed the authorities cited by the Forest Service in support of its argument that the Court has the power to tailor its remedies under the APA. However, neither of the authorities cited for the proposition that the Court could do so implicated NEPA or the NFMA. *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (considering validity of conservation easements under the APA, and reviewing whether title could be rescinded); *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (reviewing the propriety of vacatur of an EPA rule under the APA).

**MEMORANDUM DECISION AND ORDER  - 67**

## CONCLUSION

Pursuant to the above discussion, Plaintiff's motion for summary judgment will be granted, and Defendants' and Intervenor-Defendant's cross motion will be denied, with respect to the First, Third, and Sixth claims for relief, as well as the NEPA claims related to the same in the Second and Fifth claims for relief set forth in the Amended Complaint. For all other claims, Defendants' and Intervenor-Defendant's cross motions for summary judgment will be granted, and Plaintiff's motion for summary judgment will be denied.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)   Plaintiff's Motion for Summary Judgment (Dkt. 27) is **GRANTED in PART AND DENIED IN PART**.

2)   Defendant's Cross Motion for Summary Judgment (Dkt. 29) is **GRANTED IN PART AND DENIED IN PART**.

3)   Intervenor's Cross Motion for Summary Judgment (Dkt. 30) is **GRANTED IN PART AND DENIED IN PART**.

4)   Plaintiff's Motion to Strike (Dkt. 42) is **GRANTED IN PART AND DENIED IN PART**.

5)   The Decision Notice and Finding of No Significant Impact for End of the World are hereby reversed and remanded to the United States Forest Service for preparation of an environmental impact statement under NEPA consistent with this decision.

6)   The Record of Decision and the Final Environmental Impact Statement for Hungry Ridge are hereby remanded to the United States Forest Service for further evaluation under the NFMA and NEPA consistent with this decision.

6)   The End of the World Project and the Hungry Ridge Project are hereby enjoined.

DATED: June 24, 2022

Candy W. Dale
U.S. Magistrate Judge

MEMORANDUM DECISION AND ORDER - 69